# EXHIBIT A

```
1                IN THE UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF DELAWARE

3

4    BELVAC PRODUCTION MACHINERY,    )
     INC.,                           )
5                                    )
                     Plaintiff,      )
6                                    ) C.A. No. 25-166-JLH
     v.                              )
7                                    )
     ADONIS ACQUISITION HOLDINGS LLC,)
8                                    )
                     Defendant.      )
9

10                                   J. Caleb Boggs Courthouse
                                     844 North King Street
11                                   Wilmington, Delaware

12                                   Wednesday, April 16, 2025
                                     1:04 p.m.
13                                   Motion Hearing

14
     BEFORE:  THE HONORABLE JENNIFER L. HALL, U.S.D.C.J.
15

16   APPEARANCES:

17           CONNOLLY GALLAGHER LLP
             BY:  ARTHUR G. CONNOLLY, III, ESQUIRE
18           BY:  ALAN R. SILVERSTEIN, ESQUIRE

19                   -and-

20           McGUIREWOODS
             BY:  DAVID E. FINKELSON, ESQUIRE
21           BY:  KYLE S. SMITH, ESQUIRE

22                                   For the Plaintiff

23
             RICHARDS LAYTON & FINGER, P.A.
24           BY:  KELLY E. FARNAN, ESQUIRE

25                   -and-
```

APPEARANCES CONTINUED:

MERCHANT & GOULD P.C.
BY:  HEATHER J. KLIEBENSTEIN, ESQUIRE

-and-

PROSKAUER ROSE LLP
BY:  DAVID A. MUNKITTRICK, ESQUIRE

For the Defendant

*** PROCEEDINGS ***

DEPUTY CLERK:  All rise.  Court is now in session.  The Honorable Jennifer L. Hall presiding.

THE COURT:  Okay.  Please be seated.

Okay.  We're here for a hearing today in *Belvac Production Machinery Incorporated vs. Adonis Acquisition Holdings LLC*.  It's Civil Action Number 25-166.

Let's go ahead and put our appearances on the record, starting with Plaintiff.

MR. CONNOLLY:  Good afternoon, Your Honor.  Arthur Connolly from Connolly Gallagher.  With me today are my partner, Alan Silverstein, from Connolly Gallagher.  And our co-counsel David Finkelson and Kyle Smith from McGuireWoods.

Excuse me.  Also with us today is our witness.  It's Stephen Packer.

THE COURT:  Very good.

MR. CONNOLLY:  Thank you, Your Honor.

01:04:52  1            THE COURT:  Nice to see everybody.

01:04:55  2            MS. FARNAN:  Good afternoon, Your Honor.  Kelly

01:04:57  3    Farnan from Richards Layton & Finger on behalf of the

01:04:59  4    Defendant, Adonis Acquisition.  I have from Merchant & Gould

01:05:03  5    Heather Kliebenstein.  From Proskauer, David Munkittrick.

01:05:07  6    And then we also have our CEO, John Sacksteder, in the back.

01:05:11  7            THE COURT:  All right.  Good to see everybody.

01:05:13  8            Okay.  I can tell you that we've looked at the

01:05:18  9    briefs closely and the attachments that were provided.  I

01:05:23 10    think we have a really good understanding about what

01:05:26 11    happened here and so -- but we put the time on the calendar,

01:05:35 12    so you have the time, if you need it, to make your

01:05:38 13    arguments.

01:05:38 14            Did we decide how we want to proceed?  Are we

01:05:41 15    just doing the preliminary injunction hearing today or are

01:05:43 16    we also hearing argument on the motion to dismiss?

01:05:47 17            MR. FINKELSON:  Your Honor, Dave Finkelson on

01:05:50 18    behalf of Belvac.  I think we're doing both.

01:05:53 19            Adonis had expressed an interest in presenting

01:05:55 20    argument or limited argument on the motion to dismiss.  I

01:05:58 21    think our proposal and plan was to proceed with the

01:06:02 22    preliminary injunction motion first.  We do have a witness

01:06:05 23    who we intend to present testimony in support of the

01:06:07 24    preliminary injunction, Mr. Packer.

01:06:09 25            I will also follow that with argument on our

01:06:12 1    motion and then would expect counsel for Adonis to respond

01:06:15 2    to that argument, present any argument on its motion to

01:06:18 3    dismiss, which we would then rebut and or respond to in the

01:06:21 4    time allotted.

01:06:22 5              THE COURT:  Any objection to proceeding that

01:06:24 6    way?

01:06:24 7              MS. KLIEBENSTEIN:  Would you like me to step up

01:06:27 8    here?

01:06:27 9              THE COURT:  Sure.

01:06:27 10             MS. KLIEBENSTEIN:  No.  No objection, Your

01:06:29 11   Honor.

01:06:29 12             My thought with the motion to dismiss is

01:06:33 13   everything that will need to be said about it will also be

01:06:36 14   said in the context of the preliminary injunction.  And I

01:06:39 15   would expect to cross Mr. Packer contemporaneous with his

01:06:43 16   direct exam.

01:06:44 17             THE COURT:  That's fine.  All right.

01:06:46 18             MS. KLIEBENSTEIN:  Thank you.

01:06:47 19             THE COURT:  Let's proceed.

01:06:57 20             MR. FINKELSON:  Dave Finkelson from McGuireWoods

01:06:58 21   on behalf of the Plaintiff, Belvac Production Machinery, in

01:06:59 22   support of our motion for preliminary injunction, which we'd

01:07:02 23   like to start, Your Honor, by calling Stephen Packer to the

01:07:04 24   stand to give testimony in support of the motion.

01:07:12 25             THE COURT:  That's fine.  Please come forward

Packer - Direct

01:07:14 1   and approach the witness stand.

01:07:23 2              Remain standing.

01:07:25 3              DEPUTY CLERK:  Please remain standing and raise

01:07:31 4   your hand.

01:07:31 5              Please state and spell your name for the record.

01:07:34 6              THE WITNESS:  Stephen Packer.  S-T-E-P-H-E-N.

01:07:37 7   P-A-C-K-E-R.

01:07:39 8              DEPUTY CLERK:  Do you swear or affirm that the

01:07:41 9   testimony you give to the Court will be the truth, the whole

01:07:43 10  truth and nothing but the truth, so help you God, or do you

01:07:46 11  so affirm?

01:07:46 12             THE WITNESS:  I do so affirm.

01:07:46 13             STEPHEN PACKER, after having been duly affirmed,

01:07:48 14  testified as follows:

01:07:48 15             DEPUTY CLERK:  Thank you.  You may be seated.

01:07:51 16             THE COURT:  Let's proceed.

01:07:53 17             MR. FINKELSON:  Thank you, Your Honor.

01:07:53 18                     DIRECT EXAMINATION

01:07:53 19  BY MR. FINKELSON:

01:07:53 20  Q.     Good afternoon, sir.  Can you please introduce

01:07:55 21  yourself to the Court?

01:07:56 22  A.     Good afternoon.  My name is Stephen Packer.

01:07:58 23  Q.     By whom are you employed, Mr. Packer?

01:08:00 24  A.     I work for Belvac Production Machinery in Lynchburg,

01:08:00 25  Virginia.

Packer - Direct

01:08:05 1    Q.      What is your title with Belvac?

01:08:06 2    A.      I'm the electrical engineering manager.

01:08:10 3    Q.      How many years have you spent at Belvac altogether,

01:08:12 4    Mr. Packer?

01:08:12 5    A.      Next month I'll be 15 years there.

01:08:17 6    Q.      What is your role as the electrical engineering

01:08:19 7    manager at Belvac?

01:08:20 8    A.      My team designs and -- the control system for our

01:08:29 9    machinery.  That includes the hardware and the software in

01:08:34 10   there, and we end up working very closely with our customers

01:08:38 11   as needed.  Yeah.

01:08:41 12   Q.      And when you talk about the machines at Belvac, do

01:08:45 13   those machines include can necking machines also referred to

01:08:48 14   as neckers?

01:08:49 15   A.      Yes, they do.

01:08:50 16   Q.      Do those machines also include what are known as

01:08:54 17   bodymakers?

01:08:54 18   A.      Yes.

01:08:56 19   Q.      Do you have experience specifically, Mr. Packer, with

01:08:58 20   the Belvac can making machinery, including the neckers and

01:09:02 21   bodymakers used at Adonis' facility in Salt Lake City, Utah?

01:09:07 22   A.      Yes, I do.  My team and I designed those,

01:09:11 23   commissioned them at Belvac facility and then were

01:09:16 24   instrumental in the startup at the Salt Lake City facility

01:09:22 25   as well.

Packer - Direct

01:09:23  1   Q.      And are you personally knowledgeable regarding the

01:09:26  2   software that's embedded in the Belvac equipment at the

01:09:29  3   Adonis facility?

01:09:29  4   A.      Yes, I am.

01:09:31  5   Q.      How many different types of Belvac software are

01:09:34  6   deployed at the Adonis facility?

01:09:35  7   A.      There are three.

01:09:37  8   Q.      And can you explain to the Court, please, what those

01:09:40  9   three are?

01:09:40 10   A.      Yes.  The necker programmable logic controller, we

01:09:45 11   usually just say PLC for short.  The bodymaker, BPLC

01:09:51 12   program.  And intelligent manufacturing system.  Another

01:09:57 13   acronym we say, IMS.  And, yes.

01:09:59 14   Q.      And what, generally, is the IMS software?

01:10:02 15   A.      The IMS software resides on an industrial PC in the

01:10:08 16   necker control panel, and it receives data from the necker

01:10:15 17   about rejected cans in a way that allows the operator or

01:10:22 18   quality control person to make quality control decisions on

01:10:25 19   the rest of the can-making line.

01:10:28 20   Q.      Now, with respect to the three categories of software

01:10:32 21   that you've described, the PLC software for the neckers, the

01:10:36 22   PLC software for the bodymakers and the IMS software, does

01:10:41 23   Belvac have copyright registrations for all of the software

01:10:44 24   in those categories as deployed at Adonis' facility?

01:10:47 25   A.      Yes, they do.  In fact, I was helpful in registering

Packer - Direct

01:10:51  1    those.

01:10:53  2    Q.    At a high level, can you explain to the Court what

01:10:57  3    functions are performed by the PLC software on the neckers

01:11:01  4    at Adonis' facility?

01:11:02  5    A.    Yes.  The necker PLC program controls everything.

01:11:10  6    Without that program, there would be nothing going on with

01:11:13  7    that machine.  It wouldn't -- wouldn't turn a light on or it

01:11:17  8    wouldn't run a motor.

01:11:20  9            It also does rudimentary -- sorry, alarms and

01:11:27 10    messages to the operator.  It works with the can lubrication

01:11:34 11    system.  Controls that, controls the machine lubrication

01:11:39 12    system.

01:11:40 13            There's also some very complex sequences that it

01:11:46 14    controls such as wreckage detection.  We also have a

01:11:52 15    high-speed selective sorter which is used by the quality

01:11:56 16    control team at the customer's plant to selectively sort

01:12:03 17    certain cans into a track that is then fed to a third-party

01:12:07 18    can inspection system where it measures all sorts of

01:12:11 19    physical characteristics and things of that nature.

01:12:16 20    Q.    What about the bodymakers at Adonis' facility, what

01:12:19 21    are the functions performed by the PLC software in the

01:12:23 22    bodymakers?

01:12:23 23    A.    Yeah.  The bodymaker PLC software, similar to the

01:12:28 24    necker, controls the entire machine.  Nothing would happen

01:12:32 25    with that machine.  No functions would occur without that

Packer - Direct

01:12:36  1    software.

01:12:38  2              Similar to the necker, again, rudimentary things

01:12:41  3    such as status, false alarms.  But then there's some unique

01:12:47  4    things to the bodymaker such as short can detection.  And

01:12:52  5    then it also controls a very precise trim height to the can.

01:13:01  6    Q.    Does the PLC software on the neckers and bodymakers

01:13:06  7    also perform a safety function?

01:13:07  8    A.    Yes, it does.

01:13:09  9    Q.    And can you explain how that -- how that is?

01:13:12 10    A.    Yeah.  Both on the necker PLC software and the

01:13:16 11    bodymaker PLC software, they are both deeply integrated into

01:13:21 12    the control system, the safety system for each of those

01:13:25 13    machines.  There are guards, switches that it is monitoring

01:13:30 14    for the doors and other access points.

01:13:33 15              And then when there's an emergency stop, then

01:13:36 16    it, again, works with the safety system to safely remove

01:13:42 17    all -- all energy and power from the machine.

01:13:46 18    Q.    Thank you, Mr. Packer.

01:13:47 19              Now, one of the issues in this case is whether,

01:13:50 20    in the course of operating the Belvac neckers and

01:13:54 21    bodymakers, Adonis will make copies of the Belvac software.

01:13:57 22    Are you prepared to speak to that issue?

01:13:58 23    A.    Yes, I am.

01:13:59 24    Q.    In the course of operating these Belvac machines, are

01:14:02 25    there scenarios in which Adonis necessarily will make copies

Packer - Direct

01:14:07  1    of the Belvac software?

01:14:08  2    A.    Yes.  I can think of two.

01:14:10  3    Q.    And what are those two distinct scenarios, sir?

01:14:13  4    A.    When the PLC is rebooted, you know, powered off and

01:14:18  5    then powered back on, and then when an external device such

01:14:22  6    as a laptop is connected to the PLC.

01:14:28  7    Q.    Let's start with the power off and then power on

01:14:31  8    reboot scenario.  And just to be clear when the necker --

01:14:35  9    when the -- strike that.

01:14:36 10          Just to be clear, when the Belvac necker and

01:14:38 11    bodymaker PLCs are powered on or rebooted, is a copy made of

01:14:42 12    the Belvac PLC software?

01:14:44 13    A.    Yes, it is.

01:14:47 14    Q.    And can you walk the Court through how that occurs,

01:14:49 15    please?

01:14:50 16    A.    Yes.  The Belvac software is stored long term on a

01:14:58 17    secure digital card, an SD card, that's in the processor of

01:15:02 18    the PLC.  When you power it up, a copy of that program is

01:15:09 19    then copied over to the nonvolatile -- excuse me, the

01:15:13 20    volatile ram, random access memory of the PLC.

01:15:18 21    Q.    And does that process happen each time the PLC is

01:15:21 22    powered on and rebooted?

01:15:23 23    A.    Every time.

01:15:24 24    Q.    Okay.  And does that copy that is created, upon power

01:15:27 25    on or reboot, remain in the ram of the PLC?  And if so,

Packer - Direct

01:15:32  1   until when?

01:15:32  2   A.     It does remain in the ram until the power is turned

01:15:36  3   off of the PLC.

01:15:37  4   Q.     And do you know all of this from your personal

01:15:40  5   experience working with the Belvac necker and bodymaker

01:15:43  6   PLCs?

01:15:43  7   A.     Yes, I am.  Yes, I do.

01:15:45  8   Q.     Did you confirm that personal knowledge in any other

01:15:47  9   sources?

01:15:48 10   A.     Yes, confirmed it with a -- a user manual for the PLC

01:15:54 11   from Rockwell.  And that Rockwell is the brand of

01:15:59 12   programmable logic controllers that are used on the

01:16:03 13   bodymakers and the neckers.

01:16:08 14        MR. FINKELSON:  Your Honor, I'm going to share

01:16:10 15   an exhibit on the screen with the witness.  May I approach

01:16:12 16   to give the Court some copies?

01:16:14 17        THE COURT:  Yes.  Yes.

01:16:14 18   BY MR. FINKELSON:

01:16:31 19   Q.     I've put up on the screen, Mr. Packer, a document

01:16:34 20   that appears in Exhibit 1 to a declaration that you

01:16:37 21   submitted in this case in support of the preliminary

01:16:40 22   injunction motion.

01:16:40 23        Can you just identify, please, for the Court

01:16:43 24   what we're looking at here?

01:16:46 25   A.     Yes.  This is the document that I declared and it is

Packer - Direct

01:16:51  1    the user manual -- programming manual for the nonvolatile

01:16:58  2    memory card for the Rockwell Programmable Logic Controllers.

01:17:02  3                MR. FINKELSON:  And, Your Honor, I believe this

01:17:03  4    is already in evidence for purposes of the motion by virtue

01:17:05  5    of the papers.  But to the extent I need to move it into

01:17:09  6    evidence, I do now do so.

01:17:10  7                THE COURT:  Any objection?

01:17:12  8                MS. KLIEBENSTEIN:  No, Your Honor.

01:17:14  9                THE COURT:  All right.  The document handed up

01:17:15 10    to the Court marked as Appendix 1 is admitted into evidence.

01:17:19 11                (Appendix No. 1 was admitted into evidence.)

01:17:21 12                MR. FINKELSON:  Mr. Smith, can you please turn

01:17:22 13    us to Page 9?

01:17:22 14    BY MR. FINKELSON:

01:17:25 15    Q.    We're looking now at Page 9 of Appendix 1.

01:17:29 16                Can you explain to the Court, please,

01:17:31 17    Mr. Packer, how what appears here on Page 9 confirms your

01:17:35 18    testimony regarding reproduction upon a power on or reboot?

01:17:38 19    A.    Yeah.  The middle section there, which is highlighted

01:17:42 20    now, the last sentence, "When this occurs, you can load the

01:17:48 21    copy from the memory card to the user memory of the

01:17:51 22    controller:  Whenever it powers up."

01:17:54 23    Q.    And that's consistent with your personal experience

01:17:57 24    dealing with these -- with this PLC software, that you have

01:18:01 25    an automatic copying of the software upon a reboot; is that

Packer - Direct

01:18:06  1    right, sir?

01:18:06  2    A.    That is correct.

01:18:08  3    Q.    What would be some of the reasons --

01:18:09  4          MR. FINKELSON:  You can take that down,

01:18:12  5    Mr. Smith.  Thank you.

01:18:12  6    BY MR. FINKELSON:

01:18:13  7    Q.    What would be some of the reasons, Mr. Packer, like

01:18:15  8    that a customer like Adonis would reboot the necker and

01:18:18  9    bodymaker PLCs?

01:18:19 10    A.    I can think of four different reasons.

01:18:21 11    Q.    And can you explain what those are, please, sir?

01:18:23 12    A.    Yes.  Just the normal maintenance, certain --

01:18:31 13    performing certain maintenance tasks and repairs would

01:18:35 14    require turning off power to the whole control panel, which

01:18:39 15    would then, of course, power off the PLC.  And I'm just

01:18:44 16    talking about things that happen all the time.

01:18:48 17          Like if I was to work on our washer in our

01:18:52 18    basement, the clothes washer, I would -- first thing, I

01:18:55 19    would unplug this.  Unplug the washer before I tore it

01:19:00 20    apart.

01:19:01 21          Similar to this, when anyone is working in the

01:19:05 22    necker for extended periods of time, you need to power off.

01:19:10 23    And these certain maintenance tasks could be replacing a

01:19:19 24    bearing, or a bushing or even exchanging the tooling which

01:19:23 25    are used in the necker to shape the top of the can.

14

Packer - Direct

01:19:29  1    Q.      That's one category.

01:19:30  2            What's the second instance --

01:19:32  3    A.      Yes.

01:19:32  4    Q.      -- in which a customer like Adonis would reboot the

01:19:35  5    necker and bodymaker PLCs?

01:19:37  6    A.      They would need to turn off the logic control panel.

01:19:41  7    Again, turning off the PLC if a device -- electronic device

01:19:45  8    in the control panel failed and needed to be replaced.

01:19:50  9    Q.      Okay.

01:19:52 10            Moving to a third category.  What about hardware

01:19:54 11    changes or modifications?

01:19:56 12    A.      Exactly.  Third would be the modifications such as

01:20:00 13    adding anything to the necker or taking some modules off of

01:20:05 14    our necker would require that.

01:20:07 15            And then the fourth one, if I may, would just be

01:20:10 16    any power outage that might occur from weather or any other

01:20:17 17    event that turns power off in the plant.

01:20:20 18    Q.      How frequently do at least one of these things

01:20:23 19    generally occur necessitating a reboot, in your experience?

01:20:26 20    A.      The -- the first one for sure all the time.  Very

01:20:30 21    frequently.  Multiple times a month, if not -- yeah, many

01:20:36 22    times.

01:20:37 23    Q.      Okay.  Have you reviewed the declaration submitted in

01:20:41 24    this case by Jerry Gilbert of Adonis?

01:20:44 25    A.      Yes, I have.

Packer - Direct

01:20:45  1    Q.     And do you recall Mr. Gilbert's statement that Adonis

01:20:49  2    has not yet powered off and rebooted the PLCs in the short

01:20:53  3    time since Adonis --

01:20:55  4                    MR. FINKELSON:  Bless you, Your Honor.

01:20:55  5                    THE COURT:  Thank you.

01:20:55  6    BY MR. FINKELSON:

01:20:57  7    Q.     Do you recall Mr. Gilbert's statement that Adonis has

01:20:59  8    not yet powered off or rebooted the PLCs in the short time

01:21:03  9    since Adonis took ownership of the Belvac machinery?

01:21:06 10    A.     I have read that.  Yes, sir.

01:21:07 11    Q.     And what do you make of that, sir?

01:21:08 12    A.     If they haven't already, they will.  It is imminent

01:21:12 13    and unavoidable.

01:21:14 14    Q.     Let's move from the power on reboot category to the

01:21:17 15    second category of copying that you identified with respect

01:21:22 16    to external device access.  Can you first explain why a

01:21:28 17    customer like Adonis would access the Belvac necker and

01:21:32 18    bodymaker PLC software from an external device?

01:21:36 19    A.     Yes.  Any time they need to review the PLC program,

01:21:44 20    troubleshoot the PLC program, you know, for whatever reason,

01:21:47 21    the necker has stopped and it's not obvious from the

01:21:51 22    messages on the screen why it stopped and how to resolve it,

01:21:55 23    they would need to go online with the PLC using an external

01:22:00 24    device such as a laptop.

01:22:03 25                    And then the last one would be to make changes

Packer - Direct

01:22:06 1    to the program, and they would be making changes.  It's not

01:22:10 2    infrequent.  You know, the needs of the can plant are going

01:22:13 3    to change, and so they want to be able to change the PLC

01:22:19 4    program as needed.

01:22:21 5    Q.    Do you recall Mr. Gilbert's own testimony in his

01:22:23 6    declaration about another circumstance in which access to

01:22:27 7    the PLC code would be needed?

01:22:30 8    A.    Yes.  Mr. Gilbert declared that there are technicians

01:22:36 9    that need to change certain operating parameters, and he

01:22:40 10   mentioned speed, I believe.

01:22:44 11   Q.    The situation where a copy is created using external

01:22:47 12   device access, how would you describe the frequency with

01:22:51 13   which that occurs?

01:22:52 14   A.    It will be happening very frequently.  Yeah, almost

01:23:01 15   all the time.  Yeah.

01:23:03 16   Q.    Do Adonis personnel have the ability to access the

01:23:06 17   PLC software from an external device?

01:23:09 18   A.    According to Mr. Gilbert's declaration, they own two

01:23:16 19   copies of Rockwell Automation Studio 5000 Application on two

01:23:22 20   different laptops.

01:23:24 21   Q.    Along with the license and access rights that come

01:23:27 22   with that; is that right?

01:23:28 23   A.    That come with the Rockwell software, yes.

01:23:31 24   Q.    And the ability of those Adonis personnel to access

01:23:35 25   the PLC software, does that include an ability to access the

Packer - Direct

01:23:41 1    safety system aspects of the Belvac software?

01:23:43 2    A.    Yes, they can access all parts, including the safety

01:23:47 3    aspects.

01:23:47 4    Q.    Is any different password required to do that?

01:23:50 5    A.    There are no passwords.

01:23:52 6    Q.    And similarly to what we talked about on the -- of

01:23:54 7    the power on reboots, do you understand that Mr. Gilbert has

01:23:58 8    stated by declaration that Adonis has not yet accessed the

01:24:01 9    PLC software from an external device since the purchase?

01:24:04 10   A.    Yes.  I read that in his declaration.

01:24:06 11   Q.    And what's your view of that with respect to external

01:24:09 12   device access?

01:24:10 13   A.    It's going to happen.  It is imminent.  And, yeah, to

01:24:15 14   continue to make cans in a most efficient way and respond

01:24:21 15   to -- the most to the changes that the plant requires,

01:24:25 16   they're going to need to access, you know, the PLC program

01:24:29 17   with a laptop or other device.

01:24:31 18   Q.    And just so the record's clear, when the Belvac

01:24:34 19   necker and bodymaker PLC software is accessed from an

01:24:38 20   external device such as a laptop for any purpose, is a copy

01:24:42 21   made of the Belvac software?

01:24:43 22   A.    Yes, it is.

01:24:49 23   Q.    Can you explain each of the different ways that a

01:24:52 24   copy of the Belvac PLC software is created in the external

01:24:56 25   device access scenario?

Packer - Direct

01:24:58  1   A.      I can think of two ways.  The first is if there's not

01:25:04  2   a copy already of the Belvac software on the laptop, in that

01:25:12  3   instance, a technician or an electrician would go to the

01:25:15  4   necker or bodymaker PLC with that laptop and run -- running

01:25:22  5   Rockwell Automation Studio 5000 application, they would

01:25:26  6   upload the program from the PLC onto the laptop's hard drive

01:25:34  7   long-term storage; and therefore, a copy would be made.

01:25:37  8   Q.      And what's the second alternative scenario?

01:25:40  9   A.      Second alternative would be if they already have a

01:25:44 10   copy on the laptop, a copy of the Belvac software, then they

01:25:51 11   would just -- whenever they open up the program using

01:25:58 12   Rockwell's software, a copy would be made from the laptop's

01:26:03 13   hard drive into the laptop's ram.

01:26:07 14   Q.      So as to the first example you provided for, how long

01:26:10 15   does the local copy of the software remain in the external

01:26:14 16   device's nonvolatile memory?

01:26:17 17   A.      Until the technician would delete it.

01:26:21 18   Q.      Okay.  And as to the second example that you provided

01:26:23 19   for, how long does the copy of the software remain in the

01:26:27 20   external device's ram?

01:26:29 21   A.      Until the technician or electrician closes that

01:26:34 22   program.

01:26:34 23   Q.      Okay.  Let me change gears and talk about the necker

01:26:39 24   parts.

01:26:40 25           First, has Belvac recently delivered certain

Packer - Direct

01:26:42  1    can-making parts to Adonis?

01:26:44  2    A.     Yes, they have.

01:26:45  3    Q.     And do you refer to those in your declarations as the

01:26:48  4    necker parts?

01:26:49  5    A.     Yes.

01:26:50  6    Q.     What more specifically are the necker parts?

01:26:52  7    A.     These are five necking modules and an intermediate

01:26:58  8    in-feed module.  So our neckers -- in particular, our

01:27:03  9    modular -- kind of think of it as a train, you know, with

01:27:09 10    box cars.  So if you want to neck the top of the can down a

01:27:14 11    lot, you would just have more modules.  Okay.  Different

01:27:18 12    size tooling in each one.

01:27:20 13            So these five necking modules and this

01:27:26 14    intermediate in-feed module are going to be inserted into

01:27:29 15    the middle of this necker on Line 1.

01:27:34 16    Q.     Let me ask you this:  Do the necker parts themselves

01:27:37 17    have any software?

01:27:38 18    A.     No, they do not.

01:27:40 19    Q.     So, based on your knowledge and experience with those

01:27:43 20    necker parts and with the equipment that's already at the

01:27:46 21    Adonis facility, what does Adonis need to do to put those

01:27:50 22    parts in operation?

01:27:51 23    A.     Need to do a lot of things, but two are relevant

01:27:55 24    here.  They need to be -- power off the control panel;

01:28:00 25    therefore, the PLC, and they need to modify the software.

Packer - Direct

01:28:06 1    Q.    Okay.  Let's talk about each of those.

01:28:08 2            Why is that power off and then rebooting

01:28:12 3    necessary in order for Adonis to put the necker parts into

01:28:17 4    operation?

01:28:17 5    A.    Again, as I mentioned, you know, we're splitting --

01:28:20 6    they are going to be splitting apart the necker.  And, yeah,

01:28:25 7    OSHA would require -- does require that they power off.  The

01:28:30 8    machine is powered by, you know, 480 volts AC.  Just like I

01:28:36 9    would turn off my washer machine if I was working on that.

01:28:40 10            And this is much more than just a simple repair.

01:28:42 11   This is tearing -- taking the machine completely apart.  So,

01:28:46 12   yes, they would turn off the power and lock out the control

01:28:52 13   panel.

01:28:53 14   Q.    And just to give the Court a sense of the size and

01:28:56 15   scope of the machinery we're talking about, can you --

01:28:59 16   A.    Yeah.

01:29:00 17   Q.    -- describe that please?

01:29:01 18   A.    Yeah, from my seat to that exit sign.

01:29:04 19   Q.    And how heavy is this equipment?

01:29:06 20   A.    Oh, tons.  Each module, you need to use a forklift to

01:29:09 21   move.

01:29:10 22   Q.    All right.  What about the external device access

01:29:14 23   that you mentioned to modify the PLC software to accommodate

01:29:18 24   the necker parts, why is that necessary?

01:29:20 25   A.    Without that, the PLC program will not recognize the

Packer - Direct

01:29:27  1    new parts.  They're getting a new motor and a new varile

01:29:34  2    speed drive that controls the motor.  And without

01:29:37  3    programming changes, it won't -- the program will not

01:29:41  4    recognize the new VFD, varile frequency drive.  It won't

01:29:46  5    recognize any of the sensors.

01:29:49  6           Yeah.  Nothing would work on the intermediate

01:29:53  7    in-feed.  It won't be lubricating cans on that intermediate

01:29:57  8    in-feed and on and on.

01:30:00  9    Q.    Will each of these steps that you've talked about

01:30:02 10    with the necker parts, the powering off and back on of the

01:30:07 11    PLC and the access and modification of the necker PLC

01:30:12 12    software, result in copies being made of the Belvac

01:30:15 13    software?

01:30:15 14    A.    Yes.

01:30:16 15    Q.    And is that for all the reasons you described earlier

01:30:18 16    in the context of the reboot process and the external device

01:30:23 17    access?

01:30:23 18    A.    Yes, sir.  Exactly.

01:30:25 19    Q.    Let me move to a final topic.  You've testified in

01:30:27 20    your declaration about the issue of irreparable harm; is

01:30:31 21    that right?

01:30:31 22    A.    Yes, I have.

01:30:34 23    Q.    As a layperson, Mr. Packer, what do you understand

01:30:37 24    irreparable harm to mean?

01:30:38 25    A.    Damage to our reputation and goodwill in the

Packer - Direct

01:30:44 1   industry.  And when you do that, you can't put an estimate

01:30:48 2   on the -- on the dollar amount of that.

01:30:52 3   Q.      If Adonis is permitted to use and reproduce the

01:30:55 4   Belvac software, will Belvac suffer harm that it can't

01:30:58 5   quantify in dollars?

01:30:59 6   A.      Yes, it will.

01:31:01 7   Q.      And are there specific examples of why Belvac

01:31:05 8   believes that to be the case?

01:31:06 9   A.      I could think of three.  Irreparable harm to our

01:31:11 10  reputation and goodwill in the industry in regards to

01:31:16 11  safety.

01:31:18 12          Same thing.  Irreparable harm to our good name

01:31:23 13  and reputation with regard to quality.  And also just loss

01:31:28 14  of control of our intellectual property.

01:31:32 15  Q.      Let's talk about each of those briefly, and let's

01:31:34 16  start with safety.

01:31:36 17          First, what steps does Belvac take to ensure the

01:31:40 18  safe operation of its neckers and bodymakers?

01:31:42 19  A.      Okay.  While we're designing the neckers and

01:31:46 20  bodymakers, we're working -- my team, it is working very

01:31:50 21  closely with mechanical engineers, and we come up with a

01:31:55 22  risk assessment.  And so based on the risk assessment, we

01:31:59 23  put up guarding and then determine what kind of sensors to

01:32:05 24  be used for those guards.  How many E-stop push buttons, how

01:32:10 25  to remove power safely on an emergency stop, all those

Packer - Direct

01:32:14  1    things are considered.

01:32:15  2              So when we are building and we have -- when we

01:32:19  3    have built, and assembled and tested each of the neckers and

01:32:25  4    bodymakers in our Lynchburg facility, the last step that we

01:32:29  5    do before we start tearing it up so we can ship it is to do

01:32:34  6    a complete safety validation and verification based on

01:32:38  7    that -- that risk assessment.

01:32:40  8    Q.    And you used the word "E-stop."  What does the E

01:32:43  9    refer to?

01:32:43 10    A.    I'm sorry.  Emergency stop.

01:32:45 11    Q.    Okay.  So you talked about the safety certification

01:32:48 12    that is done at the Lynchburg facility.

01:32:51 13              How about upon installation of --

01:32:53 14    A.    Yes.

01:32:53 15    Q.    -- the neckers and bodymakers?

01:32:55 16    A.    Our service personnel, once they're done, they verify

01:33:01 17    that the safety system is working as required as well.

01:33:05 18    Q.    How about post-installation?

01:33:07 19    A.    Our service personnel are constantly rotating in and

01:33:13 20    out of our customers' can plants.  They're in there for all

01:33:18 21    sorts of reasons, for training, for helping with

01:33:24 22    maintenance, for doing some upgrades as we've discussed.

01:33:29 23              So when they see the machine behaving in a way

01:33:33 24    that they know shouldn't or just are questioning it, they

01:33:37 25    will contact my team or the electrical engineers and then we

Packer - Direct

01:33:41  1    will work with the customer to make any changes as required.

01:33:44  2    Q.    And those customers that you referred to, are they

01:33:46  3    all licensees of the Belvac software?

01:33:49  4    A.    Yes, they are.

01:33:50  5    Q.    To your understanding, is Adonis a licensee of the

01:33:54  6    Belvac software?

01:33:55  7    A.    My understanding -- sorry.  My understanding is, no,

01:33:57  8    they're not.

01:34:03  9              MR. FINKELSON:  Your Honor, there's one other

01:34:05 10    document that I would like to share with the witness.  May I

01:34:07 11    approach with copies?

01:34:09 12              THE COURT:  Yes.

01:34:11 13              MR. FINKELSON:  I don't need to move this into

01:34:26 14    evidence, Your Honor, but for the record, this is one of

01:34:28 15    Mr. Gilbert's declarations that he submitted in conjunction

01:34:32 16    with the preliminary injunction briefing.

01:34:39 17              Mr. Smith, can you take us to Paragraph 8,

01:34:42 18    please, of this March 17th, 2025 declaration and highlight

01:34:47 19    the third sentence?

01:34:47 20    BY MR. FINKELSON:

01:34:49 21    Q.    Do you see here, Mr. Packer, Mr. Gilbert's testimony

01:34:53 22    that the Belvac safety code software ensures that critical

01:34:59 23    safety components of the equipment are operational?

01:35:03 24    A.    I couldn't agree with him more.  I wholeheartedly

01:35:07 25    agree with that.

Packer - Direct

01:35:08  1    Q.     Let's look at another statement in this Paragraph 8

01:35:13  2    that --

01:35:14  3                MR. FINKELSON:  If you could highlight the first

01:35:15  4    sentence, please, Mr. Smith.  The very first one.

01:35:15  5    BY MR. FINKELSON:

01:35:27  6    Q.     You see where it says, "The software includes safety

01:35:31  7    code that neither I nor other personnel at Adonis are able

01:35:35  8    to modify"?

01:35:36  9    A.     I do.  I have read that.

01:35:38 10    Q.     And later on, a few sentences down, it notes that,

01:35:42 11    according to Mr. Gilbert, "Adonis is unable to modify the

01:35:46 12    safety code."

01:35:47 13                Do you see that?

01:35:47 14    A.     Yes, I do.

01:35:48 15    Q.     Is Mr. Gilbert correct about those statements?

01:35:51 16    A.     He is not correct.  Those -- those are -- he is

01:35:54 17    misunderstood.  He misunderstands.

01:35:56 18    Q.     And what is -- what are the accurate facts with

01:36:00 19    respect to Adonis' personnel's ability to access the safety

01:36:04 20    code in the Belvac software?

01:36:05 21    A.     Yeah.  Belvac does not password protect any parts of

01:36:10 22    the Belvac software.  Mr. Gilbert has already declared that

01:36:18 23    Adonis has two copies of the Rockwell software necessary to

01:36:22 24    make changes on those laptops; and, therefore, they are able

01:36:28 25    to modify not only the -- well, they're able to modify the

Packer - Direct

01:36:33  1    safety answer of the PLC program.

01:36:36  2    Q.      Thank you, Mr. Packer.

01:36:37  3            This may be an obvious question, but what are

01:36:40  4    the potential safety consequences if Belvac loses its

01:36:44  5    ability to control the software embedded in the machines at

01:36:49  6    Adonis, including the safety software?

01:36:51  7    A.      Oh, God forbid anyone gets hurt or even killed in

01:36:56  8    these machines.  They are dangerous equipment going at high

01:36:59  9    speeds.  The top speed for the necker is 3,000 cans per

01:37:03 10    minute.  It is a fast-moving machine.

01:37:07 11            If there were changes made that are outside of

01:37:12 12    Belvac's control that negatively affect the safe operation

01:37:15 13    of the machine and someone gets hurt, Belvac's reputation

01:37:21 14    and goodwill in the industry would be irreparably harmed.

01:37:26 15            The canning industry is a very close-knit

01:37:30 16    industry.  I almost guarantee that, you know, all -- most of

01:37:34 17    the big players in the can industry know that there are

01:37:38 18    Belvac bodymakers and neckers at the Adonis facility.

01:37:44 19    Q.      All right.  Let's move from the safety-related issues

01:37:46 20    to the quality-related harm that you identified.

01:37:49 21            Can you elaborate on that?

01:37:50 22    A.      Well, similar to the safety, if there are changes

01:37:56 23    made to the Belvac software on the bodymaker or the necker

01:38:02 24    that Belvac is not in control of, or, you know, monitoring

01:38:06 25    through our service personnel's witnessing of the machine

Packer - Direct

01:38:12 1    function, the can quality can certainly degrade.  And

01:38:18 2    there -- in addition to that, you know, the throughput of

01:38:23 3    the machine might be negatively affected which would, again,

01:38:28 4    get out in the industry, and Belvac would -- would be

01:38:35 5    irreparably harmed to that.  Our good name would be

01:38:38 6    tarnished because of that.

01:38:39 7    Q.    How would those can quality issues or delays flow

01:38:42 8    downstream to customers?

01:38:44 9    A.    Well, they could have defects that cause leaks in the

01:38:50 10   cans.  They could have all sorts of issues such as that, or

01:38:53 11   just not getting the quantity of cans they need in a timely

01:38:57 12   manner.

01:38:57 13   Q.    And would that adversely affect Belvac's reputation?

01:39:00 14   A.    It would definitely get out that those cans are not

01:39:03 15   or those machines, excuse me, are not performing as

01:39:07 16   expected.  And it would -- it would tarnish our reputation.

01:39:09 17   Q.    And, lastly, can you speak further to the harm that

01:39:12 18   would result from Belvac losing control over its

01:39:17 19   intellectual property?

01:39:20 20   A.    This one hurts me the most almost because I've

01:39:23 21   already put 15 years developing the software.  Countless

01:39:28 22   hours, man-hours, not only of my time, but other engineers.

01:39:32 23   We've spent, you know, all sorts of money developing this

01:39:36 24   software.  We've developed -- we've built prototypes.  We've

01:39:41 25   had all sorts of investments to get to the point where our

Packer - Cross

01:39:45  1    software is what it is today.  And to have no control over

01:39:51  2    that software and it to be used in an unlicensed manner

01:39:56  3    would irreparably harm Belvac.

01:39:58  4    Q.    Would it deprive Belvac of a competitive advantage

01:40:02  5    that it otherwise has --

01:40:03  6    A.    Oh, sure.

01:40:03  7    Q.    That it otherwise has in the marketplace?

01:40:06  8    A.    My apologies.  Yes, it would.  I -- I am very proud

01:40:11  9    of the competitive advantages that we have built into the

01:40:14 10    software that no other customer -- no other competitor has.

01:40:20 11              MR. FINKELSON:  Thank you, Mr. Packer.

01:40:21 12              Your Honor, I'll pass the witness, subject to

01:40:25 13    the right to redirect, if necessary.

01:40:27 14              THE COURT:  Thank you.

01:40:27 15                   CROSS-EXAMINATION

01:40:27 16    BY MS. KLIEBENSTEIN:

01:40:50 17    Q.    Let me get situated.  It goes quicker when I'm

01:40:54 18    organized.

01:40:57 19              All right.  Good afternoon, Mr. Packer.

01:41:14 20    A.    Good afternoon.

01:41:15 21    Q.    My name is Heather Kliebenstein and I represent the

01:41:19 22    Defendants in this matter.  And I'll be asking you a few

01:41:21 23    questions about your testimony.

01:41:23 24              I will try not to repeat what's in the

01:41:27 25    declarations so as to be efficient.  Working from the end to

Packer - Cross

01:41:36  1    the front of your testimony, you were just talking about the

01:41:41  2    safety features in the Belvac code.

01:41:43  3            Do you recall that testimony?

01:41:44  4    A.    Yes, ma'am.

01:41:45  5    Q.    And we looked at a declaration from Mr. Gilbert who

01:41:51  6    is from Adonis and it -- you know, from my perspective, it

01:41:56  7    appears like the parties agree that the safety code is

01:41:59  8    important.

01:41:59  9            Would you agree with that?

01:42:00 10    A.    Very much so.

01:42:01 11    Q.    And Vobev, now Adonis, they've been in the canning

01:42:07 12    industry for several years; correct?

01:42:08 13    A.    Yes.

01:42:09 14    Q.    So they're not, you know, brand new setting up the

01:42:12 15    very first factory.  They've been running it for several

01:42:15 16    years.  They know how to work with the equipment; correct?

01:42:17 17    A.    Belvac has been there training them for quite a

01:42:21 18    while, yes.

01:42:23 19    Q.    Understood.  But the point remains that Vobev, now

01:42:31 20    Adonis, isn't a brand new kid on the block, if you will?

01:42:37 21    A.    Okay.  I accept that.

01:42:43 22    Q.    And I recall another declaration that you signed that

01:42:48 23    stated "Belvac locks the safety logic and creates a unique

01:42:55 24    safety signature."

01:42:56 25    A.    Yes.

Packer - Cross

01:42:56  1    Q.      Do you recall that?

01:42:58  2    A.      Yes.

01:42:59  3    Q.      It's not just out there in the open.  Things have to

01:43:02  4    be done to get into the safety code; right?

01:43:03  5    A.      That's correct.  And I'd like to elaborate, if I may.

01:43:09  6    Q.      I appreciate that.  Your counsel can ask you that

01:43:13  7    question.

01:43:13  8    A.      Very good.

01:43:20  9    Q.      I note in your testimony that you didn't mention the

01:43:24 10    April 7th date in your final declaration in this matter.

01:43:26 11    You stated that Adonis would be installing the new necker

01:43:31 12    equipment on April 7th.

01:43:32 13            Do you recall that?

01:43:33 14    A.      I think it needed to ship from our facility by that

01:43:37 15    date, and I believe it did.  But I'm not in control of that.

01:43:41 16    Q.      So you don't know if Adonis has received the

01:43:43 17    equipment?

01:43:44 18    A.      I know that they have, yes.  I heard -- I have heard

01:43:47 19    feedback that they have received it.

01:43:48 20    Q.      Okay.  And the necker equipment that we're talking

01:43:55 21    about, remind me, where are the facilities from which

01:44:01 22    equipment ships for Belvac?

01:44:03 23    A.      Our Lynchburg facility.  Lynchburg, Virginia.

01:44:07 24    Q.      Any others?

01:44:08 25    A.      For -- for these machines, no.

Packer - Cross

01:44:11  1    Q.      Are you sure about that?

01:44:11  2    A.      We have shipped decorators from other places and

01:44:17  3    we've shipped -- but for the Belvac equipment that we're

01:44:22  4    talking about --

01:44:22  5    Q.      Mm-hmm.

01:44:23  6    A.      -- the bodymakers and the neckers, they're coming

01:44:26  7    from Lynchburg.

01:44:27  8    Q.      Is there a facility in Belgium?

01:44:28  9    A.      The Netherlands, not Belgium.

01:44:32 10    Q.      Apologies.  The Netherlands?

01:44:34 11    A.      Almost got me.

01:44:36 12    Q.      There's a facility in the Netherlands; correct?

01:44:38 13    A.      They make decorators.  Yes.

01:44:40 14    Q.      And would it surprise you if some of the equipment

01:44:42 15    was coming from the Netherlands?

01:44:44 16    A.      The necker equipment that we're talking about, the

01:44:48 17    five neck and intermediate in-feed?

01:44:52 18    Q.      The equipment that Adonis is receiving pursuant to

01:44:58 19    the Critical Vendor Agreement.

01:44:59 20    A.      I don't have any knowledge of the Critical Vendor

01:45:03 21    Agreement.

01:45:03 22    Q.      Okay.  So you're not sure about all the equipment

01:45:05 23    that was ordered and is being delivered?

01:45:07 24    A.      That's correct.  I'm only aware of the five necking

01:45:10 25    module and the intermediate in-feed per line, one necker.

Packer - Cross

01:45:13  1    Q.    And as to the install date, have you been advised

01:45:16  2    that Adonis has told personnel at Belvac that the install

01:45:23  3    project is on hold, that it's not -- there's no plan for it

01:45:26  4    at the moment?

01:45:28  5    A.    I think I had heard that, yes.

01:45:29  6    Q.    You've heard that?

01:45:31  7            And what exactly have you heard relating to that

01:45:34  8    topic?

01:45:34  9    A.    Only that it's on hold.

01:45:38 10    Q.    And so that part of your declaration that the install

01:45:40 11    was going to happen on April 7th is not correct?

01:45:43 12    A.    I believe I stated that it needed to be shipped from

01:45:47 13    our Lynchburg facility by April 7th.

01:45:58 14    Q.    You mentioned that the equipment, the new equipment,

01:46:04 15    does not have any software on it; is that right?

01:46:06 16    A.    That is correct.

01:46:07 17    Q.    And why not?

01:46:08 18    A.    It's just hardware.  There's no processor shipping

01:46:17 19    with those parts.

01:46:19 20    Q.    Okay.  Let's back up and talk about the software that

01:46:49 21    runs the neckers and the software that runs the bodymakers

01:46:53 22    where you started your testimony.

01:46:54 23    A.    Okay.

01:46:55 24    Q.    And I recall that you talked a lot about the various

01:46:58 25    functions that the software performs for the neckers and the

Packer - Cross

01:47:01  1    bodymakers.  Am I characterizing that correctly?

01:47:03  2    A.    Yes.

01:47:04  3    Q.    Would you characterize the software as functional?

01:47:07  4    A.    Yes.

01:47:17  5    Q.    And the functions that you listed, those are -- would

01:47:24  6    you call those essential functions to run the equipment?

01:47:27  7    A.    Yes, lubrication and alarms and -- yes.

01:47:39  8    Q.    Do you know -- moving into the relationship with

01:47:42  9    Vobev over the years.  You testified earlier that you've

01:47:47 10    worked with Vobev; correct?

01:47:49 11    A.    Yes.  I've traveled at least twice there.

01:47:51 12    Q.    At least twice.  The last time you were boots on the

01:47:54 13    ground was September 2022?

01:47:55 14    A.    Me personally, but I think there's been other Belvac

01:47:58 15    people there since then.

01:47:59 16    Q.    You personally.  So two-and-a-half years ago, you

01:48:03 17    personally; correct?

01:48:03 18    A.    Yes.  Yes, ma'am.

01:48:04 19    Q.    And what type of work did you do at the two visits?

01:48:07 20    A.    The first was the initial installation of the first

01:48:13 21    machine.  I was helping with that.  High visibility and we

01:48:17 22    wanted to make sure an electrical engineer was there.

01:48:19 23          The second, I believe, was for integration of a

01:48:24 24    custom software in the PLC for the necker line, one where it

01:48:30 25    would send data to a third-party can inspection machine.  So

Packer - Cross

01:48:37 1    that was custom software that we were installing for them.

01:48:41 2    Q.    Are you aware of how much Vobev has paid Belvac over

01:48:45 3    the years for the equipment?

01:48:46 4    A.    No, I'm not.

01:48:48 5    Q.    Would it surprise you if it was over $60 million?

01:48:51 6    A.    No, it wouldn't.

01:48:54 7    Q.    And with regard to services, would you -- would

01:48:59 8    you -- Belvac offers customization services for the

01:49:05 9    software; correct?

01:49:06 10   A.    Yes.  We just talked about one.  Yes.

01:49:10 11   Q.    Yes.  Yes.

01:49:11 12         And so that's to get the machines up and running

01:49:14 13   at the specification that a particular customer needs;

01:49:17 14   right?

01:49:17 15   A.    Mm-hmm.  Yes.

01:49:18 16   Q.    Would it surprise you that -- well, how are those

01:49:23 17   services charged and paid for with Belvac?  Is that hourly

01:49:27 18   or is it different?

01:49:28 19   A.    For installation?

01:49:32 20   Q.    For installation.  Let's take it one by one.

01:49:35 21   A.    Yeah.  I believe -- I'm not involved in it, so I'm --

01:49:41 22   you know, I'm not a good expert on this part of it, but our

01:49:45 23   service coordinator would provide an estimate to the

01:49:50 24   customer plant based on specifics of the machine that

01:49:52 25   they're installing.  How many man-hours it would take to do

Packer - Cross

01:49:56  1    that, and then time and materials.  Yeah.

01:50:01  2    Q.    Would it surprise you if Vobev had paid Belvac over

01:50:05  3    10 million for services over the years?

01:50:07  4    A.    No, it wouldn't.  From what I've heard, we've had

01:50:10  5    thousands of hours of training and retraining and, yeah, a

01:50:17  6    lot of time there.

01:50:18  7    Q.    And customization; correct?

01:50:20  8    A.    And customization; that's correct.

01:50:32  9    Q.    Would you agree that if the Belvac software was

01:50:36 10    removed today from the neckers and the bodymakers that they

01:50:41 11    would cease to function; correct?

01:50:43 12    A.    Yes, that's what I've just testified.

01:51:05 13    Q.    Let's talk about computing for a minute, if we can.

01:51:12 14    So you testified earlier that it's your understanding --

01:51:14 15    it's your belief that when the machines are booted on and

01:51:18 16    off, the PLC is booted on or off that the SD card, the

01:51:25 17    nonvolatile memory, whether it's flash or SD card, that

01:51:28 18    makes a copy of the software and puts it into ram; correct?

01:51:31 19    A.    Yes, ma'am.  Yes.

01:51:31 20    Q.    That's a very traditional computing structure; isn't

01:51:34 21    that right?

01:51:35 22    A.    Yeah.

01:51:36 23    Q.    And that's because the SD card, that's what stores

01:51:42 24    software?

01:51:42 25    A.    That is correct.

Packer - Redirect

01:51:43  1    Q.    And the ram is what runs it?

01:51:45  2    A.    That is correct.

01:51:46  3    Q.    So two different functions; correct?

01:51:48  4    A.    Yes, but a copy is made.

01:52:11  5    Q.    And I asked you earlier:  That's a traditional way

01:52:15  6    that computers -- computing devices run; correct?

01:52:18  7    A.    It's my understanding, yes.

01:52:19  8    Q.    That's because software doesn't operate -- doesn't

01:52:23  9    run from the SD card, it only runs from ram; right?

01:52:26 10    A.    For the PLC, yes.  That's correct.

01:52:29 11    Q.    So that action, that copying, if it exists, has to

01:52:33 12    happen in order to run the software to run the equipment?

01:52:38 13    A.    Whenever there's a reboot, yes, that has to happen.

01:53:06 14            MS. KLIEBENSTEIN:  No further questions, Your

01:53:07 15    Honor.

01:53:07 16            THE COURT:  Thank you.

01:53:09 17            MS. FARNAN:  I just have a very brief redirect,

01:53:11 18    Your Honor, if I may.

01:53:12 19            THE COURT:  Yes, please.

01:53:12 20               REDIRECT EXAMINATION

01:53:14 21    BY MR. FINKELSON:

01:53:14 22    Q.    Mr. Packer, counsel asked you a moment ago whether

01:53:19 23    the Belvac software is functional, and you said yes.  Do you

01:53:23 24    recall that testimony, sir?

01:53:24 25    A.    Yes, I did.

01:53:25 1    Q.    And did you understand that question to be asking you

01:53:30 2    whether the Belvac software performs functions?

01:53:32 3    A.    Yes.  It controls the necker and it controls the

01:53:38 4    bodymaker.

01:53:39 5    Q.    Okay.  And is that the basis on which you said yes to

01:53:42 6    that question?

01:53:42 7    A.    I don't know of another basis.  Yes.

01:53:46 8    Q.    And you're not a lawyer, are you, Mr. Packer?

01:53:48 9    A.    No, I'm one -- one business law class.  That's it.

01:53:54 10   Q.    Do you have any idea what it means for something to

01:53:56 11   be functional for purposes of copyright law purposes?

01:54:00 12   A.    No, I wouldn't venture to guess.

01:54:02 13   Q.    And your answer wasn't speaking to that in any way,

01:54:05 14   was it, sir?

01:54:06 15   A.    No, not at all.  It was the -- yeah, the software

01:54:09 16   functions as it's intended to control the machine.

01:54:15 17        MR. FINKELSON:  Mr. Packer, thank you for being

01:54:16 18   available here today.  I have no further questions for you.

01:54:19 19        And, Your Honor, I would ask if the witness

01:54:21 20   could be dismissed.

01:54:22 21        THE COURT:  That's fine.  You may step down and

01:54:24 22   you are dismissed.

01:54:25 23        THE WITNESS:  Thank you.

01:54:29 24        MR. FINKELSON:  Your Honor, may I proceed with

01:54:41 25   argument in support of our motion for preliminary

01:54:43 1    injunction?

01:54:44 2                    THE COURT:  You may.

01:54:45 3                    MR. FINKELSON:  For all the ink spilled in the

01:54:47 4    briefing, Your Honor, about use, this is first and foremost

01:54:53 5    a case about Adonis unlawfully copying Belvac's copyrighted

01:54:59 6    software in violation of Belvac's exclusive reproduction

01:55:02 7    rights under the Copyright Act.

01:55:05 8                    And Adonis has known this day was coming from

01:55:07 9    the moment it hatched its plan in the Bankruptcy Court.  A

01:55:11 10   plan to purchase Vobev and to purchase the Belvac can-making

01:55:15 11   equipment at the Vobev facility without having to pay Belvac

01:55:19 12   the more than $13 million still due for that equipment.

01:55:25 13                   To accomplish that plan, Vobev and Adonis

01:55:29 14   rejected the preexisting contracts between Belvac and Vobev.

01:55:35 15   Those contracts provided to Vobev and would have provided to

01:55:38 16   Adonis, had they been assigned a license, to use the Belvac

01:55:44 17   software.

01:55:46 18                   Adonis said, No.  We don't want a license, but

01:55:50 19   we want to use and reproduce Belvac software any way.

01:55:54 20                   And the consequences of that choice have finally

01:55:57 21   come to roost in this Court.  And that's because without a

01:56:02 22   license to the Belvac software and without any ownership

01:56:06 23   rights to the Belvac software, Adonis cannot and should not

01:56:10 24   be permitted to do what it now unabashedly seeks to do.  And

01:56:15 25   that is to make infringing copies of the Belvac software in

01:56:19  1    the course of operating the Belvac machinery.  And we would

01:56:24  2    submit to the Court that Belvac is entitled to a preliminary

01:56:27  3    injunction to ensure that doesn't happen.

01:56:31  4           In my time with the Court today, I'd like to

01:56:34  5    address the first two preliminary injunction factors, the

01:56:37  6    ones on which we bear a prima facie burden, likelihood of

01:56:41  7    success and irreparable harm.  The other two factors are

01:56:47  8    well dealt with, I believe, in the briefing, Your Honor, and

01:56:49  9    both also counsel in favor of a preliminary injunction on

01:56:52 10    these facts.

01:56:53 11           Certainly, if the Court has questions about any

01:56:55 12    of those, or anything else, I'm happy to answer any

01:56:58 13    questions that the Court has.

01:56:59 14           Likelihood of success on the merits, what's the

01:57:03 15    standard?  We have to show we're reasonably likely to

01:57:05 16    prevail on our copyright infringement and declaratory

01:57:11 17    judgment claims.  That means under the Third Circuit case

01:57:13 18    laws articulated in the *Par Pharma* case, we have to show a

01:57:16 19    reasonable chance of winning.  We have to show that that

01:57:18 20    chance is significantly better than negligible, but not

01:57:21 21    necessarily more likely than not.

01:57:22 22           And we far exceed, we submit, that threshold on

01:57:26 23    our claims here based on the evidence of record, which shows

01:57:30 24    copyright infringement based on a violation of Belvac's

01:57:34 25    exclusive reproduction right.  A right that even Adonis

01:57:38  1    acknowledges is codified in the Copyright Act and that is

01:57:43  2    fully implicated here.

01:57:44  3              Adonis essentially makes four arguments to the

01:57:48  4    contrary.  One of those is factual.  Three of them are

01:57:53  5    legal.  And none of which bear scrutiny.

01:57:57  6              I'd like to touch upon each of those, Your

01:57:59  7    Honor, because, frankly, a lot of it popped up in the latter

01:58:02  8    stages of the briefing on the preliminary injunction.

01:58:05  9              As to the factual argument first, the factual

01:58:08 10    argument from Adonis is we haven't done it yet.  We haven't

01:58:13 11    done it yet.

01:58:15 12              That's what Mr. Gilbert said in his declaration.

01:58:19 13    He quite noticeably didn't say, because he couldn't possibly

01:58:23 14    say, that Adonis is not going to reproduce tomorrow or the

01:58:27 15    next day.  And he's not here today to testify to say

01:58:31 16    otherwise.

01:58:31 17              Because there's no question, even if it's true

01:58:35 18    in the short two months time since the acquisition that

01:58:39 19    there hasn't been any reproduction yet, unlawful

01:58:42 20    reproduction by Adonis is inevitable and, in fact, imminent.

01:58:47 21    You heard that from Mr. Packer here today.  That's one of

01:58:50 22    the reasons we thought it was so important, Your Honor, for

01:58:52 23    you to hear from him live, even though he had submitted

01:58:56 24    similar testimony in his declarations.

01:58:59 25              Inevitable and, in fact, imminent.  Adonis

01:59:02  1    itself calls the reproduction essential.  They do that in

01:59:07  2    support of an essential steps defense that I'm going to get

01:59:10  3    to that they don't have, but there's no question that this

01:59:13  4    software and the need to reproduce it is essential.

01:59:18  5            You heard about the two circumstances in which

01:59:21  6    there is going to be a copy made, if there hasn't been one

01:59:24  7    made already, of the Belvac software.  The power on reboot

01:59:30  8    scenario and the external device access scenario.  And the

01:59:34  9    necker parts are a glaring example of the imminence of that.

01:59:37 10            There was some cross-examination on that subject

01:59:39 11    today suggesting that Adonis has put those plans on hold.

01:59:44 12    Adonis hasn't brought a witness here to talk about that.

01:59:47 13    They haven't brought a witness here to say what their plans

01:59:49 14    are.

01:59:51 15            What we know is they rushed into Bankruptcy

01:59:54 16    Court in Salt Lake City and told the Bankruptcy Court they

01:59:57 17    absolutely, positively needed the necker parts immediately

02:00:01 18    or the sky was going to fall.  And we were compelled to

02:00:06 19    deliver those necker parts by a date certain, and we have

02:00:09 20    delivered those necker parts by a date certain.

02:00:12 21            So this argument that I see coming that the

02:00:15 22    necker parts are just parked somewhere at Adonis never to be

02:00:19 23    used, I can't testify to that.  Adonis counsel can't testify

02:00:22 24    to that.  But it certainly would be very contrary to what

02:00:26 25    was represented to the Bankruptcy Court in seeking emergency

02:00:30 1    relief to have those parts delivered.

02:00:33 2            And, again, the necker parts are just a clear

02:00:35 3    example.  There are many others that Mr. Packer testified

02:00:38 4    about of copying that is going to occur either through the

02:00:43 5    power on reboot process or the external device access

02:00:47 6    process.

02:00:47 7            And the *MAI* line of cases, that's from the Ninth

02:00:52 8    Circuit, the *Quantum* case from the Fourth Circuit, the *Live*

02:00:55 9    *On Face* case, all of those cases make clear that copying of

02:00:59 10   the kind that has occurred or will occur in the power on

02:01:03 11   reboot and external device access context are acts of

02:01:08 12   reproduction that constitute copyright infringement.

02:01:11 13           They don't debate that line of cases.  They

02:01:14 14   don't cite any contrary authority.

02:01:17 15           And a preliminary injunction prohibiting from --

02:01:20 16   prohibiting Adonis, excuse me, from doing that is entirely

02:01:25 17   proper in these circumstances.  Section 502(a) of the

02:01:28 18   Copyright Act authorizes injunctions, not to -- just to

02:01:32 19   restrain infringement that is ongoing, but to prevent

02:01:37 20   infringement that hasn't happened yet.

02:01:41 21           The *Naughty's* case from the Eastern District of

02:01:43 22   Texas spells that out.  We also cited the *Violet Crown* case

02:01:48 23   from the Northern District of Texas, which it deals with

02:01:50 24   preliminary injunctions and the related context of trademark

02:01:54 25   infringement.

02:01:54 1          It's all the more appropriate here to issue a

02:01:58 2  preliminary injunction, we would submit, Your Honor, given

02:02:00 3  our declaratory judgment claim.  That claim is directed

02:02:03 4  specifically to imminent infringement.  It's Count II of our

02:02:08 5  Complaint.

02:02:08 6          And imminent infringement is, at best, for

02:02:12 7  Adonis what we have here.  That's the factual argument and

02:02:17 8  it doesn't fly.

02:02:18 9          They make three legal arguments for why those

02:02:24 10  acts of reproduction either don't constitute copyright

02:02:28 11  infringement or fall within an exception.  And I want to

02:02:31 12  address each of those.

02:02:32 13          The first thing I'd say about all three of these

02:02:34 14  arguments is they were raised for the first time in a

02:02:37 15  sur-reply brief.  They address issues that -- at least

02:02:42 16  certain issues that were well covered in our opening brief.

02:02:45 17  They should have been advanced earlier, and we submit that

02:02:48 18  they were waived by not being advanced earlier.  But the

02:02:50 19  fact is that they're simply wrong.

02:02:53 20          The first of those arguments that Adonis makes

02:02:55 21  in sur-reply is that its reproduction is or will be

02:03:01 22  transitory and is, therefore, non-infringing.  The law and

02:03:05 23  the facts are to the contrary on that point, Your Honor.

02:03:09 24          The cases that Adonis itself cites make clear

02:03:14 25  that when a copy is made and exists for more than an

02:03:19  1    infinitesimal amount of time, it is nontransitory and, thus,

02:03:24  2    infringing.  The only example of a transitory instance of

02:03:30  3    copying that Adonis flags in its briefs is from the *Cartoon*

02:03:35  4    *Network* case where the copy was made and existed for

02:03:38  5    1.2 seconds.

02:03:40  6              But Adonis' own cases point out the flip side of

02:03:45  7    the coin.  They point out the circumstances where a copy is

02:03:51  8    nontransitory.

02:03:53  9              And we have at least three examples of

02:03:55 10    nontransitory copies that are flagged by Adonis' own cited

02:04:00 11    cases.  That's *Cartoon Network* and *CDK Global*.  One

02:04:04 12    nontransitory where the copy exists in ram or elsewhere for

02:04:08 13    at least several minutes.  That's *Cartoon Network* discussing

02:04:11 14    the *MAI* case.

02:04:13 15              Or, two, a copy that exists while the computer

02:04:18 16    is in use by a human technician.  That's Adonis' *CDK* case

02:04:24 17    citing the *Triad* case.

02:04:25 18              Or, three, the copy exists until the system is

02:04:29 19    turned off.  Again, *Cartoon Network* discussing *MAI*.

02:04:33 20              Our facts, as you just heard from Mr. Packer,

02:04:37 21    put this case squarely in the nontransitory category,

02:04:41 22    recognized by their own cases.  Whether the copy is made

02:04:45 23    during the PLC power on reboot process or the copy is made

02:04:50 24    during the process of accessing the PLC software from an

02:04:53 25    external device, that copy lasts sufficiently long to meet

02:04:58  1    the reproduction duration threshold.

02:05:01  2            Power on reboot, the copy created lasts in the

02:05:05  3    ram of the PLC all the way until the PLC is powered off,

02:05:09  4    which Adonis itself, in arguing they haven't done it yet in

02:05:12  5    the last two months, concedes can be weeks or months.

02:05:16  6            External device access, the copy that's first

02:05:19  7    created on the external device will last in the nonvolatile

02:05:23  8    memory of the external device until deleted by the user.

02:05:27  9    Again, that could be weeks or months.  And if a copy already

02:05:30 10    exists on the external device and the device accesses it,

02:05:35 11    another copy is created in the ram of the external device

02:05:38 12    and will last there as long as the ram copy remains open on

02:05:43 13    the device.  All examples of quintessentially nontransitory

02:05:48 14    use.  So there is no transitory exception to Adonis'

02:05:54 15    infringement.

02:05:55 16            The second argument they make is that their

02:05:58 17    infringement falls within the exception created by the

02:06:03 18    essential step doctrine.  And they fare no better there.

02:06:07 19            The essential step doctrine, which as Your Honor

02:06:09 20    knows is analogous to the first-sale doctrine, which was

02:06:14 21    briefed extensively by the parties in the Bankruptcy Court

02:06:16 22    and, again, dealt with in our opening brief, can only be

02:06:19 23    invoked by a party who owns, who owns the copy of the

02:06:24 24    software in question.

02:06:24 25            It doesn't matter how essential the software is.

02:06:27  1   We agree it's essential.  You cannot raise the essential

02:06:32  2   step doctrine as a defense if you are not an owner of the

02:06:36  3   copy of the software.

02:06:38  4            Adonis is not, is not such a party.  They are

02:06:44  5   not an owner of any copy of Belvac software.  That was made

02:06:50  6   clear in the Bankruptcy Court, and it's clear from the terms

02:06:53  7   of the underlying agreements between Vobev and Belvac.

02:06:59  8            First, the bankruptcy case.  What happened in

02:07:02  9   the bankruptcy case?  In order to push this sale through and

02:07:07 10   secure approval of it from the Bankruptcy Court, Vobev's

02:07:11 11   counsel, directly and unequivocally, represented to the

02:07:14 12   Bankruptcy Court that Vobev did not own the software.  Vobev

02:07:20 13   was represented by Mr. Galardi of Ropes & Gray.  And we

02:07:25 14   pointed your Court -- the Court to a portion of the

02:07:28 15   transcript from the bankruptcy case where the Bankruptcy

02:07:31 16   Court addressed this issue.

02:07:31 17            It's DI-9-8 at Page 40.  And the Court is

02:07:38 18   reciting the representations that had been made by Vobev and

02:07:41 19   Vobev's counsel.  And the Court said, "I'm sorry, but

02:07:44 20   Mr. Galardi" -- Vobev's counsel -- "says very clearly the

02:07:49 21   software is not the property of the estate.  Vobev doesn't

02:07:54 22   own it."

02:07:55 23            THE COURT:  I just want to be very clear for the

02:07:57 24   record.  There seemed to be, at some portions of the

02:08:05 25   Bankruptcy Court record, some confusion or at least

02:08:12  1    imprecise language distinguishing between intellectual

02:08:18  2    property in terms of rights to the software as opposed to

02:08:22  3    the actual software that resides on the machine.

02:08:24  4            So just very clearly for us, do you understand

02:08:28  5    them to have been telling the bankruptcy Judge that in

02:08:32  6    taking possession of the machines that they would not own

02:08:36  7    the copy of the software that is on the machine?

02:08:40  8            MR. FINKELSON:  Absolutely 100 percent.  And

02:08:42  9    Your Honor is right.  I don't know whether there was

02:08:44 10    confusion.  There was certainly some attempts to kind of, I

02:08:47 11    would say, thread that needle in some of the language that

02:08:50 12    is used -- was used at various times, both by Vobev counsel

02:08:54 13    and Adonis counsel.

02:08:56 14            This is clear.  It's clear from the statements

02:08:59 15    that Mr. Galardi made on the record.  It is clear from the

02:09:03 16    fact that the Court then went on.

02:09:05 17            This is also at DI-9-8 at Page 41.  The Court

02:09:09 18    went on to say, based on that representation that I just

02:09:12 19    read, Your Honor, "I'm going to give you a preliminary

02:09:15 20    ruling that the Debtor does not own this software."

02:09:19 21            It is --

02:09:20 22            THE COURT:  And so -- and I get -- and you

02:09:22 23    understood the Judge to be saying at that point does not own

02:09:24 24    the copy of the software that resides on the machine?

02:09:28 25            MR. FINKELSON:  Absolutely.  As distinguished

02:09:31  1    from does not own the IP, or does not own the intellectual

02:09:34  2    property or doesn't have a license to the intellectual

02:09:37  3    property.  The representation was clear and creates judicial

02:09:43  4    estoppel under the case law cited in our briefs.

02:09:46  5            But, frankly, more importantly, is just clear on

02:09:49  6    behalf of Vobev, which was hand in hand with Adonis through

02:09:52  7    every step of these proceedings.  It was a clear

02:09:55  8    representation about ownership of the software.

02:09:59  9            There were other representations made about IP

02:10:02 10    and about copyrights, but these representations were about

02:10:06 11    the software.  When it came to copyrights, and this is

02:10:10 12    really the bait and switch that we're dealing with here, we

02:10:13 13    tried to stop the sale.

02:10:16 14            We raised copyright infringement as to the

02:10:19 15    distribution.  And Vobev and Adonis said, No, no, Bankruptcy

02:10:23 16    Court, you don't need to worry about that here because

02:10:27 17    Belvac's going to have all of its rights to claim copyright

02:10:30 18    infringement in front of Your Honor in Delaware.

02:10:32 19            Then we get to Delaware --

02:10:33 20            THE COURT:  Well, they said that, but they,

02:10:35 21    also, I think, were clear with the Bankruptcy Court that

02:10:38 22    they thought they were going to beat you here in Delaware --

02:10:38 23            MR. FINKELSON:  Absolutely.

02:10:41 24            THE COURT:  -- for various reasons.

02:10:42 25            MR. FINKELSON:  Absolutely.  They thought they

02:10:44 1    were going to beat us here.  I don't know that they

02:10:46 2    absolutely said, Yes, they have all their rights that they

02:10:49 3    have in Delaware, but lo and behold they have no rights at

02:10:53 4    all, which is what's come out in the briefing.

02:10:55 5          But, nonetheless, as to Your Honor's specific

02:10:57 6    question, this deals with ownership of the copy of the

02:11:02 7    software, not ownership of the IP.  And the Asset Purchase

02:11:07 8    Agreement reflects that, right.  Because in the Asset

02:11:10 9    Purchase Agreement, Vobev only sells to Adonis what it owns.

02:11:14 10         And at Paragraph 2.2 of that Asset Purchase

02:11:18 11   Agreement, I think it's subsection I.  And this is DI-9-7,

02:11:23 12   "Assets that are excluded from the sale include all rights

02:11:27 13   to any software used in any computer equipment included in

02:11:32 14   the purchased assets."

02:11:33 15         And then there's additional language "to the

02:11:35 16   extent not freely transferrable to purchaser."  But there

02:11:39 17   was never an argument in the Bankruptcy Court that the copy

02:11:42 18   of the software was freely transferrable to Adonis free and

02:11:48 19   clear of our copyright infringement claims.

02:11:52 20         THE COURT:  And just to be clear, you understand

02:11:55 21   the Asset Purchase Agreement reference to software to mean

02:11:58 22   the actual copy of the software that resides on the

02:12:01 23   machines?

02:12:02 24         MR. FINKELSON:  I do.  I do in that instance.

02:12:04 25   Yes.

02:12:04  1          THE COURT:  And the reason why I asked was it

02:12:07  2    was not clear to me, looking at the Bankruptcy Court Sale

02:12:13  3    Order, which I'm having a hard time putting my finger on at

02:12:16  4    the moment.  But the part where it talks about having rights

02:12:22  5    to the IP, that makes it sound like something different than

02:12:26  6    what we're talking about here.

02:12:27  7          MR. FINKELSON:  It is.  And that was in -- I

02:12:29  8    would think as best characterized as an -- as an in addition

02:12:33  9    language that we insisted upon for purposes of the sale and

02:12:41 10    got over Adonis' objection in the same hearing transcript

02:12:46 11    that I pointed Your Honor to.  That language about

02:12:49 12    maintaining intellectual property rights, et cetera, et

02:12:52 13    cetera, that was a section that was added to the Asset

02:12:57 14    Purchase Agreement as part of the process that I just

02:13:00 15    described to the Court.

02:13:01 16          THE COURT:  And I don't want to get too far

02:13:04 17    afield here because I understand your inter partes argument,

02:13:10 18    what we're talking about, likelihood of success of showing

02:13:13 19    copyright infringement.  But I think we all understand that

02:13:17 20    part of the reason why we're here today is that -- so

02:13:20 21    there's a record to show the District Court an appeal of the

02:13:26 22    bankruptcy case, what's going on over here, which is fine.

02:13:28 23    So let's all just air it all out.

02:13:30 24          Did the bankruptcy Judge understand that, once

02:13:35 25    that sale went through, that the machines actually had the

02:13:39  1    copy of the software on them, that that was going to get

02:13:43  2    transferred?  Your side made that argument to the Judge.

02:13:46  3    The Judge said they didn't want to hear anything about

02:13:49  4    copyright infringement, which is understandable because it

02:13:52  5    wasn't really appropriate to do that there.

02:13:54  6            But did the Judge understand that the copy was

02:13:56  7    on there and that the copy has now been transferred,

02:13:58  8    notwithstanding that Adonis didn't have title to the copy of

02:14:03  9    the software?

02:14:04 10            MR. FINKELSON:  I rarely say to a Judge that

02:14:07 11    that's an unfair question, but I don't -- I don't know what

02:14:10 12    the Judge actually understood.  We certainly tried to

02:14:14 13    present that issue, Your Honor, to the Judge in the

02:14:17 14    bankruptcy proceeding.

02:14:20 15            My interpretation of what Judge Marker did was

02:14:24 16    to say, All of this stuff can be dealt with in Delaware.

02:14:28 17    I'm moving -- I'm approving the sale.  The equipment -- the

02:14:33 18    equipment is owned by Adonis -- owned by Vobev and is being

02:14:38 19    sold to Adonis.

02:14:39 20            As to the copy of the software, he specifically

02:14:42 21    said, I'm giving you a preliminary ruling that they don't

02:14:45 22    own the software.  They are not transferring ownership of

02:14:49 23    the software.  I do think he understood that they were

02:14:52 24    transferring a copy of the software that they do not own to

02:14:57 25    Vobev.

02:14:57  1          And left for this Court to decide the to the

02:15:03  2   extent not freely transferrable to the purchaser issue

02:15:07  3   which, again, I mean, we're talking about what happened in

02:15:09  4   front of the bankruptcy case.  We found that evidence

02:15:12  5   compelling.

02:15:12  6          But the fact is if this Court does the analysis

02:15:15  7   of the essential step doctrine in the first instance, we get

02:15:19  8   to the same outcome.  Because if you look at the factors for

02:15:23  9   determining ownership versus license, take the factors set

02:15:27 10   out in the Ninth Circuit in the *Vernor* case, right.  You

02:15:30 11   look at three things.

02:15:31 12          You look at the underlying agreements to see

02:15:34 13   whether they specify that the user is granted a license.

02:15:37 14   You look at whether those underlying agreements

02:15:40 15   significantly restrict the user's ability to transfer the

02:15:44 16   copy of the software, and or you look at whether the

02:15:48 17   agreements impose notable use restrictions.

02:15:51 18          And on all three counts, these underlying

02:15:55 19   agreements with Vobev could not be clearer, we would submit

02:15:58 20   to the Court.  The language that I would direct Your Honor

02:16:01 21   to for consideration -- there are multiple contracts entered

02:16:06 22   between Vobev and Belvac, so you have all of those in the

02:16:09 23   record.  They're identical in all material respects to this

02:16:12 24   issue.

02:16:13 25          The key section is Section 12.05.  And the cases

02:16:17  1    that debate, right, Adonis cites the *Krauss* case, and says

02:16:22  2    the *Krauss* case is totally on par with this case.  Let me

02:16:26  3    remind Adonis and the Court, there was no license, written

02:16:29  4    License Agreement in the *Krauss* case.

02:16:31  5          The cases that debate whether a license really

02:16:35  6    means that it's a license don't have anything like the

02:16:39  7    language that is in Section 12.05, which makes it

02:16:44  8    unequivocal that there is no ownership to the software copy

02:16:48  9    being given to Vobev.  It says, "Software is licensed, not

02:16:53 10    sold, for Purchaser's use."

02:16:55 11          It goes on to say, just so there's no confusion,

02:16:58 12    the "Aforementioned license confers no title or ownership in

02:17:03 13    the Purchaser to the software and may not be construed as

02:17:09 14    any sale of any rights in the software to the Purchaser."

02:17:14 15          It's not saying the IP.  It's not saying the

02:17:17 16    copyrights.  It is saying the software, which is precisely

02:17:22 17    the issue presented in the essential step and first-sale

02:17:29 18    doctrine case law that deals with ownership versus license.

02:17:32 19          So that should end the inquiry, but the

02:17:36 20    agreements went on to deal with there being no right to

02:17:39 21    transfer.  Second factor that the framework asks us to look

02:17:44 22    at.

02:17:45 23          12.05 says, "The license is non-transferrable."

02:17:50 24          It then goes on later in 12.05.  12.05(a) and

02:17:55 25    says, I'm quoting, but with ellipses, "Purchaser shall not

02:18:01  1    transfer the software."

02:18:07  2            So transfer is absolutely prohibited in the

02:18:09  3    terms of the agreement, which is an indication of a license,

02:18:12  4    not ownership.

02:18:13  5            Same goes for use restrictions.  12.05 refers to

02:18:17  6    the license as a "limited license."  It can only be used

02:18:23  7    specifically for one thing, "solely in connection with the

02:18:27  8    operation of the equipment."

02:18:29  9            There's limitations in 12.05(a) about various

02:18:34 10    uses that Vobev, as a licensee, could not make of the

02:18:39 11    software.  In 12.05(b), the use of the software must cease

02:18:45 12    upon default.  So this isn't like *Krauss* where the use was

02:18:48 13    in perpetuity.  The agreement itself says "must cease use

02:18:52 14    upon default."

02:18:53 15            And then you have Belvac also having audit

02:18:56 16    rights to audit any use of the software by the licensee.  So

02:19:02 17    you have a clear unequivocal expression in the contract that

02:19:06 18    it's licensed not owned.  You have transfer restrictions

02:19:10 19    that are wholly consistent with that in the agreements

02:19:13 20    themselves.  And you have use restrictions that are wholly

02:19:16 21    aligned with that in the agreement themselves as well.

02:19:18 22            So whatever weight the Court wants to give to

02:19:22 23    the Bankruptcy Court statements, both in characterizing what

02:19:26 24    Vobev said with Adonis' blessing or what the Judge said in a

02:19:31 25    preliminary ruling, it doesn't change the analysis.  If the

02:19:35 1    Court does this analysis in the first instance here and

02:19:39 2    looks at the relevant factors, this is not an ownership

02:19:44 3    situation.  And with no ownership in the software by Adonis,

02:19:48 4    there is no essential step defense.

02:19:51 5            THE COURT:  Can I just ask you:  How do I

02:19:53 6    connect the Court's "preliminary ruling" to what it

02:19:57 7    ultimately signed in the Sale Order?

02:20:01 8            MR. FINKELSON:  It happened very quickly.  I was

02:20:04 9    at that hearing by Zoom.  All the hearings were by Zoom.

02:20:10 10           The Court -- this discussion, and you'll see it

02:20:14 11   in the transcript, this is a debate where we're saying,

02:20:19 12   Judge, you need to deal with this issue now because this

02:20:22 13   software is about to go out the door to Adonis and which we

02:20:29 14   didn't think was proper.  We thought that was a violation of

02:20:32 15   our exclusive right to distribute under the Copyright Act.

02:20:36 16           And Adonis is saying and Vobev are saying, No,

02:20:39 17   no, no.  This can all be dealt with in Delaware.  So the

02:20:43 18   Court is basically turning to me -- the next question --

02:20:46 19   after he says, I'm sorry, but Mr. Galardi says very clearly

02:20:50 20   the software is not the property of the estate.  Vobev

02:20:53 21   doesn't own it.  My memory is Judge Marker then turned to me

02:20:56 22   and said, "So what's the problem?"

02:20:58 23           In other words, you're saying they're arguing

02:21:02 24   that -- they're going to argue that they own it.  They're

02:21:05 25   saying flat out -- because all of this is in response to

02:21:08  1    first-sale doctrine, and I didn't mention that point.  So

02:21:11  2    all of this is in the context of an argument under the

02:21:16  3    first-sale doctrine and before the Bankruptcy Court where

02:21:18  4    we're telling the Bankruptcy Court, They don't own it.

02:21:23  5            It's exactly the same issue presented by the

02:21:27  6    essential step doctrine.  And Judge Marker is basically

02:21:29  7    saying, I don't need to decide that because Vobev and Adonis

02:21:32  8    themselves are saying they don't own it.  So, Mr. Finkelson,

02:21:37  9    what's the problem?

02:21:38 10            And he then goes on to give the preliminary

02:21:40 11    ruling right after that.  It's literally -- it's less than a

02:21:45 12    page later.  He gives the preliminary ruling and then says,

02:21:50 13    "So I am going to approve this sale with the language that

02:21:55 14    Adonis and Vobev have proposed."

02:21:58 15            THE COURT:  And just to be clear for the record,

02:22:01 16    in fairness to the bankruptcy Judge, my own experience,

02:22:07 17    reading through these briefs, has demonstrated that these

02:22:10 18    issues have been getting crystallized as the parties'

02:22:15 19    briefing proceeds.  And the arguments are now starting to

02:22:18 20    converge toward an appropriate analysis under the law.  But

02:22:22 21    they haven't always been before the Bankruptcy Court or

02:22:26 22    here.

02:22:27 23            MR. FINKELSON:  And I -- to be clear on the

02:22:30 24    transcript and otherwise, I believe the Bankruptcy Court did

02:22:34 25    its best to work through the issues that were being

02:22:37 1    presented.

02:22:38 2              Has there been a crystallization of arguments on

02:22:42 3    both sides?  There has.

02:22:43 4              THE COURT:  Thank you for that.

02:22:44 5              MR. FINKELSON:  There has.  And that's, frankly,

02:22:48 6    why I'm spending so much time talking about reproduction,

02:22:52 7    because that's really where the fight is.  And we disagree

02:22:54 8    with each other on the use issue, which is, I think, a fair

02:22:58 9    dispute in many respects, much more complex dispute.  But

02:23:01 10   it's not necessary to decide this motion without talking

02:23:05 11   about anything but reproduction, in our view.

02:23:08 12             THE COURT:  I told you at the beginning I was

02:23:10 13   tracking and I'm still tracking.

02:23:11 14             MR. FINKELSON:  Okay.  So the last -- unless

02:23:13 15   Your Honor has any other questions on essential step, the

02:23:16 16   last defense that comes up in sur-reply as part of this

02:23:19 17   crystallization -- and really for the first time, this is

02:23:21 18   not something we had heard at any point before -- is a fair

02:23:25 19   use defense, which Adonis asserts in the sur-reply brief.

02:23:31 20             Your Honor, fair use has never -- and Adonis

02:23:36 21   doesn't cite any case saying otherwise -- it's never been

02:23:39 22   applied in these circumstances where you have an infringer

02:23:43 23   reproducing the totality of the copyrighted material to make

02:23:47 24   commercial use of the copyrighted material itself.  The only

02:23:52 25   cases they cite are the cases -- line of cases out of the

02:23:55 1    Ninth Circuit.  The *Sony* case and the *Sega* case that apply

02:23:58 2    fair use in a very specific context that has nothing to do

02:24:02 3    with what we have here.

02:24:03 4         That context in those cases is intermediate

02:24:07 5    copying that's performed during software disassembly or

02:24:13 6    reengineering for the purpose of accessing the parts of the

02:24:18 7    software code that are non-copyrightable in order to create

02:24:24 8    a machine that's compatible with those non-copyrightable

02:24:29 9    elements, but not to use, the copyrighted material itself,

02:24:31 10   in that ultimate machine.

02:24:33 11        That's what those cases are about.  We have none

02:24:37 12   of those facts here, nor is that remotely analogous to the

02:24:41 13   circumstance here.

02:24:42 14        We have Adonis reproducing the software in toto

02:24:47 15   and using it in exactly the form in which it is copyrighted.

02:24:53 16   So there's no case that has ever applied fair use that we're

02:24:58 17   aware of, and Adonis certainly hasn't cited one, in those

02:25:02 18   circumstances.

02:25:03 19        And if you look at the four fair use statutory

02:25:06 20   factors under Section 107 and you go through that analysis,

02:25:10 21   it leads to the same result, we would submit, that fair use

02:25:14 22   doesn't apply here.

02:25:15 23        The first is the purpose and character of the

02:25:18 24   use, whether it's a commercial use, or for nonprofit or

02:25:21 25   educational purposes.  Here the use is purely commercial.

02:25:26  1          It's also complete copying as opposed to

02:25:28  2    intermediate, distinguishing it from the *Sony* and *Sega*

02:25:32  3    circumstance.  And it's wholly non-transformative as a

02:25:35  4    result because they're not making any changes.

02:25:38  5          So the first factor says no fair use.

02:25:40  6          The second factor is the nature of the

02:25:43  7    copyrighted work.  Adonis argued with some support that the

02:25:47  8    cases point out that there are instances where computer

02:25:50  9    software may get somewhat less protection on that factor.

02:25:54 10    But here where you've got a complete copy of the expressive

02:25:58 11    components, we would submit that there's no reason to place

02:26:01 12    computer software on any different footing.

02:26:04 13          The third factor is the amount and

02:26:06 14    substantiality of the portion used in relation to the

02:26:09 15    copyrighted work.  A hundred percent is a hundred percent.

02:26:11 16          And the fourth is the effect upon the potential

02:26:13 17    market or value of the copyrighted work.  And if anyone who

02:26:18 18    gets their hands on this code is allowed to use it, as

02:26:22 19    Adonis says, and if we lose control of our copyrighted

02:26:26 20    software, as you heard from Mr. Packer, we're going to

02:26:29 21    suffer irreparable harm.

02:26:31 22          On the flip side of the ledger is zero public

02:26:35 23    benefit that is achieved by Adonis copying the code in toto

02:26:41 24    and making a non-transformative copy that doesn't create any

02:26:45 25    form of new expression.  If you look at the cases on fair

02:26:47 1  use, that's what they're looking at, how transformative is

02:26:51 2  this, how much is being used.  Is there -- is it an

02:26:54 3  intermediate step to a new expression.

02:26:57 4        None of that.  None of that is in play here.

02:27:00 5        So, for those reasons, Your Honor, the fair use

02:27:04 6  defense doesn't apply to these circumstances, either.  We

02:27:07 7  own valid copyrights to the software.  That's not disputed.

02:27:12 8        Adonis has or will violate our exclusive rights

02:27:16 9  to reproduce the software inevitably and imminently.  And

02:27:21 10  there's no nontransitory essential step or fair use

02:27:25 11  exception to Adonis' infringement.

02:27:27 12        So that's, in our view, Your Honor, likelihood

02:27:31 13  of success on the merits.  And I will pivot now more briefly

02:27:37 14  to irreparable harm, unless Your Honor has additional

02:27:39 15  questions.

02:27:39 16        THE COURT:  Can I just ask you, as long as we're

02:27:41 17  combining the argument for the preliminary injunction with

02:27:44 18  the motion to dismiss:  Going back to our discussion about

02:27:50 19  issues crystallizing, the Complaint, as it stands now, one

02:27:58 20  could reasonably argue, and Defendant has argued that it

02:28:02 21  doesn't really specify what the copying is, at least not to

02:28:09 22  the extent that you specified today.

02:28:14 23        If the Court were to say that maybe filing an

02:28:18 24  Amended Complaint to specify what you've put evidence on

02:28:24 25  today, for example, the copy going into the ram of a laptop

02:28:30  1   and the computer that controls the machines -- if the Court

02:28:34  2   were to allow you to do that, would you like that

02:28:37  3   opportunity?

02:28:37  4           MR. FINKELSON:  Yes, Your Honor.

02:28:38  5           THE COURT:  Okay.

02:28:39  6           MR. FINKELSON:  And to be clear, my colleague,

02:28:43  7   Mr. Smith, was going to argue the motion to dismiss.  I

02:28:46  8   don't think it's necessary because I think the issues are

02:28:48  9   quite clear.

02:28:48 10           We felt like they -- we sufficiently pled our

02:28:51 11   claims.  Is there additional -- are there additional facts

02:28:55 12   that are clear?  Absolutely.  It is noticed pleading, and

02:29:00 13   the goal is to make sure the Defendant is on notice of

02:29:03 14   what's at issue.

02:29:04 15           There's no -- Adonis is the most on notice party

02:29:06 16   I'm aware of because we've been talking about this since the

02:29:09 17   Bankruptcy Court, even before we filed the Complaint.  But,

02:29:11 18   Your Honor, Your Honor asked me a very clear question.  And,

02:29:14 19   yes, if Your Honor believes that we should more fully

02:29:17 20   articulate the facts and will give us the leave to do so, we

02:29:20 21   would like to take that opportunity.  And we will -- and we

02:29:25 22   will -- and we will repeat the facts that have been fleshed

02:29:28 23   out in the briefing, and we will state more clearly or, to

02:29:33 24   use Your Honor's word, in a better crystallized way what the

02:29:36 25   theories of infringement are.

02:29:38 1          THE COURT:  And I appreciate that.  I guess the

02:29:40 2   only thing I would take issue with is the statement that it

02:29:42 3   was clear to begin with.  Because, again, as evidenced by

02:29:47 4   the fact that we didn't get to what the fact of the copying

02:29:52 5   was until late in the briefing, one might argue, not

02:29:55 6   unreasonably, that it wasn't clear.

02:29:58 7          MR. FINKELSON:  Understood and well taken, Your

02:30:00 8   Honor.

02:30:00 9          THE COURT:  All right.  Thank you.

02:30:02 10         MR. FINKELSON:  May I move to irreparable harm?

02:30:04 11         THE COURT:  Yes.

02:30:05 12         MR. FINKELSON:  So on irreparable harm, Your

02:30:07 13  Honor, the standard is whether we are likely to suffer

02:30:14 14  irreparable injury without relief, and the Third Circuit,

02:30:16 15  the *Silvertop* case, no detailed showing is required.  And

02:30:21 16  irreparable harm is shown if there's a threat of future

02:30:25 17  infringement with its attendant loss of control, reputation

02:30:29 18  and goodwill.  That's *Silvertop*.  That's *Telebrands*.

02:30:33 19         And we would submit that there's no question

02:30:35 20  that's the case here.  We're not arguing for a presumption

02:30:38 21  of irreparable harm.  We never have been.  That presumption

02:30:42 22  doesn't exist.

02:30:43 23         But the case law does clearly set forth what the

02:30:46 24  analysis is, and we believe, as you heard further from

02:30:49 25  Mr. Packer today, we've identified three ways in which

63

02:30:53  1   Belvac is likely to be irreparably harmed by Adonis' use and

02:30:57  2   reproduction and by Belvac's loss of control over its

02:31:00  3   software.

02:31:01  4           THE COURT:  Let me ask you this:  There's also a

02:31:06  5   requirement in the law that the irreparable harm has to be

02:31:14  6   causally attributed to the actual infringement.  And what I

02:31:18  7   heard the witness say on the stand was that if Defendant had

02:31:24  8   a License Agreement that there would also be some sort of a

02:31:27  9   service plan and control over the software.

02:31:30 10           And I get that that's how it has played out in

02:31:33 11   your client's business.  But the harm that the witness was

02:31:38 12   talking about didn't seem to me to be harm that resulted

02:31:42 13   from a copy being made on the ram.  It seemed to me to be

02:31:46 14   harm because they haven't agreed to your -- they haven't

02:31:48 15   assumed the license that Belvac has -- maybe I said that

02:31:54 16   wrong.

02:31:54 17           Do you understand what I'm asking?

02:31:56 18           MR. FINKELSON:  I do, Your Honor.  I would take

02:31:57 19   issue with it, respectfully.

02:31:59 20           We have endeavored to tie the harm that we're

02:32:03 21   talking about here to the acts of liability.  One of the

02:32:06 22   instances that Mr. Packer talked about was the instance in

02:32:11 23   which Adonis, by virtue of reproducing -- one of the reasons

02:32:15 24   they -- one of the ways they reproduce is by going in and

02:32:18 25   making modifications to the software.  That's an infringing

02:32:22  1    act itself.  And the harm that flows from that type of

02:32:25  2    modification, whether it's a safety-related harm or a

02:32:29  3    quality-related harm is directly and causally tied to the

02:32:33  4    fact of reproduction.  You certainly have additional harms

02:32:38  5    that we've pointed to that are tied to use

02:32:45  6    post-reproduction, but, again, that -- that doesn't happen,

02:32:47  7    but for the act of reproduction in the first instance.

02:32:51  8          So we were mindful of Your Honor's concern.  We

02:32:55  9    tried to address that with Mr. Packer's testimony.  But to

02:32:59 10    be clear, in our view, the irreparable harm here flows

02:33:03 11    directly from the liability, the acts of liability that

02:33:09 12    we're alleging, the copyright infringement through

02:33:12 13    reproduction that we are alleging.

02:33:14 14          And, certainly, one of the harms that we are

02:33:16 15    suffering, in addition to safety-related reputational harms

02:33:20 16    and quality-related reputational harms, is the loss of

02:33:24 17    control over our IP.  We are in a forced license scenario.

02:33:29 18    And as Your Honor knows, there's case law recognizing that

02:33:33 19    forced license itself as irreparable harm.  There's some

02:33:35 20    nuance in that, to be sure, that's been played out as that

02:33:37 21    line of cases has evolved.

02:33:38 22          But we are in a -- essentially, if Adonis is to

02:33:42 23    be believed here and is to prevail, we are in a forced

02:33:46 24    license scenario where we will have somebody reproducing our

02:33:50 25    software in a way that we have no control over where we bear

02:33:54 1    all the risks of that uncontrolled reproduction.

02:33:59 2            And that is a causal connection between the act

02:34:03 3    of infringement and the harm that is caused.  Because when

02:34:08 4    it comes to safety and it comes to quality, it's routine to

02:34:12 5    modify parameters on these machines by accessing the PLC

02:34:16 6    code.  That's uncontested.

02:34:18 7            And accessing the PLC code is an act of

02:34:22 8    infringement.  It's a reproduction.  And that reproduction

02:34:26 9    that then results in cans that come out imperfectly, or that

02:34:31 10   require shutdown of the machines or that, God forbid, hurt

02:34:36 11   somebody, all flows downstream to Adonis' customers.  And,

02:34:42 12   as Mr. Packer pointed out in his testimony about the close

02:34:47 13   nature of this community, and as we pointed out in the

02:34:49 14   briefs, Adonis itself tells the world or Vobev before Adonis

02:34:53 15   that they use our equipment.

02:34:55 16           So bad quality, missed orders, hurt people.  The

02:35:00 17   relevant community knows if that's happened at what is now

02:35:04 18   Adonis' facility, that's Belvac's equipment.

02:35:10 19           And that, Your Honor, is the irreparable harm.

02:35:12 20   And we submit it is casually connected to the infringing

02:35:17 21   acts and a preliminary injunction should issue to stop it.

02:35:20 22           And with that, Your Honor, just so I have a

02:35:23 23   little bit of our time left in rebuttal -- unless Your Honor

02:35:27 24   has any other questions -- I'll pass the podium.

02:35:32 25           THE COURT:  All right.  Thanks very much.

02:35:33  1          Let's go ahead and take a break so we can give

02:35:36  2    the court reporter a few minutes.  It's 2:35.  We'll break

02:35:39  3    for ten minutes until 2:45.

02:35:42  4          DEPUTY CLERK:  All rise.

02:44:06  5          (Recess was taken.)

02:51:16  6          DEPUTY CLERK:  All rise.

02:51:17  7          THE COURT:  Please be seated.  Let's proceed.

02:51:23  8          MS. KLIEBENSTEIN:  Thank you, Your Honor.  The

02:51:28  9    history between the parties, the complexity of the factual

02:51:31 10    and the legal issues and whatever happened during the

02:51:35 11    bankruptcy proceedings, all of that becomes diminished when

02:51:39 12    we remember the purpose of a preliminary injunction.  The

02:51:43 13    threat to shut down my client's business.

02:51:47 14          The purpose of a preliminary injunction is to

02:51:49 15    preserve the status quo and maintain the current state of

02:51:54 16    affairs.  The status quo, Your Honor, in my opinion, is

02:51:58 17    already being preserved right now.

02:52:02 18          Throughout this afternoon, it appears that the

02:52:05 19    Plaintiff acknowledges that use on ram, while the machine is

02:52:09 20    running, is not copyright infringement.  It appears to admit

02:52:13 21    that what Adonis is doing now is not copyright infringement.

02:52:17 22          So then the question becomes:  When the machine

02:52:22 23    is -- if the machines are turned on and off or if an

02:52:25 24    external device is plugged in, what is the irreparable harm

02:52:28 25    that stems from that?  Adonis is doing nothing more today

02:52:34 1    than Vobev was doing six months ago then the parties were

02:52:39 2    doing through the bankruptcy proceedings, and since they've

02:52:41 3    been doing since February 7th.  Adonis is not on the cusp of

02:52:44 4    reselling Belvac's software.  It's not on the cusp of

02:52:48 5    stealing Belvac's other customers.

02:52:49 6            In contrast to a trademark case, for example,

02:52:53 7    Adonis is not tricking third-party customers in any way.

02:52:57 8    Adonis' customers don't care how the cans are made, they

02:53:00 9    just need them made.  Belvac is not experiencing real harm.

02:53:06 10           This lawsuit is primarily a breach of contract

02:53:09 11   action.  Belvac wants to be repaid for the 14 million that

02:53:12 12   it asserts it's owed from the business dealings of the

02:53:16 13   parties beforehand.  The right place for that dispute is not

02:53:22 14   in this courtroom.  It's in an action against the Debtor.

02:53:26 15           It's also important to look at what this

02:53:30 16   injunction has asked you to order, to prohibit Adonis from

02:53:35 17   using or disclosing the software, number one, to return

02:53:38 18   copies.  There's been no allegation of improper disclosure

02:53:43 19   in this case.

02:53:43 20           We've already talked about use.  Use alone is

02:53:46 21   not infringement.  There's no basis to demand return because

02:53:50 22   simply possessing it is not infringement.

02:53:52 23           I'd like to start -- I'm happy to start where

02:53:57 24   you want me to start.  Where I'd like to start is

02:54:00 25   irreparable harm and a balancing of the equities.

02:54:04  1          Belvac must prove, independent from the

02:54:07  2   likelihood of success on the merits, that it's

02:54:10  3   experiencing -- is experiencing irreparable injury, that it

02:54:14  4   will suffer irreparable harm that Your Honor noted is

02:54:16  5   causally connected, causally attributed to the challenged

02:54:22  6   infringement, not that it's likely to suffer.

02:54:24  7          So all of the statements of if this happens,

02:54:27  8   this could happen aren't relevant.  There has to be a clear

02:54:33  9   showing of actual harm.  Irreparable harm is not presumed.

02:54:39 10          It's critical to keep in mind again:  What are

02:54:42 11   the acts of accused infringement?  What does the irreparable

02:54:45 12   harm have to be from?

02:54:47 13          The allegations are turning the machines on and

02:54:49 14   off and plugging in an external device.  There is no causal

02:54:55 15   connection to any harm stemming from use alone, and that's

02:54:59 16   where I think primarily most of the arguments are coming

02:55:02 17   from.

02:55:03 18          There's no argument that when you turn it on and

02:55:06 19   off, there is then a safety issue.  When you plug in an

02:55:11 20   external device to change the settings, then there is a

02:55:15 21   quality issue.  There's none of that linkage and that's

02:55:18 22   critical.

02:55:19 23          As I had said before, the parties don't compete.

02:55:24 24   This is a vendor-customer relationship.  It's a

02:55:29 25   fundamentally different issue when it comes to irreparable

02:55:31  1    harm.  Adonis isn't cutting into their market.  We're

02:55:35  2    privately using the software on the equipment that nobody

02:55:37  3    disputes we own.  Allowing Adonis to continue is preserving

02:55:42  4    the status quo.

02:55:43  5            All of Belvac's arguments are in the framework

02:55:47  6    of, If this, then this could happen.  I find it telling that

02:55:53  7    bankruptcy was finalized, I believe, on February 7th.  That

02:55:56  8    was over ten weeks ago.  There have been no examples of the

02:56:00  9    irreparable harm happening.  No other customers mentioning

02:56:05 10    the lawsuit, thinking that the reputation has gone down.  No

02:56:10 11    safety issues, et cetera.  There is no harm that cannot be

02:56:14 12    remedied with money.

02:56:16 13            Belvac says that denying a preliminary

02:56:18 14    injunction is going to force them into -- is going to result

02:56:21 15    in a forced license.  Injunctions aren't always granted

02:56:27 16    after eBay.  We are not at trial.  This is not a permanent

02:56:30 17    injunction request.  That's not irreparable injury.

02:56:32 18            Belvac makes arguments about safety, namely

02:56:36 19    apparently Adonis' safety.  If Adonis were to modify the

02:56:39 20    safety logic, Adonis could unknowingly place their personnel

02:56:42 21    at risk.  That's the primary thrust of Mr. Packer's

02:56:46 22    testimony.

02:56:46 23            Yet, Belvac provides zero examples of injuries

02:56:52 24    from other customers or Vobev.  There's no examples of

02:56:57 25    people who have been injured, killed, et cetera, from the

02:57:01  1    equipment.  We have the declaration of Mr. Gilbert that

02:57:05  2    recognizes the safety of the equipment is very important.

02:57:09  3    The parties are on the same page as that.

02:57:10  4            There's no reason to expect that my client is

02:57:13  5    going to take any action when turning the machines on and

02:57:16  6    off or plugging in an external drive or an external device

02:57:20  7    to change settings is going to impact the safety equipment.

02:57:25  8            The next issue is diminished market share and

02:57:28  9    consumer poll.  That somehow the market for their equipment

02:57:32 10    will go down at a rate that cannot be compensated

02:57:35 11    monetarily.  Again, this is entirely speculative and not

02:57:39 12    specific enough to shut down a company of 415 people.

02:57:44 13            The Court asked a really good question about the

02:57:50 14    service issue and whether that was tied to the infringement.

02:57:56 15    The contract between the parties that I have seen in 2020

02:57:59 16    and 2022 doesn't have a service component that's required.

02:58:04 17    It's not like SaaS software where there's mandatory updates

02:58:08 18    where there are required servicings that happen.  My

02:58:13 19    understanding is those are service agreements between the

02:58:16 20    parties that are separate.

02:58:20 21            THE COURT:  Would it violate the license?  I

02:58:23 22    understand that Adonis doesn't have a license, but would it

02:58:25 23    violate the license to have someone else service it?

02:58:33 24            MS. KLIEBENSTEIN:  In 12.05 --

02:58:36 25            THE COURT:  I don't want to get too far afield

02:58:38  1    again either here, but is the plant -- I mean, and maybe you

02:58:41  2    don't know.  At some point the machines are going to need to

02:58:44  3    be repaired.

02:58:45  4              Have you-all thought about mediating this case

02:58:48  5    or has that been done?

02:58:50  6              MS. KLIEBENSTEIN:  That's a very good question,

02:58:53  7    Your Honor.  I'm trying to get through today.

02:58:55  8              THE COURT:  Okay.

02:58:56  9              MS. KLIEBENSTEIN:  So, you know, that's a

02:58:59 10    conversation for tomorrow.

02:59:02 11              THE COURT:  Okay.

02:59:02 12              MS. KLIEBENSTEIN:  Certainly.  I was -- I'm a

02:59:05 13    newcomer.

02:59:06 14              THE COURT:  Understood.

02:59:08 15              MS. KLIEBENSTEIN:  I wasn't a participant in the

02:59:10 16    bankruptcy proceedings.

02:59:11 17              THE COURT:  Right.  Maybe that was an unfair

02:59:13 18    question, but I do sort of see all of the things happening

02:59:15 19    now are sort of ways to get leverage.  At some point you-all

02:59:18 20    are going to have to come to terms and work this out.

02:59:21 21              I'm happy to do my role in this, which is decide

02:59:23 22    the preliminary injunction in the copyright case, but it

02:59:28 23    does seem like maybe the folks ought to sit down and talk to

02:59:31 24    each other.  But that's a comment.  If you don't -- if

02:59:33 25    you're not able to respond, that's fine.

02:59:35  1          MS. KLIEBENSTEIN:  I appreciate that comment.

02:59:37  2    There are a lot of moving parts at the current moment, but

02:59:41  3    appreciated.

02:59:42  4          THE COURT:  Literally moving parts within a

02:59:45  5    machine, right.

02:59:45  6          MS. KLIEBENSTEIN:  I would take you to 14.04

02:59:52  7    which, you know, there's actually a lot of interesting parts

02:59:54  8    of this contract, which is all to say specific conclusions

03:00:03  9    on a preliminary injunction hearing, I believe, are

03:00:05 10    difficult to make.

03:00:07 11          When you look at 14.04 "Consequences of

03:00:13 12    Termination," Section A(ii) allows the owner -- and the

03:00:16 13    owner, mind you, is Vobev.  Vobev is titled as the owner --

03:00:21 14    "allowed to finish the work by whatever method the owner may

03:00:24 15    deem expedient at his expense."

03:00:25 16          So that to me says that there is not a hook, as

03:00:28 17    there is in some contracts, to always consistently use

03:00:33 18    Belvac.

03:00:33 19          THE COURT:  Understood.

03:00:36 20          MS. KLIEBENSTEIN:  Moving on to balancing of the

03:00:43 21    equities very briefly.  Everybody agrees that if the -- if

03:00:48 22    there is an injunction, the machines are worthless.

03:00:51 23    Millions -- tens of millions of dollars of machines would be

03:00:55 24    worthless.  No cans could be made.  Adonis' entire business

03:00:58 25    would need to be shut down because that's 100 percent of

03:01:01  1    their revenue stream.

03:01:03  2            Adonis would have three choices.  Buy new

03:01:06  3    equipment, write new code or go bankrupt.

03:01:10  4            Buying new equipment is a tens of millions of

03:01:12  5    dollars proposition, and it would take months to get that up

03:01:15  6    and running.  You've heard how big some of the machines are.

03:01:18  7    They're very complex.

03:01:19  8            Writing new code, Belvac said itself in

03:01:24  9    Mr. Packer's original declaration, it's not aware of any

03:01:27 10    third party that could write replacement software.  Writing

03:01:31 11    new code is unknown at this time, and whether it takes eight

03:01:34 12    weeks or eight months, that's still too long for my client

03:01:37 13    to be out of business.

03:01:38 14            So if an injunction is granted, it's

03:01:42 15    option three for us.  And 415 people will be out of a job

03:01:47 16    should this injunction issue.

03:01:48 17            I would suggest -- well, I don't suggest -- if

03:01:53 18    you're weighing the equities and the harm to Belvac on this

03:01:57 19    end, it would appear to me that the harm to Adonis is clear,

03:02:03 20    and concrete and immediate.  And it's going to be

03:02:05 21    significant.

03:02:08 22            Moving on to the legal merits.  Again, it

03:02:14 23    appears uncontested or at least conceded that it's at the

03:02:20 24    very least a tossup that unlicensed use alone does not

03:02:24 25    violate the Copyright Act.  I don't believe it's a tossup.

03:02:28  1   I believe it's crystal clear.

03:02:30  2          There are cases, of course, that have the

03:02:32  3   sentence, This use is unlicensed; therefore, it's copyright

03:02:35  4   infringement.  However, if you typically read one, two

03:02:38  5   paragraphs down, it will say, because they did this or they

03:02:41  6   did that.  It will articulate actions that would fall under

03:02:47  7   Section 106 of the Copyright Act.  Use alone is not enough.

03:02:50  8          In reply, a note about -- a note about the

03:02:59  9   waiver argument.  So we've been responding to what's been

03:03:04 10   presented to us.  In the opening brief of the preliminary

03:03:08 11   injunction, it was all about use.  The Complaint is all

03:03:10 12   about use.  We responded to use.  In the reply, we got

03:03:15 13   something else.

03:03:16 14          Then we asked Your Honor for permission for a

03:03:20 15   sur-reply, knowing that those are very disfavored.  We chose

03:03:23 16   to make that a very short sur-reply so that we would get

03:03:26 17   your permission.  There was very little space to articulate

03:03:29 18   all there is to say about fair use and all there is to say

03:03:32 19   about essential step.

03:03:34 20          I don't believe that's waiver.  I believe that's

03:03:36 21   a proper and appropriate response to what was in the reply.

03:03:41 22   Maybe a better position is that what was put in the reply is

03:03:44 23   waived.  New subject matter outside the scope of the

03:03:46 24   Complaint, and we shouldn't have had to respond to it at

03:03:49 25   all.

03:03:49  1          They should be stuck with use alone, and now

03:03:52  2   we'd all agree that use alone does not violate Section 106

03:03:56  3   of the Copyright Act.

03:03:57  4          On fixation, the duration of fixation, the case

03:04:12  5   law, in my opinion, is not so clear.  In *CDK*, the Ninth

03:04:17  6   Circuit noted that the *MAI* decision did not rule, as a

03:04:21  7   matter of law, that putting it into ram equals copying for a

03:04:26  8   fixed duration of a long enough period.

03:04:30  9          I believe that that issue is ripe for expert

03:04:33 10   testimony on how exactly computers run and whether something

03:04:37 11   is transitory or not.

03:04:40 12          Moving on to the essential step.  Moving on to

03:04:49 13   the essential step, I want to pause for a minute and address

03:04:53 14   Your Honor's questions about how I perceive the bankruptcy

03:04:56 15   proceedings as someone who's coming in kind of in your shoes

03:05:01 16   and reacting to what I'm reading.

03:05:03 17          My impression of transcripts is that they are a

03:05:08 18   sum of words.  They are also a sum of body language and

03:05:11 19   verbal cues.  And they're also a sum of the posture of the

03:05:15 20   problem as it's come up through.

03:05:19 21          And opposing counsel said that that section of

03:05:23 22   the transcript and what the Judge was talking about is the

03:05:28 23   first-sale doctrine.

03:05:28 24          THE COURT:  Well, that was because the

03:05:30 25   distribution in the bankruptcy case was the distribution

03:05:34 1    from the Debtor to your client.  And so the first-sale

03:05:40 2    doctrine talks about whether or not that's a copyright

03:05:42 3    infringement on the part of the Debtor.  But your client's

03:05:44 4    not distributing to anyone at this point.

03:05:47 5              So the first-sale doctrine doesn't really come

03:05:49 6    up here; right?  Am I missing something?

03:05:51 7              MS. KLIEBENSTEIN:  No, Your Honor, you're not.

03:05:52 8              THE COURT:  Okay.

03:05:53 9              MS. KLIEBENSTEIN:  But I think it is actually a

03:05:54 10   critical point --

03:05:55 11             THE COURT:  Okay.

03:05:55 12             MS. KLIEBENSTEIN:  -- because under the first --

03:05:57 13   copyright is -- copyright law is very complicated.  I am

03:06:01 14   lucky to do it all day every day.  And sometimes the same

03:06:05 15   word has different definitions determined by what you're

03:06:08 16   talking about.

03:06:10 17             Ownership for the first-sale doctrine, what I

03:06:13 18   tell people is, you know, it's capital O ownership.  It's

03:06:16 19   like you own the thing.  It is yours exclusively.  You own

03:06:20 20   all the bundles of rights and all the sticks.

03:06:23 21             When it comes to essential step, it is not the

03:06:26 22   same thing.  And that's borne out by the case law.  The case

03:06:29 23   law that discusses it refers to incidents of ownership.

03:06:33 24   That's not the same as the capital O ownership that's

03:06:36 25   required under the first-sale doctrine, if that makes sense.

03:06:39 1                    THE COURT:  Sure.

03:06:40 2                    MS. KLIEBENSTEIN:  And so it's very important

03:06:42 3        that the bankruptcy Judge was being premised with we're

03:06:46 4        talking about fair use capital O ownership what's going --

03:06:50 5                    THE COURT:  Ownership of the intellectual

03:06:52 6        property rights.  Is that what you call capital O ownership?

03:06:54 7                    MS. KLIEBENSTEIN:  No.  Well, there's that, too.

03:06:57 8        I mean, you were asking questions about the

03:06:59 9        actual software that's in the machine, not incidents of

03:07:03 10       ownership, capital O ownership, which are two different

03:07:06 11       things.

03:07:07 12                   And when I read the transcript, how I read the

03:07:16 13       Order is it's not inconsistent with the transcript.  It's

03:07:21 14       fulsome.  It's telling us what the Judge was talking about.

03:07:25 15                   And when you go to the Order, Footnote 5, the

03:07:28 16       purchased -- I'll wait for you.  I apologize.

03:07:33 17                   THE COURT:  Yeah.  Stand by.  You already handed

03:07:39 18       it to me, didn't you?

03:07:42 19                   THE CLERK:  It's Exhibit M.

03:07:47 20                   THE COURT:  Footnote 5, got it.

03:07:48 21                   MS. KLIEBENSTEIN:  And this is in response to

03:07:49 22       your question about:  How do I connect the preliminary

03:07:51 23       ruling to the Order?  And Footnote 5, the purchaser has

03:07:58 24       agreed that the purchased assets shall not include any

03:08:01 25       transfer of intellectual property rights owned by Belvac.

03:08:04  1    That's one point of color.

03:08:06  2                Then you move back to Page 17, Paragraph KK.

03:08:18  3    The Sale Order does not authorize the purchaser to purchase

03:08:21  4    or license any intellectual property rights.

03:08:27  5                I'll move on when you're ready.

03:08:44  6                And then in Paragraph 52, there's a full

03:08:48  7    preservation of intellectual property rights.

03:08:59  8                THE COURT:  So where does the Bankruptcy Court

03:09:01  9    deal with your opponent's argument that it was a copyright

03:09:09 10    infringement to approve the Sale Order, because the machines

03:09:15 11    had a copy of the software on them and that transfer of the

03:09:21 12    machines was a distribution of the software?

03:09:24 13                He made the preliminary finding that your client

03:09:29 14    or that the Debtor didn't own the software.  That seemed to

03:09:34 15    me to be clear.

03:09:35 16                Was there -- I'm trying to understand what

03:09:39 17    exactly happened here, and that maybe you-all will argue

03:09:42 18    about that in front of the District Court in Utah.  But did

03:09:46 19    he ever order that your client lawfully has possession of

03:09:50 20    the copy of the software that's on the machines?

03:09:52 21                MS. KLIEBENSTEIN:  I do not -- say that again.

03:09:57 22                THE COURT:  Did he ever order that your client

03:09:59 23    lawfully has possession or ownership of the particular copy

03:10:03 24    of the software that's on the machines?

03:10:05 25                MS. KLIEBENSTEIN:  My understanding is that was

03:10:07 1    not, one way or the other, addressed.

03:10:11 2              THE COURT:  Right.  And so I think that's where

03:10:13 3    it gets to sort of the heart of the issue is:  Didn't it

03:10:16 4    need to be addressed to approve the Sale Order, because it

03:10:21 5    happened?

03:10:22 6              MS. KLIEBENSTEIN:  My understanding -- well, my

03:10:24 7    understanding is that Bankruptcy Courts do not -- I don't

03:10:29 8    know if they don't like to or do not handle intellectual

03:10:33 9    property issues.  My understanding is that this issue came

03:10:37 10   up on the eve of the closing of the deal, the bankruptcy,

03:10:42 11   and it came up at the hearing, along with many, many, many

03:10:45 12   other things.  And this is how the Judge, I don't want to

03:10:51 13   say, kicked the can --

03:10:52 14             THE COURT:  Right.  Well, certainly --

03:10:54 15             MS. KLIEBENSTEIN:  -- but --

03:10:54 16             THE COURT:  -- I understand that everybody was

03:10:58 17   anticipating that there was going to have to be a decision

03:11:06 18   about copyright infringement between the two parties that

03:11:09 19   are before me right now.  But did the -- I guess, isn't that

03:11:15 20   different from saying that the Bankruptcy Court approved a

03:11:18 21   sale that actually violated rights?

03:11:20 22             And that's why they were objecting to the sale;

03:11:22 23   right?  Because transfer of the machines was in itself a

03:11:27 24   copyright infringement.  And that couldn't be heard here,

03:11:29 25   because that is an infringement on the part of the Debtor,

03:11:33 1    who is not a party to this Court.

03:11:35 2              Is that not -- am I tracking?

03:11:38 3              MS. KLIEBENSTEIN:  I understand your point, and

03:11:41 4    I don't -- you know, I don't want to say anything that's

03:11:44 5    going to jeopardize my client's rights in further bankruptcy

03:11:47 6    proceedings.  So let me try to -- let me try to make sense

03:11:54 7    of what I know.

03:11:56 8              So it is not unusual in software copyright cases

03:12:00 9    to have an old user and a new user, both -- and this is me

03:12:06 10   stepping out of representing the Defendant -- both can be

03:12:10 11   liable for copyright infringement in -- for different

03:12:14 12   reasons.  And so just because the original -- well, I

03:12:21 13   believe, frankly, the original action would be a breach of

03:12:24 14   contract against the Debtor for violating the terms of the

03:12:28 15   agreement.

03:12:29 16             From time to time in the copyright practice, you

03:12:31 17   can also have a copyright infringement objection --

03:12:33 18             THE COURT:  Understood.  So put in that context,

03:12:35 19   it's not unusual in a bankruptcy for machinery to get

03:12:40 20   transferred and then the new owner has to deal with the

03:12:46 21   intellectual property rights in a separate thing.  But that

03:12:49 22   didn't happen here because the license was -- I don't want

03:12:54 23   to use the imprecise bankruptcy term, but it was rejected by

03:12:58 24   your client; right, in the bankruptcy?  They didn't accept

03:13:00 25   the license in the bankruptcy proceeding.

03:13:04  1          And I assume, although this is not in the

03:13:06  2    record, that that was because Plaintiff was asking for all

03:13:11  3    the money they were owed.  But maybe I'm wrong about that.

03:13:15  4          MS. KLIEBENSTEIN:  I don't know the reasons --

03:13:17  5          THE COURT:  Okay.

03:13:18  6          MS. KLIEBENSTEIN:  -- but I do know that is the

03:13:20  7    conclusion of the bankruptcy proceeding is that the

03:13:22  8    underlying contracts --

03:13:23  9          THE COURT:  Right.

03:13:23 10          MS. KLIEBENSTEIN:  -- did not go along to

03:13:25 11    Adonis.

03:13:25 12          THE COURT:  Okay.

03:13:26 13          MS. KLIEBENSTEIN:  If that makes sense.

03:13:28 14          THE COURT:  Yes.

03:13:29 15          MS. KLIEBENSTEIN:  So moving into the essential

03:13:38 16    step, I think we all agree on what is the test.  It appears

03:13:41 17    that the second and third elements of the essential step

03:13:43 18    test, namely that the copy isn't used in any other manner

03:13:47 19    and that the new copy is created as an essential step of

03:13:50 20    using the software with the equipment, those appear to be

03:13:53 21    agreed upon by the parties.  Rather, it's the first that the

03:13:56 22    user is an owner of a copy of the software installed in the

03:14:01 23    equipment is where the dispute is.

03:14:04 24          The test is whether Adonis has incidents of

03:14:07 25    ownership to use the software internally privately.  Not do

03:14:12  1    we own title, not do we own for all uses.  And it's a

03:14:16  2    fact-bound inquiry.

03:14:17  3            The question of incidents of ownership is

03:14:22  4    basically -- is do we have incidents of ownership that would

03:14:25  5    allow us to turn the machines on or off or to hook up an

03:14:29  6    external device to make modifications to the settings.  The

03:14:33  7    facts show that it does.

03:14:36  8            With regard to the original equipment, there's

03:14:39  9    no dispute that it was on the equipment.  It was used to run

03:14:43 10    the equipment.  And the machines were owned.  There's no

03:14:47 11    kill switch on this software.

03:14:49 12            There's no dispute, as we heard with Mr. Packer,

03:14:52 13    that a lot of money was paid for this customized software

03:14:56 14    between the parties.  Vobev is called the owner in the 2020

03:15:01 15    agreement and the 2022 agreement.  And while I recognize

03:15:03 16    that those agreements don't apply to my client, it does

03:15:06 17    apply to what's on that equipment.

03:15:11 18            Under Section 12.05 of those license agreements

03:15:14 19    or those agreements, Vobev was always permitted to make

03:15:19 20    modifications, to customize the line controls, the test

03:15:23 21    screens and the safety alarms, which I find very

03:15:25 22    interesting, given the irreparable harm arguments.  The

03:15:29 23    license goes past the termination of the contract.  The

03:15:34 24    contract can terminate, and there's no hook to take back the

03:15:38 25    software.  That's Section 14.04

03:15:43 1          I also think that Section 2.02, Title of Risk

03:15:46 2   and Loss, is interesting as well.  "Title to all property

03:15:51 3   created by the work, including documents or incorporated

03:15:54 4   into the production line, shall pass to owner on the

03:15:58 5   earliest of payment delivery," et cetera.

03:16:01 6          We haven't brought up the Critical Vendor

03:16:05 7   Agreement yet, and I think that is another fact as well.

03:16:10 8   The critical vendor -- the Critical Vendor Agreement was

03:16:15 9   executed in the middle of January 2025 before the dispute

03:16:21 10  was raised to the Bankruptcy Court.  And what happened in

03:16:25 11  that Critical Vendor Agreement is that we paid about

03:16:28 12  $3.8 million in exchange for a promise that Belvac would

03:16:33 13  continue to supply goods and services to Adonis based on the

03:16:37 14  parties' working relationship.  That was at least 120 days

03:16:43 15  prior to the bankruptcy petition date.

03:16:46 16         The Critical Vendor Agreement recognized that

03:16:48 17  Adonis, through the Bankruptcy Order, Adonis steps into the

03:16:53 18  shoes of Vobev for that Critical Vendor Agreement.  Adonis

03:16:56 19  is Vobev and the history with Vobev has to be accounted for.

03:17:00 20         Then we have to look at, Okay, when the Critical

03:17:03 21  Vendor Agreement mentions trade terms, what do we know about

03:17:05 22  those trades terms?  Well, they're set forth at least in the

03:17:09 23  2020 and 2022 agreements.  They outline that the software

03:17:14 24  can be used, that services will be provided.

03:17:18 25         I think the fact that it was called a license

03:17:20  1    from the start is really confusing ownership of the

03:17:24  2    copyright with incidents of ownership of the copy.  And when

03:17:29  3    you back up to the 10,000-foot level, it doesn't make sense

03:17:32  4    that Adonis could lawfully use the software, the machines,

03:17:37  5    but couldn't fix it when it develops a bug and couldn't turn

03:17:40  6    it on again if the power goes out.  That doesn't make any

03:17:44  7    sense.  And that's what the essential step doctrine was made

03:17:47  8    for.

03:17:47  9            Fair use.  As we heard about from Mr. Packer,

03:18:00 10    transformation does occur when it goes from nonvolatile

03:18:05 11    memory, an SD card or a flash drive over to ram.  What we

03:18:10 12    heard Mr. Packer agree to is that the copy on the SD card is

03:18:13 13    for storage and the copy on ram is for executing.  They're

03:18:17 14    different uses.  The software doesn't run from the SD card.

03:18:21 15    It can only run from the ram.

03:18:23 16            The copy on the external device is for editing.

03:18:26 17    These are transformative uses.

03:18:30 18            The nature of the work, Mr. Packer agreed, is

03:18:34 19    primarily functional.  The effect on the market is zero.

03:18:39 20    We're not selling the software to somebody else.  We're not

03:18:42 21    cutting in on their market.

03:18:49 22            I'd like to make a note about the bond.  My

03:18:58 23    understanding of a bond requirement is that it's not from

03:19:00 24    the perspective of:  What does the Plaintiff think it should

03:19:05 25    pay, but what is the harm to the Defendant?  We've asked for

03:19:10  1   $50 million with $400,000 increasing day by day during the

03:19:15  2   injunction because this injunction would entirely put us out

03:19:18  3   of business.  A bond for 13 million that's somehow tied of

03:19:23  4   what was owed under the pre-petition contracts, it's like

03:19:26  5   apples and oranges to what the purpose of the bond is set

03:19:31  6   out to be.

03:19:32  7           And, Your Honor, I don't think I have any other

03:19:37  8   comments, unless you have further questions.

03:19:39  9           THE COURT:  No, I don't.  Thank you very much.

03:19:44 10           MR. FINKELSON:  May I proceed, Your Honor?

03:19:47 11           THE COURT:  Yes.

03:19:48 12           MR. FINKELSON:  With respect to the bond, Your

03:19:54 13   Honor, our position, I think, is well articulated in the

03:19:58 14   briefs.  There's no question to anybody what Adonis would

03:20:02 15   have needed to do to avoid being in this situation that we

03:20:06 16   are all now in today.  It was clear in the Bankruptcy Court.

03:20:11 17   It's clear from Your Honor's admonitions to both parties

03:20:14 18   with respect to what's been the history of negotiation here.

03:20:17 19           But all Adonis had to do was to assume the

03:20:22 20   contracts that Vobev had.  That would have given them a

03:20:27 21   license.  We wouldn't be talking about copyright

03:20:30 22   infringement.

03:20:30 23           Why didn't Adonis do that?  It did that because

03:20:33 24   it didn't want to pay $13 million and now comes in and asks

03:20:38 25   for a bond of $196 million, assuming in a very friendly way,

03:20:46  1   that this case only takes a year to get to trial.

03:20:48  2          THE COURT:  Can I ask you, given that you've had

03:20:52  3   a longer history on the case, have the parties sat down and

03:20:56  4   tried to work this out?

03:20:57  5          MR. FINKELSON:  The parties have not had a

03:20:59  6   formal mediation, but the parties have had informal

03:21:03  7   discussions, both through counsel and directly business to

03:21:06  8   business, in hopes of resolving this and have not been able

03:21:11  9   to make progress to this point.  But often when someone in

03:21:15 10   Your Honor's position says that out loud to the parties,

03:21:19 11   sometimes that helps.

03:21:20 12          And we have representatives from both the

03:21:22 13   parties here.  Mr. Packer not as senior in the organization

03:21:26 14   as Adonis' corporate representative.  But we're mindful of

03:21:30 15   Your Honor's comments, and I genuinely would like to find a

03:21:35 16   pathway to resolve this.

03:21:37 17          THE COURT:  I take it from your factual

03:21:39 18   presentation that it is your view, as a matter of fact, that

03:21:43 19   at some point, the machine is going to need to be repaired

03:21:47 20   and that they are going to need your help.

03:21:51 21          Is that the case?  I mean, I see that --

03:21:54 22          MR. FINKELSON:  Yes.

03:21:54 23          THE COURT:  -- this is going to end up at one

03:21:56 24   place and so why not -- why shouldn't both sides spend their

03:22:04 25   time and money getting it resolved rather than litigating

03:22:07  1    it, if there's only one station where this train is going to

03:22:13  2    end up?

03:22:15  3            MR. FINKELSON:  Understood, Your Honor.  And,

03:22:16  4    again, I think that the parties have attempted to have

03:22:21  5    discussions.  None of the counsel at the table for Adonis

03:22:25  6    has been involved.  It's been one of counsel of the table's

03:22:28  7    counsel, Mr. Daigle, who's been involved.  He's acted in

03:22:32  8    good faith.  They've been good faith discussions.

03:22:35  9            Adonis personnel has been on that call.  I think

03:22:38 10    they've acted in good faith in those discussions.  Our

03:22:42 11    client has acted in good faith, and so far we haven't made

03:22:45 12    progress.

03:22:45 13            And often, as is the circumstance here, the

03:22:48 14    parties sometimes need a nudge by a Court deciding the

03:22:53 15    issues that are presented before the Court at the time.  And

03:22:59 16    they often go into it assuming the nudge is going to be that

03:23:03 17    of the other party and ends up being them.  And it certainly

03:23:06 18    could be either here.

03:23:07 19            And -- but we'd like to find a pathway to

03:23:11 20    resolve this, short of litigating this case.  And -- but we

03:23:16 21    haven't been able to do that so far.

03:23:18 22            So our proposal on the bond is tethered to

03:23:21 23    business realities.  It's also tethered, even if you take

03:23:23 24    the $400,000 a day which bears no relationship to any facts

03:23:29 25    in this case, just pulled from another case, I think.  Even

03:23:31  1    if you take that and a reasonable assessment of how long it

03:23:34  2    would take for Adonis to create brand new code from scratch,

03:23:39  3    weeks not months, it comes out to a very similar number in

03:23:43  4    that kind of 12-to-$13-million range.  We think that's

03:23:47  5    appropriate here, given the facts and given the

03:23:50  6    circumstances.

03:23:50  7              The comments about the CV agreement have no

03:23:56  8    bearing on the issues before this Court.  The CV agreement

03:24:01  9    is a forward-looking agreement that deals with

03:24:05 10    forward-looking issues.  The parties have some disputes

03:24:08 11    about the terms.

03:24:09 12              One thing we don't have any dispute about is

03:24:13 13    what the trade terms are and that those trade terms have

03:24:19 14    nothing to do with what's in the prior Vobev-Belvac

03:24:24 15    agreements.  And the reason we don't have a disagreement is

03:24:26 16    because they went into the Bankruptcy Court to get the neck

03:24:31 17    reports delivered over our objection and said, Any of those

03:24:34 18    terms and conditions that used to exist as to Vobev, they

03:24:37 19    don't exist to us, Adonis.

03:24:39 20              And we said, Well, we should have some terms and

03:24:42 21    conditions.  These are at least a reference point.  And the

03:24:46 22    Judge accepted Adonis' argument and didn't impose any of

03:24:51 23    those terms and conditions.

03:24:52 24              So the CV agreement may present issues for Your

03:24:54 25    Honor to deal with down the line.  It doesn't address or

89

03:24:57  1    deal with the issues that we're talking about here today.

03:25:00  2              I don't know the difference between big O and

03:25:03  3    little O in the context of copyright.  I don't think there

03:25:10  4    is a difference between ownership for first sale purposes

03:25:15  5    and ownership for essential step purposes.  If you look at

03:25:17  6    the cases, they don't treat them differently.

03:25:20  7              There is a difference between ownership being

03:25:22  8    only a title-based question and ownership being an incidence

03:25:28  9    of ownership-based investigation.  And I don't disagree with

03:25:32 10    counsel for Adonis that in the essential step context, and I

03:25:36 11    think also in the first-sale context, it is looking at those

03:25:39 12    incidents of ownership.  And that tells you to look at the

03:25:42 13    agreements.

03:25:43 14              There were a few sections cited today that I

03:25:45 15    hadn't heard referenced to before in any of the briefing.

03:25:49 16    12.05 speaks to all three things that matter.  What's it

03:25:54 17    called and is there any ownership being granted or not in

03:25:59 18    the software, not in the IP.  If the language of that

03:26:03 19    agreement was talking about IP, then I would get the

03:26:05 20    argument that that's different than ownership in the

03:26:08 21    software.

03:26:08 22              We're here to talk about ownership in the

03:26:10 23    software.  And that's what 12.05 addresses directly.  It

03:26:14 24    also addresses transfer.  It also addresses what use can be

03:26:18 25    made, including not having a third party see or be dis --

03:26:24  1    you know, disclose the software code to a third party.

03:26:28  2            So this kind of bringing in of other provisions

03:26:31  3    that may bear on maintenance or otherwise, I don't think any

03:26:36  4    of that impacts the analysis.  12.05 is clear in what it

03:26:40  5    allows and clear in what it prohibits when it comes to use,

03:26:45  6    which is not in perpetuity upon default.  They lose it.

03:26:50  7            Belvac has the right to conduct an audit to see

03:26:54  8    whether they're in breach, in which case they lose it, and

03:26:58  9    they're not allowed to transfer it to anybody.  And

03:27:00 10    that's -- if you follow the thinking in the cases discussing

03:27:04 11    incidents of ownership, that's what it's about.  And I would

03:27:08 12    submit to the Court that it's not a close call on ownership

03:27:13 13    versus license for essential step purposes on these facts.

03:27:16 14            Irreparable harm.  There was a statement made

03:27:23 15    that the test is we must show that we are, in fact,

03:27:28 16    suffering irreparable harm.  That's not the test.

03:27:30 17            The standard in the Third Circuit from the

03:27:34 18    _Silvertop_ case uses the language that irreparable harm is

03:27:38 19    likely.  It doesn't -- there is no burden for us to show

03:27:44 20    here that we are, in fact, actually suffering irreparable

03:27:48 21    harm.  How could we do that when you're talking about

03:27:51 22    reputation-based injury, or goodwill-based ^ injury or loss

03:27:54 23    of control-based injury.

03:27:56 24            The test is likely to suffer irreparable harm.

03:27:59 25    And we've outlined for the Court the ways in which we are

03:28:03  1    going to suffer that irreparable harm directly tethered to

03:28:07  2    the acts of reproduction.

03:28:10  3          And then the weighing of the equities.  Adonis

03:28:15  4    is here by its own choice.  Adonis bought this equipment,

03:28:21  5    bought this company knowing that this issue existed.  And

03:28:27  6    they may have bet on their -- on the question of whether

03:28:30  7    they were right, but when they've made that election -- when

03:28:37  8    they knew we said, You cannot do this, you're going to be

03:28:40  9    here and we're going to be alleging copyright infringement,

03:28:45 10    to use the fact that a preliminary injunction is going to

03:28:48 11    shut Adonis down as somehow favoring Adonis on the weighing

03:28:53 12    of the harms, the case law is clear.  When you weigh the

03:28:58 13    harms, if it's a self-inflicted harm, it doesn't carry

03:29:02 14    weight.

03:29:02 15          There's -- there could not be a more

03:29:04 16    self-inflicted harm than this one.  We screamed from the

03:29:06 17    rooftops that this was going to be a problem.

03:29:11 18          And to Your Honor's questions about the

03:29:12 19    bankruptcy proceeding, we recognized that we had a distinct

03:29:19 20    claim, both for copyright infringement and breach of

03:29:22 21    contract, against the Debtor.  And, in our view, also had a

03:29:26 22    copyright infringement claim against Adonis once we got

03:29:30 23    here.

03:29:32 24          I don't think the Court, ultimately, tangled

03:29:35 25    with the issue in response to your direct question that,

03:29:38  1    yes, I don't think the Court ultimately tangled with the

03:29:41  2    issue.  Adonis basically said to the Court, That can be

03:29:44  3    dealt with in this proceeding in Delaware, when the "it" is

03:29:50  4    really not one in the same as the "it" as we're dealing with

03:29:53  5    here.  So that's, I think, my best answer to your question

03:29:56  6    on what is admittedly not the most crystal clear --

03:30:00  7                 THE COURT:  I appreciate that.

03:30:01  8                 MR. FINKELSON:  -- of records on that point.

03:30:02  9                 And, lastly, just so we're clear, because we

03:30:04 10    have talked all about reproduction here today.  And -- but

03:30:07 11    to be clear, it remains our position, in the alternative,

03:30:12 12    that the post-license commercial exploitation of our

03:30:17 13    software by Adonis through use of that software alone is, in

03:30:25 14    fact, inconsistent with our exclusive rights under the

03:30:30 15    Copyright Act.

03:30:30 16                 THE COURT:  Which one?  Which exclusive right?

03:30:31 17                 MR. FINKELSON:  It remains our position -- it's

03:30:34 18    inconsistent with the -- both the reproductive -- right of

03:30:37 19    reproduction and the right of distribution, because part and

03:30:41 20    parcel of having a software license program, right, is that

03:30:46 21    you're using that license program to control those things.

03:30:52 22                 And that's what the Clinical In -- there's only

03:30:55 23    one case cited by the parties on this use issue as fairly

03:31:00 24    presented by our position on it.  That's the *Clinical*

03:31:04 25    *Insights* case.  I think it's from the Western District of

03:31:06 1    New York.  I always get -- I get --

03:31:08 2              THE COURT:  Well, let's just get into this.  I

03:31:11 3    just want to make sure we're very clear, because I think we

03:31:14 4    were productively talking about copies made incident to

03:31:19 5    running the software.  But the rights in 17 U.S. Code 106,

03:31:26 6    Number 1 is the right to reproduce the copyrighted work.

03:31:30 7              So aside from the copy made in the ram, or on

03:31:33 8    the laptop or the ram of the laptop, how is use reproducing

03:31:38 9    the copyrighted work?  We can go through this.  Maybe it's

03:31:41 10   not productive right now.

03:31:43 11             MR. FINKELSON:  Yes.  And I'm happy to go

03:31:45 12   through it if Your Honor would like to.  I focused on the

03:31:49 13   kind --

03:31:49 14             THE COURT:  The copying.

03:31:50 15             MR. FINKELSON:  The copying --

03:31:51 16             THE COURT:  Right.

03:31:52 17             MR. FINKELSON:  -- which is clearer.  I just

03:31:54 18   want to make clear for the record, because this case is

03:31:55 19   going to proceed in some form, that we will continue to

03:32:00 20   assert --

03:32:01 21             THE COURT:  You haven't dropped the argument?

03:32:03 22             MR. FINKELSON:  We haven't dropped the argument,

03:32:05 23   but our position is in a situation -- the test is

03:32:08 24   inconsistency with one of the exclusive rights.  That's the

03:32:11 25   test.  If you look at the *Teleprompter* case, that's from the

03:32:14  1    Supreme Court.  That's how it's phrased.

03:32:16  2          And it is our position, and we believe *Clinical*

03:32:19  3    *Insights* supports this, that when you have a post-license

03:32:24  4    software use, here strategically and on purpose, that that

03:32:32  5    continued use alone, even if there was no actual

03:32:35  6    reproduction, that that is inconsistent with our right, both

03:32:39  7    to do and to authorize -- both of which are spelled out in

03:32:45  8    Section 106 -- to do and to authorize reproduction and

03:32:50  9    distribution.

03:32:51 10          That's our position, and we think *Clinical*

03:32:54 11    *Insights* supports it.  We don't think any of -- we're not

03:32:56 12    arguing for a new rule that uses an exclusive right.  We're

03:33:00 13    not arguing for any of that stuff.

03:33:02 14          But we do believe there's a nuanced question

03:33:04 15    here that we would like to tease out with the Court if this

03:33:10 16    matter proceeds, if we're allowed to, on that question.  But

03:33:12 17    it is not a question that's necessary to be decided for

03:33:15 18    purposes of granting us a preliminary injunction based on

03:33:18 19    reproduction.

03:33:19 20          And the scope of that injunction can be tailored

03:33:23 21    to that fact as well as the Court sees fit.  We framed it in

03:33:28 22    terms of use because use imminently and invariably is going

03:33:31 23    to involve reproduction, right.  But you could frame it in

03:33:35 24    terms of reproduction, and that would also speak to the

03:33:42 25    issues before the Court.

03:33:43  1       So I just want to make clear we're not

03:33:45  2   jettisoning the argument.  I didn't devote much time to it

03:33:48  3   today because I think it is hotly debated, but we believe

03:33:52  4   that there is room for that argument, even in the absence of

03:33:57  5   actual reproduction.  But it's not necessary to reach that

03:34:00  6   or decide that for purposes of ruling on the preliminary

03:34:03  7   injunction.

03:34:03  8       THE COURT:  Well, it might be to rule on the

03:34:04  9   motion to dismiss, but you said that you'd be happy, too, if

03:34:11 10   I granted leave to amend.

03:34:13 11       MR. FINKELSON:  Yes.  And I was actually going

03:34:14 12   to ask you that question.  So if you grant us leave to

03:34:17 13   amend, what we would propose to do in that amendment are two

03:34:21 14   things.

03:34:21 15       One, to spell out the reproduction -- acts of

03:34:25 16   reproduction facts as have been played out in the

03:34:28 17   preliminary injunction briefing.  And, also, with Your

03:34:32 18   Honor's permission, to do a better job of crystallizing this

03:34:37 19   use issue so that our position is clearer on this

03:34:41 20   alternative basis than perhaps it is on the face of the

03:34:45 21   initial Complaint.

03:34:46 22       THE COURT:  Well, certainly the Court would not

03:34:47 23   require you to do anything other than provide a short and

03:34:51 24   plain statement of your entitlement to relief.  So no need

03:34:54 25   to brief it in that.

03:34:57  1          And if you're saying that I don't have to decide

03:34:58  2    it, I would like to exercise that option not to decide it.

03:35:04  3    I'm suspicious of that argument, but if you amend to add the

03:35:07  4    reproduction, that certainly would state a claim.  I don't

03:35:12  5    think anybody's arguing that it doesn't state a claim.

03:35:15  6          MR. FINKELSON:  Right.

03:35:15  7          THE COURT:  Whether or not it's a winning claim,

03:35:17  8    I don't know.  But let's leave it at that.

03:35:19  9          Let me ask you one more --

03:35:20 10          MR. FINKELSON:  Please.

03:35:21 11          THE COURT:  -- thing which is this:  I had a

03:35:27 12    question for you earlier about irreparable harm, and I asked

03:35:32 13    you how it was tied to the reproduction.  And you had an

03:35:36 14    answer for it, which is that they could make modifications,

03:35:42 15    and that those modifications would necessarily make a copy

03:35:46 16    of the software and that those could have safety issues.

03:35:48 17          But under the original license, the licensee,

03:35:58 18    Vobev, they had a right to make modifications consistent

03:36:01 19    with what, adopting the software; right?

03:36:05 20          MR. FINKELSON:  They had a right in

03:36:06 21    Section 12.05 to make certain specifically enumerated

03:36:09 22    modifications.

03:36:10 23          THE COURT:  Right.

03:36:11 24          MR. FINKELSON:  Counsel made the point that one

03:36:12 25    of them was safety alarms.  Safety alarms is not safety

03:36:15  1    sensors and all the equipment that's kind of ensuring

03:36:19  2    safety.  It's whether Your Honor wants a red light or a

03:36:23  3    screaming red light popping up on her screen when there is a

03:36:26  4    safety event.  So an alarm -- the ability to modify with

03:36:30  5    respect to a safety alarm is very different than the ability

03:36:33  6    to modify how the code is actually performing the safety

03:36:38  7    functions, if that makes sense.

03:36:39  8            So that's -- but there is no question they had a

03:36:41  9    right to make certain modifications.  That right, however,

03:36:45 10    was subject to both a contractual provision and a practical

03:36:49 11    reality, neither of which exist here.

03:36:52 12            The contractual provision was, We have the right

03:36:53 13    to audit, right, to come in and audit any modifications.  We

03:36:57 14    don't have that right with Adonis, because they're not

03:36:59 15    subject to a contract any -- they've rejected the license.

03:37:04 16            The practical reality, and I think maybe this is

03:37:07 17    where Your Honor picked up on some of Mr. Packer's

03:37:09 18    testimony, the practical reality is with all of our

03:37:12 19    licensees, we're in their places of business all of the

03:37:16 20    time, right.  Why are we in there?  We're by virtue -- in

03:37:20 21    there by virtue of them being authorized licensees of ours.

03:37:24 22            So I do think the question of servicing is --

03:37:30 23    points in our favor as opposed to against us, because here

03:37:33 24    we have a situation where a party has decided to forego all

03:37:38 25    of that.  They're going to go it on their own.  They just

03:37:41 1    want to run the machines.  They're not bound by any

03:37:44 2    contractual provisions of a licensee to have any

03:37:47 3    modifications.  They may be limited to only a subclass as

03:37:51 4    was set forth in the contract.  They're not subject to audit

03:37:55 5    rights.  We're not in their facility because they're going

03:37:58 6    their own.

03:37:59 7            So all of the protections that exist in a

03:38:01 8    licensee scenario are gone.  Are gone.  And that's where the

03:38:08 9    lack of control over the software very much is tied to the

03:38:13 10   harms that we have enumerated and that we believe are

03:38:19 11   irreparable and support injunctive relief.

03:38:21 12           Does that answer Your Honor's question?

03:38:22 13           THE COURT:  It does.  All right.

03:38:25 14           MR. FINKELSON:  Unless you have any other

03:38:26 15   questions, Your Honor.

03:38:26 16           THE COURT:  I don't, and you're about out of

03:38:29 17   time any way.  So --

03:38:29 18           MR. FINKELSON:  I was keeping track.  Thank you

03:38:31 19   for your time and patience.

03:38:32 20           THE COURT:  Okay.  So it's about 3:38 right now.

03:38:37 21   We spent a lot of time before the hearing today looking at

03:38:43 22   the record.  I think we have a good understanding of what's

03:38:46 23   going on here.  We certainly did before we came in, but even

03:38:49 24   a better one now after hearing from counsel.

03:38:52 25           And by the way, the skill and knowledge of

03:38:56  1    counsel on both sides was just excellent.  I can't remember

03:39:01  2    having a hearing in recent memory that's been so well

03:39:05  3    presented on both sides, and I really do appreciate it.

03:39:08  4             I'd like to take a recess.  I think I'm going to

03:39:11  5    be in a position to give you at least a preliminary answer

03:39:16  6    today on the question of preliminary injunction.

03:39:20  7             So let's take a break for half an hour.  I don't

03:39:25  8    know if folks have got plane flights or anything that

03:39:28  9    they're trying to get to, but I promise to be quick when I

03:39:31 10    come back.

03:39:31 11             Would that pose a problem for anyone returning

03:39:35 12    at 4:10?

03:39:37 13             MR. FINKELSON:  Not for us, Your Honor.

03:39:38 14             MS. KLIEBENSTEIN:  I don't think so.

03:39:39 15             THE COURT:  As long as I have one counsel from

03:39:41 16    each side to be present in the courtroom when I state the

03:39:43 17    ruling so that we're not conducting an ex parte proceeding,

03:39:47 18    that's fine.  If Delaware counsel have other obligations,

03:39:50 19    you're definitely excused.  So we'll see you back in half an

03:39:56 20    hour.

03:39:56 21             DEPUTY CLERK:  All rise.

03:42:20 22             (Recess was taken.)

04:22:35 23             DEPUTY CLERK:  All rise.

04:22:36 24             THE COURT:  Please be seated.  Thank you for

04:22:37 25    your patience.

04:22:52 1        All right.  I'm ready to rule on the motion for

04:22:55 2    a preliminary injunction.  The motion for a preliminary

04:22:57 3    injunction is going to be denied.

04:22:59 4        Both sides agree on the elements required to

04:23:03 5    obtain a preliminary injunction.  That is, the Plaintiff

04:23:05 6    must establish likelihood of success on the merits that the

04:23:10 7    Plaintiff is likely to suffer irreparable harm in the

04:23:13 8    absence of preliminary relief, that the balance of equities

04:23:16 9    tips in the Plaintiff's favor, and that an injunction is in

04:23:19 10   the public interest.  We all agree on those elements.

04:23:24 11        The failure to establish any element renders a

04:23:27 12   preliminary injunction inappropriate.  And I find on this

04:23:28 13   record that Belvac has failed to establish the element of

04:23:32 14   irreparable harm, which precludes the Court from entering a

04:23:36 15   preliminary injunction.

04:23:37 16        Belvac contended in its papers and argued before

04:23:42 17   the Court today a number of bases in support of a finding of

04:23:47 18   irreparable harm.  It argued that denying a preliminary

04:23:51 19   injunction here would amount to a forced license to Belvac's

04:23:54 20   creative work.  Whatever force that argument has in other

04:23:58 21   contexts and circumstances, it doesn't have force here.

04:24:03 22        We are talking about software that runs canning

04:24:07 23   machines.  I have no doubt that developing the software

04:24:10 24   required significant monetary investment and creativity, but

04:24:14 25   the fact remains that Belvac routinely licenses its software

04:24:18  1    to its customers.  Under the circumstances here, I cannot

04:24:21  2    find that damages would be inadequate to compensate Belvac

04:24:25  3    for the use of its work.

04:24:27  4          For the same reason, I reject Belvac's argument

04:24:29  5    that damages for infringement are hard to quantify and that

04:24:32  6    there's no adequate remedy of law.  Belvac and Adonis don't

04:24:38  7    compete.  Belvac regularly licenses its software.  And the

04:24:41  8    record reflects that the value attributable to Adonis' use

04:24:45  9    of the software can be quantified and surely can be

04:24:51 10    calculated at trial.

04:24:52 11          Belvac also argues and we focused on this at the

04:24:56 12    oral argument today that Adonis use of the software without

04:24:59 13    Belvac's oversight might injure Belvac's reputation in the

04:25:03 14    eyes of consumers of the cans, or in the industry or

04:25:07 15    elsewhere.  The argument goes that Adonis might make a

04:25:11 16    modification of the software that jeopardizes safety or

04:25:15 17    quality, in one way or the other, and this could cause

04:25:18 18    reputational damage.

04:25:20 19          But as a legal matter, Belvac must show that the

04:25:23 20    irreparable harm is causally attributable to the challenged

04:25:27 21    infringement.  That's a Third Circuit case, *TD Bank vs.*

04:25:30 22    *Hill*.  It's 928 F.3d. 259 at 282.

04:25:34 23          The challenged infringement that we focused on

04:25:38 24    during the hearing today is that a copy of the software is

04:25:42 25    made in the ram of the machines when they're turned on and

04:25:46 1    in the hard drives and ram of laptops connected to the

04:25:49 2    machines.  The challenged infringement doesn't cause the

04:25:52 3    alleged harm.

04:25:53 4          I appreciate the argument made by counsel for

04:25:57 5    Belvac today that if Adonis had a License Agreement with

04:26:00 6    Belvac, it would avoid the harm Belvac is talking about by

04:26:04 7    enhancing safety.  For example, by giving Belvac audit

04:26:08 8    rights and other protections that would exist in a license

04:26:11 9    scenario.  But those harms are not caused by the challenged

04:26:15 10   infringement itself.

04:26:15 11         So that's the Court's ruling on the motion for

04:26:21 12   preliminary injunction.

04:26:23 13         We also have a pending motion to dismiss the

04:26:28 14   Complaint.  Plaintiff has indicated that it would like leave

04:26:30 15   to amend the Complaint, so leave will be granted.  I'll ask

04:26:33 16   that any Amended Complaint be filed within 14 days.  If the

04:26:37 17   parties stipulate to an extension, that's fine, too.

04:26:40 18         Once an Amended Complaint is granted, the Court

04:26:42 19   will dismiss the pending motion to dismiss as moot.

04:26:45 20         And then, finally, I wanted to make a pitch to

04:26:52 21   the parties to get this resolved by mediation or otherwise.

04:26:59 22   As I'm sure everyone has advised their clients, litigating a

04:27:03 23   case like this is going to be a huge investment of time and

04:27:08 24   money.  We're going to need, for example, expert reports to

04:27:12 25   talk about whether a copy of the software is, in fact,

04:27:16  1    loaded onto the ram.  We'll hear testimony about that.

04:27:21  2    Discovery will be incredibly expensive.

04:27:24  3              And I don't think it's going to be that much

04:27:26  4    more informative than where we are right now.  We're all

04:27:31  5    going to know exactly what we know right now at the end of

04:27:33  6    it, but it's going to cost a lot of money and time.  So I

04:27:36  7    would encourage both sides to think about whether this case

04:27:39  8    can be resolved without any further litigation and expense.

04:27:45  9              Does anybody else have anything they want to say

04:27:48 10    at this point before we conclude?

04:27:49 11              MR. FINKELSON:  Nothing further from Plaintiff.

04:27:51 12    Thank you for your time today.

04:27:53 13              THE COURT:  Thank you.

04:27:53 14              MS. KLIEBENSTEIN:  Just for clarification on the

04:27:56 15    motion to dismiss, it's denied as moot with leave to refile

04:28:00 16    pending --

04:28:00 17              THE COURT:  You can file another motion to

04:28:02 18    dismiss if you feel they haven't remedied the deficiencies

04:28:05 19    you pointed out --

04:28:06 20              MS. KLIEBENSTEIN:  Sure.

04:28:07 21              THE COURT:  -- but we're not going to deny it.

04:28:09 22    We'll give them leave to refile or give them leave to file

04:28:12 23    an Amended Complaint.  And at that point, your motion will

04:28:15 24    be moot and we will dismiss it.

04:28:19 25              MS. KLIEBENSTEIN:  Thank you.

04:28:19    1                    THE COURT:  All right.  Thank you.

04:28:20    2                    DEPUTY CLERK:  All rise.

            3                    (Court was adjourned at 4:28 p.m.)

            4                    I hereby certify the foregoing is a true and

            5    accurate transcript from my stenographic notes in the

            6    proceeding.

            7                            /s/ Heather M. Triozzi
                                        Certified Merit and Real-Time Reporter
            8                            U.S. District Court

            9

           10

           11

           12

           13

           14

           15

           16

           17

           18

           19

           20

           21

           22

           23

           24

           25

## $

**$13** [2] - 38:12, 85:24
**$196** [1] - 85:25
**$400,000** [2] - 85:1, 87:24
**$50** [1] - 85:1
**$60** [1] - 34:5

## /

**/s** [1] - 104:7

## 1

**1** [6] - 11:20, 12:10, 12:11, 12:15, 19:15, 93:6
**1.2** [1] - 44:5
**10** [1] - 35:3
**10,000-foot** [1] - 84:3
**100** [2] - 47:8, 72:25
**106** [4] - 74:7, 75:2, 93:5, 94:8
**107** [1] - 58:20
**12-to-$13-million** [1] - 88:4
**12.05** [1] - 52:25, 53:7, 53:23, 53:24, 54:5, 70:24, 82:18, 89:16, 89:23, 90:4, 96:21
**12.05(a** [2] - 53:24, 54:9
**12.05(b** [1] - 54:11
**120** [1] - 83:14
**13** [1] - 85:3
**14** [2] - 67:11, 102:16
**14.04** [3] - 72:6, 72:11, 82:25
**15** [2] - 6:5, 27:21
**16** [1] - 1:12
**17** [2] - 78:2, 93:5
**17th** [1] - 24:18
**1:04** [1] - 1:12

## 2

**2.02** [1] - 83:1
**2.2** [1] - 49:10
**2020** [3] - 70:15, 82:14, 83:23
**2022** [4] - 33:13, 70:16, 82:15, 83:23
**2025** [3] - 1:12, 24:18, 83:9
**25-166** [1] - 2:14
**25-166-JLH** [1] - 1:6
**259** [1] - 101:22
**282** [1] - 101:22

**2:35** [1] - 66:2
**2:45** [1] - 66:3

## 3

**3,000** [1] - 26:9
**3.8** [1] - 83:12
**3:38** [1] - 98:20

## 4

**40** [1] - 46:17
**41** [1] - 47:17
**415** [2] - 70:12, 73:15
**480** [1] - 20:8
**4:10** [1] - 99:12
**4:28** [1] - 104:3

## 5

**5** [3] - 77:15, 77:20, 77:23
**5000** [2] - 16:19, 18:5
**502(a** [1] - 42:17
**52** [1] - 78:6

## 7

**7th** [6] - 30:10, 30:12, 32:11, 32:13, 67:3, 69:7

## 8

**8** [2] - 24:17, 25:1
**844** [1] - 1:10

## 9

**9** [3] - 12:13, 12:15, 12:17
**928** [1] - 101:22

## A

**A(ii** [1] - 72:12
**ability** [8] - 16:16, 16:24, 16:25, 25:19, 26:5, 52:15, 97:4, 97:5
**able** [7] - 16:3, 25:7, 25:24, 25:25, 71:25, 86:8, 87:21
**absence** [2] - 95:4, 100:8
**absolutely** [8] - 41:17, 47:8, 47:25, 48:23, 48:25, 49:2, 54:2, 61:12
**AC** [1] - 20:8
**accept** [2] - 29:21,
80:24
**accepted** [1] - 88:22
**access** [2] - 9:14, 10:20, 15:16, 15:17, 16:6, 16:12, 16:16, 16:21, 16:24, 16:25, 17:2, 17:12, 17:16, 17:25, 20:22, 21:11, 21:17, 25:19, 41:8, 42:5, 42:11, 45:6
**accessed** [2] - 17:8, 17:19
**accesses** [1] - 45:10
**accessing** [4] - 44:24, 58:6, 65:5, 65:7
**accommodate** [1] - 20:23
**accomplish** [1] - 38:13
**according** [2] - 16:18, 25:11
**accounted** [1] - 83:19
**accurate** [2] - 25:18, 104:5
**accused** [1] - 68:11
**achieved** [1] - 59:23
**acknowledges** [2] - 40:1, 66:19
**ACQUISITION** [1] - 1:7
**Acquisition** [2] - 2:13, 3:4
**acquisition** [1] - 40:18
**acronym** [1] - 7:13
**act** [4] - 64:1, 64:7, 65:2, 65:7
**Act** [8] - 38:7, 40:1, 42:18, 55:15, 73:25, 74:7, 75:3, 92:15
**acted** [3] - 87:7, 87:10, 87:11
**Action** [1] - 2:14
**action** [5] - 36:11, 67:11, 67:14, 70:5, 80:13
**actions** [1] - 74:6
**acts** [8] - 42:11, 43:10, 63:21, 64:11, 65:21, 68:11, 91:2, 95:15
**actual** [7] - 47:3, 49:22, 63:6, 68:9, 77:9, 94:5, 95:5
**add** [1] - 96:3
**added** [1] - 50:13
**adding** [1] - 14:13
**addition** [3] - 27:2, 50:8, 64:15
**additional** [5] - 49:15, 60:14, 61:11, 64:4
**address** [6] - 39:5, 43:12, 43:15, 64:9,
75:13, 88:25
**addressed** [3] - 46:16, 79:1, 79:4
**addresses** [3] - 89:23, 89:24
**adequate** [1] - 101:6
**adjourned** [1] - 104:3
**admit** [1] - 66:20
**admitted** [2] - 12:10, 12:11
**admittedly** [1] - 92:6
**admonitions** [1] - 85:17
**ADONIS** [1] - 1:7
**Adonis** [127] - 2:13, 3:4, 3:19, 4:1, 7:3, 7:6, 9:21, 9:25, 13:8, 14:4, 14:24, 15:1, 15:3, 15:7, 15:9, 15:17, 16:16, 16:24, 17:8, 19:1, 19:21, 20:3, 22:3, 24:5, 25:7, 25:11, 25:23, 26:6, 26:18, 29:6, 29:11, 29:20, 30:11, 30:16, 31:18, 32:2, 38:5, 38:8, 38:13, 38:16, 38:18, 38:23, 39:25, 40:3, 40:10, 40:14, 40:20, 40:25, 41:11, 41:12, 41:22, 41:23, 42:16, 43:7, 43:20, 43:24, 44:3, 45:4, 46:4, 47:13, 48:6, 48:15, 49:9, 49:18, 51:8, 51:18, 51:19, 53:1, 53:3, 55:3, 55:13, 55:16, 56:7, 56:14, 57:19, 57:20, 58:14, 58:17, 59:7, 59:19, 59:23, 60:8, 61:15, 63:23, 64:22, 65:14, 66:21, 66:25, 67:3, 67:7, 67:16, 69:1, 69:3, 69:19, 69:20, 70:22, 73:2, 73:19, 81:11, 81:24, 83:13, 83:17, 83:18, 84:4, 85:14, 85:19, 85:23, 87:5, 87:9, 88:2, 88:19, 89:10, 91:3, 91:4, 91:11, 91:22, 92:2, 92:13, 97:14, 101:6, 101:12, 101:15, 102:5
**Adonis'** [21] - 6:21, 7:24, 8:4, 8:20, 25:19, 44:6, 44:10, 44:16, 45:14, 50:10,
54:24, 60:11, 63:1, 65:11, 65:18, 67:8, 69:19, 72:24, 86:14, 88:22, 101:8
**adopting** [1] - 96:19
**advanced** [2] - 43:17, 43:18
**advantage** [1] - 28:4
**advantages** [1] - 28:9
**adversely** [1] - 27:13
**advised** [2] - 32:1, 102:22
**affairs** [1] - 66:16
**affect** [2] - 26:12, 27:13
**affected** [1] - 27:3
**affirm** [3] - 5:8, 5:11, 5:12
**affirmed** [1] - 5:13
**afield** [2] - 50:17, 70:25
**Aforementioned** [1] - 53:12
**afternoon** [7] - 2:17, 3:2, 5:20, 5:22, 28:19, 28:20, 66:18
**ago** [4] - 33:16, 36:22, 67:1, 69:8
**agree** [11] - 24:24, 24:25, 29:7, 29:9, 35:9, 46:1, 75:2, 81:16, 84:12, 100:4, 100:10
**agreed** [4] - 63:14, 77:24, 81:21, 84:18
**agreement** [11] - 54:3, 54:13, 54:21, 80:15, 82:15, 88:7, 88:8, 88:9, 88:24, 89:19
**Agreement** [16] - 31:19, 31:21, 49:8, 49:9, 49:11, 49:21, 50:14, 53:4, 63:8, 83:7, 83:8, 83:11, 83:16, 83:18, 83:21, 102:5
**agreements** [14] - 46:7, 52:12, 52:14, 52:17, 52:19, 53:20, 54:19, 70:19, 82:16, 82:18, 82:19, 83:23, 88:15, 89:13
**agrees** [1] - 72:21
**ahead** [2] - 2:15, 66:1
**air** [1] - 50:23
**Alan** [1] - 2:19
**ALAN** [1] - 1:18
**alarm** [2] - 97:4, 97:5
**alarms** [6] - 8:9, 9:3, 33:7, 82:21, 96:25

2

**aligned** [1] - 54:21
**allegation** [1] - 67:18
**allegations** [1] - 68:13
**alleged** [1] - 102:3
**alleging** [3] - 64:12, 64:13, 91:9
**allotted** [1] - 4:4
**allow** [2] - 61:2, 82:5
**allowed** [4] - 59:18, 72:14, 90:9, 94:16
**allowing** [1] - 69:3
**allows** [3] - 7:17, 72:12, 90:5
**almost** [4] - 16:14, 26:16, 27:20, 31:11
**alone** [6] - 67:20, 68:15, 73:24, 74:7, 75:1, 75:2, 92:13, 94:5
**alternative** [4] - 18:8, 18:9, 92:11, 95:20
**altogether** [1] - 6:3
**amend** [4] - 95:10, 95:13, 96:3, 102:15
**Amended** [4] - 60:24, 102:16, 102:18, 103:23
**amendment** [1] - 95:13
**amount** [4] - 22:2, 44:1, 59:13, 100:19
**analogous** [2] - 45:20, 58:12
**analysis** [7] - 52:6, 54:25, 55:1, 56:20, 58:20, 62:24, 90:4
**answer** [7] - 26:1, 37:13, 39:12, 92:5, 96:14, 98:12, 99:5
**anticipating** [1] - 79:17
**apart** [3] - 13:20, 20:6, 20:11
**apologies** [2] - 28:8, 31:10
**apologize** [1] - 77:16
**appeal** [1] - 50:21
**appear** [2] - 73:19, 81:20
**appearances** [1] - 2:15
**APPEARANCES** [2] - 1:16, 2:1
**Appendix** [3] - 12:10, 12:11, 12:15
**apples** [1] - 85:5
**Application** [1] - 16:19
**application** [1] - 18:5
**applied** [2] - 57:22,
58:16
**apply** [5] - 58:1, 58:22, 60:6, 82:16, 82:17
**appreciate** [6] - 30:6, 62:1, 72:1, 92:7, 99:3, 102:4
**appreciated** [1] - 72:3
**approach** [3] - 5:1, 11:15, 24:11
**appropriate** [5] - 43:1, 51:5, 56:20, 74:21, 88:5
**approval** [1] - 46:10
**approve** [3] - 56:13, 78:10, 79:4
**approved** [1] - 79:20
**approving** [1] - 51:17
**April** [5] - 1:12, 30:10, 30:12, 32:11, 32:13
**argue** [5] - 55:24, 60:20, 61:7, 62:5, 78:17
**argued** [4] - 59:7, 60:20, 100:16, 100:18
**argues** [1] - 101:11
**arguing** [6] - 45:4, 55:23, 62:20, 94:12, 94:13, 94:5
**argument** [32] - 3:16, 3:20, 3:25, 4:2, 37:25, 40:9, 40:10, 41:21, 43:7, 45:16, 49:17, 50:17, 51:2, 56:2, 60:17, 68:18, 74:9, 78:9, 88:22, 89:20, 93:21, 93:22, 95:2, 95:4, 96:3, 100:20, 101:4, 101:12, 101:15, 102:4
**arguments** [11] - 3:13, 40:3, 43:9, 43:14, 43:20, 56:19, 57:2, 68:16, 69:5, 69:18, 82:22
**Arthur** [1] - 2:18
**ARTHUR** [1] - 1:17
**articulate** [3] - 61:20, 74:6, 74:17
**articulated** [2] - 39:18, 85:13
**aside** [1] - 93:7
**aspects** [2] - 17:1, 17:3
**assembled** [1] - 23:3
**assert** [1] - 93:20
**asserts** [2] - 57:19, 67:12
**assessment** [4] -
22:22, 23:7, 88:1
**Asset** [5] - 49:7, 49:8, 49:10, 49:21, 50:13
**Assets** [1] - 49:12
**assets** [2] - 49:14, 77:24
**assigned** [1] - 38:16
**assume** [2] - 81:1, 85:19
**assumed** [1] - 63:15
**assuming** [2] - 85:25, 87:16
**attachments** [1] - 3:9
**attempted** [1] - 87:4
**attempts** [1] - 47:10
**attendant** [1] - 62:17
**attributable** [2] - 101:8, 101:20
**attributed** [2] - 63:6, 68:5
**audit** [7] - 54:15, 54:16, 90:7, 97:13, 98:4, 102:7
**authority** [1] - 42:14
**authorize** [3] - 78:3, 94:7, 94:8
**authorized** [1] - 97:21
**authorizes** [1] - 42:18
**automatic** [1] - 12:25
**Automation** [2] - 16:19, 18:5
**available** [1] - 37:18
**avoid** [2] - 85:15, 102:6
**aware** [5] - 31:24, 34:2, 58:17, 61:16, 73:9

## B

**bad** [1] - 65:16
**bait** [1] - 48:12
**balance** [1] - 100:8
**balancing** [2] - 67:25, 72:20
**Bank** [1] - 101:21
**bankrupt** [1] - 73:3
**Bankruptcy** [27] - 38:9, 41:15, 41:16, 41:25, 45:21, 46:6, 46:10, 46:12, 46:15, 46:25, 48:15, 48:21, 49:17, 50:2, 54:23, 56:3, 56:4, 56:21, 56:24, 61:17, 78:8, 79:7, 79:20, 83:10, 83:17, 85:16, 88:16
**bankruptcy** [25] - 46:8, 46:9, 46:15, 47:5, 50:22, 50:24,
51:14, 52:4, 56:16, 66:11, 67:2, 69:7, 71:16, 75:14, 75:25, 77:3, 79:10, 80:5, 80:19, 80:23, 80:24, 80:25, 81:7, 83:15, 91:19
**based** [14] - 19:19, 22:22, 23:6, 34:24, 39:23, 39:24, 47:18, 83:13, 89:8, 89:9, 90:22, 90:23, 94:18
**basement** [1] - 13:18
**bases** [1] - 100:17
**basis** [4] - 37:5, 37:7, 67:21, 95:20
**bear** [4] - 39:6, 40:5, 64:25, 90:3
**bearing** [2] - 13:24, 88:8
**bears** [1] - 87:24
**beat** [2] - 48:22, 49:1
**becomes** [2] - 66:11, 66:22
**BEFORE** [1] - 1:14
**beforehand** [1] - 67:13
**begin** [1] - 62:3
**beginning** [1] - 57:12
**behalf** [4] - 3:3, 3:18, 4:21, 48:6
**behaving** [1] - 23:23
**behold** [1] - 49:3
**Belgium** [2] - 31:8, 31:9
**belief** [1] - 35:15
**believes** [2] - 22:8, 61:19
**BELVAC** [1] - 1:4
**Belvac** [105] - 2:12, 3:18, 4:21, 5:24, 6:1, 6:3, 6:7, 6:12, 6:20, 6:23, 7:2, 7:5, 7:23, 9:20, 9:21, 9:24, 10:1, 10:10, 10:12, 10:16, 11:5, 15:9, 15:17, 17:1, 17:18, 17:21, 17:24, 18:2, 18:10, 18:25, 21:12, 22:4, 22:7, 22:17, 24:3, 24:6, 24:22, 25:20, 25:21, 25:22, 26:4, 26:18, 26:23, 26:24, 27:4, 27:18, 28:3, 28:4, 29:2, 29:17, 29:23, 30:22, 31:3, 32:2, 33:14, 34:2, 34:8, 34:17, 35:2, 35:9, 36:23, 37:2, 38:10, 38:11,
38:14, 38:16, 38:19, 38:22, 38:23, 38:25, 39:1, 39:2, 41:7, 46:5, 46:7, 52:22, 54:15, 63:1, 63:15, 67:9, 67:11, 68:1, 69:13, 69:18, 69:23, 72:18, 73:8, 73:18, 77:25, 83:12, 88:14, 90:7, 100:13, 100:16, 100:25, 101:2, 101:6, 101:7, 101:11, 101:19, 102:5, 102:6, 102:7
**Belvac's** [16] - 26:12, 26:13, 27:13, 38:5, 38:6, 39:24, 48:17, 63:2, 65:18, 67:4, 67:5, 69:5, 100:19, 101:4, 101:13
**benefit** [1] - 59:23
**best** [4] - 43:6, 50:8, 56:25, 92:5
**bet** [1] - 91:6
**better** [6] - 39:20, 45:18, 61:24, 74:22, 95:18, 98:24
**between** [13] - 38:14, 46:7, 47:1, 52:22, 65:2, 66:9, 70:15, 70:19, 79:18, 82:14, 89:2, 89:4, 89:7
**big** [3] - 26:17, 73:6, 89:2
**bit** [1] - 65:23
**bless** [1] - 15:4
**blessing** [1] - 54:24
**block** [1] - 29:20
**body** [1] - 75:18
**bodymaker** [13] - 7:11, 8:23, 9:4, 9:11, 10:11, 11:5, 13:9, 14:5, 15:18, 17:19, 18:4, 26:23, 37:4
**bodymakers** [17] - 6:17, 6:21, 7:22, 8:20, 8:22, 9:6, 9:21, 11:13, 22:18, 22:20, 23:4, 23:15, 26:18, 31:6, 32:21, 33:1, 35:10
**Boggs** [1] - 1:10
**bond** [7] - 84:22, 84:23, 85:3, 85:5, 85:12, 85:25, 87:22
**booted** [2] - 35:15, 35:16
**boots** [1] - 33:12
**borne** [1] - 76:22
**bought** [2] - 91:4, 91:5

**bound** [2] - 82:2, 98:1
**box** [1] - 19:10
**BPLC** [1] - 7:11
**brand** [4] - 11:11, 29:14, 29:20, 88:2
**breach** [4] - 67:10, 80:13, 90:8, 91:20
**break** [3] - 66:1, 66:2, 99:7
**brief** [7] - 36:17, 43:15, 43:16, 45:22, 57:19, 74:10, 95:25
**briefed** [1] - 45:21
**briefing** [10] - 24:16, 38:4, 39:8, 40:8, 49:4, 56:19, 61:23, 62:5, 89:15, 95:17
**briefly** [3] - 22:15, 60:13, 72:21
**briefs** [6] - 3:9, 44:3, 48:4, 56:17, 65:14, 85:14
**bringing** [1] - 90:2
**brought** [3] - 41:12, 41:13, 83:6
**bug** [1] - 84:5
**building** [1] - 23:2
**built** [3] - 23:3, 27:24, 28:9
**bundles** [1] - 76:20
**burden** [2] - 39:6, 90:19
**bushing** [1] - 13:24
**business** [11] - 37:9, 63:11, 66:13, 67:12, 72:24, 73:13, 85:3, 86:7, 86:8, 87:23, 97:19
**buttons** [1] - 22:24
**buy** [1] - 73:2
**buying** [1] - 73:4
**BY** [16] - 1:17, 1:18, 1:20, 1:21, 1:24, 2:2, 2:5, 5:19, 11:18, 12:14, 13:6, 15:6, 24:20, 25:5, 28:16, 36:21

## C

**C.A** [1] - 1:6
**calculated** [1] - 101:10
**Caleb** [1] - 1:10
**calendar** [1] - 3:11
**can-making** [3] - 7:19, 19:1, 38:10
**canning** [3] - 26:15, 29:11, 100:22
**cannot** [6] - 38:23,

46:1, 69:11, 70:10, 91:8, 101:1
**cans** [12] - 7:17, 8:17, 17:14, 21:7, 26:9, 27:10, 27:11, 27:14, 65:9, 67:8, 72:24, 101:14
**capital** [5] - 76:18, 76:24, 77:4, 77:6, 77:10
**card** [11] - 10:17, 12:2, 12:21, 35:16, 35:17, 35:23, 36:9, 84:11, 84:12, 84:14
**care** [1] - 67:8
**carry** [1] - 91:13
**cars** [1] - 19:10
**Cartoon** [4] - 44:3, 44:11, 44:13, 44:19
**case** [60] - 9:19, 11:21, 14:24, 22:8, 38:5, 39:17, 39:18, 42:8, 42:9, 42:21, 42:22, 44:4, 44:14, 44:16, 44:17, 44:21, 46:8, 46:9, 46:15, 48:4, 50:22, 52:4, 52:10, 53:1, 53:2, 53:4, 53:18, 57:21, 58:1, 58:16, 62:15, 62:20, 62:23, 64:18, 67:6, 67:19, 71:4, 71:22, 75:4, 75:25, 76:22, 86:1, 86:3, 86:21, 87:20, 87:25, 90:8, 90:18, 91:12, 92:23, 92:25, 93:18, 93:25, 101:21, 102:23, 103:7
**cases** [21] - 42:7, 42:9, 42:13, 43:24, 44:6, 44:11, 44:22, 52:25, 53:5, 57:25, 58:4, 58:11, 59:8, 59:25, 64:21, 74:2, 80:8, 89:6, 90:10
**casually** [1] - 65:20
**categories** [2] - 7:20, 7:24
**category** [5] - 14:1, 14:10, 15:14, 15:15, 44:21
**causal** [2] - 65:2, 68:14
**causally** [5] - 63:6, 64:3, 68:5, 101:20
**caused** [2] - 65:3, 102:9
**CDK** [3] - 44:11, 44:16, 75:5

**cease** [3] - 35:11, 54:11, 54:13
**CEO** [1] - 3:6
**certain** [11] - 8:17, 13:12, 13:13, 13:23, 16:9, 18:25, 41:19, 41:20, 43:16, 96:21, 97:9
**certainly** [14] - 27:1, 39:11, 41:24, 47:10, 51:12, 58:17, 64:4, 64:14, 71:12, 79:14, 87:17, 95:22, 96:4, 98:23
**certification** [1] - 23:11
**certify** [1] - 104:4
**cetera** [5] - 50:12, 50:13, 69:11, 69:25, 83:5
**challenged** [5] - 68:5, 101:20, 101:23, 102:2, 102:9
**chance** [2] - 39:19, 39:20
**change** [7] - 16:3, 16:9, 18:23, 54:25, 68:20, 70:7
**changes** [10] - 14:11, 15:25, 16:1, 17:15, 21:3, 24:1, 25:24, 26:11, 26:22, 59:4
**character** [1] - 58:23
**characteristics** [1] - 8:19
**characterize** [1] - 33:3
**characterized** [1] - 50:8
**characterizing** [2] - 33:1, 54:23
**charged** [1] - 34:17
**choice** [2] - 38:20, 91:4
**choices** [1] - 73:2
**chose** [1] - 74:15
**Circuit** [9] - 39:17, 42:8, 52:10, 58:1, 62:14, 75:6, 90:17, 101:21
**circumstance** [4] - 16:6, 58:13, 59:3, 87:13
**circumstances** [9] - 41:5, 42:17, 44:7, 57:22, 58:18, 60:6, 88:6, 100:21, 101:1
**cite** [3] - 42:14, 57:21, 57:25
**cited** [6] - 42:22,

44:10, 48:4, 58:17, 89:14, 92:23
**cites** [2] - 43:24, 53:1
**citing** [1] - 44:17
**City** [3] - 6:21, 6:24, 41:16
**Civil** [1] - 2:14
**claim** [8] - 43:3, 48:17, 91:20, 91:22, 96:4, 96:5, 96:7
**claims** [4] - 39:17, 39:23, 49:19, 61:11
**clarification** [1] - 103:14
**class** [1] - 37:9
**clear** [45] - 10:8, 10:10, 17:18, 42:2, 42:9, 43:24, 46:6, 46:23, 47:14, 47:15, 48:3, 48:5, 48:7, 48:21, 49:19, 49:20, 50:2, 54:17, 56:15, 56:23, 61:6, 61:9, 61:12, 61:18, 62:3, 62:6, 64:10, 68:8, 73:19, 74:1, 75:5, 78:15, 85:16, 85:17, 90:4, 90:5, 91:12, 92:6, 92:9, 92:11, 93:3, 93:18, 95:1
**clearer** [3] - 52:19, 93:17, 95:19
**clearly** [5] - 46:20, 47:4, 55:19, 61:23, 62:23
**CLERK** [10] - 2:9, 5:3, 5:8, 5:15, 66:4, 66:6, 77:19, 99:21, 99:23, 104:2
**client** [9] - 70:4, 73:12, 76:1, 78:13, 78:19, 78:22, 80:24, 82:16, 87:11
**client's** [4] - 63:11, 66:13, 76:3, 80:5
**clients** [1] - 102:22
**Clinical** [4] - 92:22, 92:24, 94:2, 94:10
**close** [3] - 26:15, 65:12, 90:12
**close-knit** [1] - 26:15
**closely** [3] - 3:9, 6:10, 22:21
**closes** [1] - 18:21
**closing** [1] - 79:10
**clothes** [1] - 13:18
**co** [1] - 2:20
**co-counsel** [1] - 2:20
**code** [19] - 16:7, 24:22, 25:7, 25:12,

25:20, 29:2, 29:7, 30:4, 58:7, 59:18, 59:23, 65:6, 65:7, 73:3, 73:8, 73:11, 88:2, 90:1, 97:6
**Code** [1] - 93:5
**codified** [1] - 40:1
**coin** [1] - 44:7
**colleague** [1] - 61:6
**color** [1] - 78:1
**combining** [1] - 60:17
**coming** [6] - 31:6, 31:15, 38:8, 41:21, 68:16, 75:15
**comment** [2] - 71:24, 72:1
**comments** [3] - 85:8, 86:15, 88:7
**commercial** [4] - 57:24, 58:24, 58:25, 92:12
**commissioned** [1] - 6:23
**community** [2] - 65:13, 65:17
**company** [2] - 70:12, 91:5
**compatible** [1] - 58:8
**compelled** [1] - 41:18
**compelling** [1] - 52:5
**compensate** [1] - 101:2
**compensated** [1] - 70:10
**compete** [2] - 68:23, 101:7
**competitive** [2] - 28:4, 28:9
**competitor** [1] - 28:10
**Complaint** [12] - 43:5, 60:19, 60:24, 61:17, 74:11, 74:24, 95:21, 102:14, 102:15, 102:16, 102:18, 103:23
**complete** [3] - 23:6, 59:1, 59:10
**completely** [1] - 20:11
**complex** [3] - 8:13, 57:9, 73:7
**complexity** [1] - 66:9
**complicated** [1] - 76:13
**component** [1] - 70:16
**components** [2] - 24:23, 59:11
**computer** [5] - 44:15, 49:13, 59:8, 59:12, 61:1
**computers** [2] - 36:6,

75:10
**computing** [3] - 35:13, 35:20, 36:6
**conceded** [1] - 73:23
**concedes** [1] - 45:5
**concern** [1] - 64:8
**conclude** [1] - 103:10
**conclusion** [1] - 81:7
**conclusions** [1] - 72:8
**concrete** [1] - 73:20
**conditions** [3] - 88:18, 88:21, 88:23
**conduct** [1] - 90:7
**conducting** [1] - 99:17
**confers** [1] - 53:12
**confirm** [1] - 11:8
**confirmed** [1] - 11:10
**confirms** [1] - 12:17
**confusing** [1] - 84:1
**confusion** [3] - 46:25, 47:10, 53:11
**conjunction** [1] - 24:15
**connect** [2] - 55:6, 77:22
**connected** [4] - 10:6, 65:20, 68:5, 102:1
**connection** [3] - 54:7, 65:2, 68:15
**Connolly** [3] - 2:18, 2:19
**CONNOLLY** [4] - 1:17, 1:17, 2:17, 2:25
**Consequences** [1] - 72:11
**consequences** [2] - 26:4, 38:20
**consideration** [1] - 52:21
**considered** [1] - 23:1
**consistent** [3] - 12:23, 54:19, 96:18
**consistently** [1] - 72:17
**constantly** [1] - 23:19
**constitute** [2] - 42:12, 43:10
**construed** [1] - 53:13
**consumer** [1] - 70:9
**consumers** [1] - 101:14
**contact** [1] - 23:25
**contemporaneous** [1] - 4:15
**contended** [1] - 100:16
**context** [11] - 4:14, 21:16, 42:11, 42:24, 56:2, 58:2, 58:4, 80:18, 89:3, 89:10,

89:11
**contexts** [1] - 100:21
**continue** [4] - 17:14, 69:3, 83:13, 93:19
**continued** [1] - 94:5
**CONTINUED** [1] - 2:1
**contract** [10] - 54:17, 67:10, 70:15, 72:8, 80:14, 82:23, 82:24, 91:21, 97:15, 98:4
**contracts** [7] - 38:14, 38:15, 52:21, 72:17, 81:8, 85:4, 85:20
**contractual** [3] - 97:10, 97:12, 98:2
**contrary** [4] - 40:4, 41:24, 42:14, 43:23
**contrast** [1] - 67:6
**control** [28] - 6:8, 7:16, 7:18, 8:16, 9:12, 13:14, 14:6, 14:8, 19:24, 20:12, 22:14, 26:5, 26:12, 26:24, 27:18, 28:1, 30:15, 37:16, 59:19, 62:17, 63:2, 63:9, 64:17, 64:25, 90:23, 92:21, 98:9
**control-based** [1] - 90:23
**controller** [2] - 7:10, 12:22
**controllers** [1] - 11:12
**Controllers** [1] - 12:2
**controls** [11] - 8:5, 8:11, 8:14, 8:24, 9:5, 21:2, 37:3, 61:1, 82:20
**converge** [1] - 56:20
**conversation** [1] - 71:10
**coordinator** [1] - 34:23
**copied** [1] - 10:19
**copies** [11] - 9:21, 9:25, 11:16, 16:19, 21:12, 24:11, 25:23, 38:25, 44:10, 67:18, 93:4
**copy** [65] - 10:11, 10:18, 10:24, 12:21, 16:11, 17:20, 17:24, 18:2, 18:7, 18:10, 18:12, 18:15, 18:19, 35:18, 36:4, 41:6, 43:25, 44:4, 44:7, 44:12, 44:15, 44:18, 44:22, 44:23, 44:25, 45:2, 45:6, 45:9, 45:11, 45:12, 45:23,

46:3, 46:5, 47:7, 47:24, 49:6, 49:17, 49:22, 51:1, 51:6, 51:7, 51:8, 51:20, 51:24, 52:16, 53:8, 59:10, 59:24, 60:25, 63:13, 78:11, 78:20, 78:23, 81:18, 81:19, 81:22, 84:2, 84:12, 84:13, 84:16, 93:7, 96:15, 101:24, 102:25
**copying** [15] - 12:25, 15:15, 36:11, 38:5, 42:4, 42:9, 44:3, 58:5, 59:1, 59:23, 60:21, 62:4, 75:7, 93:14, 93:15
**Copyright** [8] - 38:7, 40:1, 42:18, 55:15, 73:25, 74:7, 75:3, 92:15
**copyright** [32] - 7:23, 37:11, 39:16, 39:24, 42:12, 43:10, 48:14, 48:17, 49:19, 50:19, 51:4, 64:12, 66:20, 66:21, 71:22, 74:3, 76:2, 76:13, 78:9, 79:18, 79:24, 80:8, 80:11, 80:16, 80:17, 84:2, 85:21, 89:3, 91:9, 91:20, 91:22
**copyrightable** [2] - 58:7, 58:8
**copyrighted** [11] - 38:5, 57:23, 57:24, 58:9, 58:15, 59:7, 59:15, 59:17, 59:19, 93:6, 93:9
**copyrights** [4] - 48:10, 48:11, 53:16, 60:7
**corporate** [1] - 86:14
**correct** [22] - 13:2, 25:15, 25:16, 29:12, 29:16, 30:5, 31:12, 31:24, 32:11, 32:16, 33:10, 33:17, 34:9, 35:7, 35:8, 35:11, 35:18, 35:25, 36:2, 36:3, 36:6, 36:10
**correctly** [1] - 33:1
**cost** [1] - 103:6
**counsel** [23] - 2:20, 4:1, 30:6, 36:22, 39:9, 41:23, 46:11, 46:19, 46:20, 47:12, 47:13, 75:21, 86:7, 87:5, 87:6, 87:7, 89:10, 96:24, 98:24,

99:1, 99:15, 99:18, 102:4
**Count** [1] - 43:4
**countless** [1] - 27:21
**counts** [1] - 52:18
**course** [5] - 9:20, 9:24, 13:15, 39:1, 74:2
**COURT** [90] - 1:1, 2:11, 2:24, 3:1, 3:7, 4:5, 4:9, 4:17, 4:19, 4:25, 5:16, 11:17, 12:7, 12:9, 15:5, 24:12, 28:14, 36:16, 36:19, 37:21, 38:2, 46:23, 47:22, 48:20, 48:24, 49:20, 50:1, 50:16, 55:5, 56:15, 57:4, 57:12, 60:16, 61:5, 62:1, 62:9, 62:11, 63:4, 65:25, 66:7, 70:21, 70:25, 71:8, 71:11, 71:14, 71:17, 72:4, 72:19, 75:24, 76:8, 76:11, 77:1, 77:5, 77:17, 77:20, 78:8, 78:22, 79:2, 79:14, 79:16, 80:18, 81:5, 81:9, 81:12, 81:14, 85:9, 85:11, 86:2, 86:17, 86:23, 92:7, 92:16, 93:2, 93:14, 93:16, 93:21, 95:8, 95:22, 96:7, 96:11, 96:23, 98:13, 98:16, 98:20, 99:15, 99:24, 103:13, 103:17, 103:21, 104:1
**Court** [80] - 2:9, 5:9, 5:21, 7:8, 8:2, 10:14, 11:16, 11:23, 12:10, 12:16, 20:14, 38:9, 38:21, 39:2, 39:4, 39:11, 39:13, 41:16, 41:25, 45:21, 46:6, 46:10, 46:12, 46:14, 46:16, 46:17, 46:19, 46:25, 47:16, 47:17, 48:16, 48:21, 49:17, 50:2, 50:15, 50:21, 52:1, 52:6, 52:20, 53:3, 54:22, 54:23, 55:1, 55:10, 55:18, 56:3, 56:4, 56:21, 56:24, 60:23, 61:1, 61:17, 70:13, 78:8, 78:18, 79:20, 80:1, 83:10, 85:16, 87:14, 87:15, 88:8, 88:16,

90:12, 90:25, 91:24, 92:1, 92:2, 94:1, 94:15, 94:21, 94:25, 95:22, 100:14, 100:17, 102:18, 104:3, 104:8
**court** [1] - 66:2
**Court's** [2] - 55:6, 102:11
**Courthouse** [1] - 1:10
**courtroom** [2] - 67:14, 99:16
**Courts** [1] - 79:7
**covered** [1] - 43:16
**create** [3] - 58:7, 59:24, 88:2
**created** [9] - 10:24, 16:11, 17:24, 45:2, 45:7, 45:11, 45:17, 81:19, 83:3
**creates** [2] - 29:23, 48:3
**creative** [1] - 100:20
**creativity** [1] - 100:24
**critical** [5] - 24:22, 68:10, 68:22, 76:10, 83:8
**Critical** [8] - 31:19, 31:20, 83:6, 83:8, 83:11, 83:16, 83:18, 83:20
**cross** [3] - 4:15, 28:15, 41:10
**cross-examination** [2] - 28:15, 41:10
**Crown** [1] - 42:22
**crystal** [2] - 74:1, 92:6
**crystallization** [2] - 57:2, 57:17
**crystallized** [2] - 56:18, 61:24
**crystallizing** [2] - 60:19, 95:18
**cues** [1] - 75:19
**current** [2] - 66:15, 72:2
**cusp** [2] - 67:3, 67:4
**custom** [2] - 33:24, 34:1
**customer** [8] - 13:8, 14:4, 15:17, 24:1, 28:10, 34:13, 34:24, 68:24
**customer's** [1] - 8:16
**customers** [10] - 6:10, 24:2, 27:8, 65:11, 67:5, 67:7, 67:8, 69:9, 69:24, 100:1
**customers'** [1] - 23:20
**customization** [3] -

34:8, 35:7, 35:8
**customize** [1] - 82:20
**customized** [1] -
82:13
**cutting** [2] - 69:1,
84:21
**CV** [3] - 88:7, 88:8,
88:24

**D**

**Daigle** [1] - 87:7
**damage** [2] - 21:25,
101:18
**damages** [2] - 101:2,
101:5
**dangerous** [1] - 26:8
**data** [2] - 7:16, 33:25
**date** [6] - 30:10, 30:15,
32:1, 41:19, 41:20,
83:15
**Dave** [2] - 3:17, 4:20
**David** [2] - 2:20, 3:5
**DAVID** [2] - 1:20, 2:5
**days** [2] - 83:14,
102:16
**deal** [7] - 53:20, 55:12,
78:9, 79:10, 80:20,
88:25, 89:1
**dealing** [3] - 12:24,
48:12, 92:4
**dealings** [1] - 67:12
**deals** [4] - 42:23, 49:6,
53:18, 88:9
**dealt** [5] - 39:8, 45:22,
51:16, 55:17, 92:3
**debate** [4] - 42:13,
53:1, 53:5, 55:11
**debated** [1] - 95:3
**Debtor** [8] - 47:20,
67:14, 76:1, 76:3,
78:14, 79:25, 80:14,
91:21
**decide** [8] - 3:14, 52:1,
56:7, 57:10, 71:21,
95:6, 96:1, 96:2
**decided** [2] - 94:17,
97:24
**deciding** [1] - 87:14
**decision** [2] - 75:6,
79:17
**decisions** [1] - 7:18
**declaration** [15] -
11:20, 14:23, 16:6,
16:18, 17:8, 17:10,
21:20, 24:18, 29:5,
29:22, 30:10, 32:10,
40:12, 70:1, 73:9
**declarations** [4] -
19:3, 24:15, 28:25,

40:24
**declaratory** [2] -
39:16, 43:3
**declared** [3] - 11:25,
16:8, 25:22
**decorators** [2] - 31:2,
31:13
**deem** [1] - 72:15
**deeply** [1] - 9:11
**default** [3] - 54:12,
54:14, 90:6
**defects** [1] - 27:9
**Defendant** [8] - 1:8,
2:6, 3:4, 60:20,
61:13, 63:7, 80:10,
84:25
**Defendants** [1] -
28:22
**defense** [6] - 41:2,
46:2, 55:4, 57:16,
57:19, 60:6
**deficiencies** [1] -
103:18
**definitely** [2] - 27:14,
99:19
**definitions** [1] - 76:15
**degrade** [1] - 27:1
**DELAWARE** [1] - 1:2
**Delaware** [9] - 1:11,
48:18, 48:19, 48:22,
49:3, 51:16, 55:17,
92:3, 99:18
**delays** [1] - 27:7
**delete** [1] - 18:17
**deleted** [1] - 45:8
**deliver** [1] - 41:19
**delivered** [5] - 18:25,
31:23, 41:20, 42:1,
88:17
**delivery** [1] - 83:5
**demand** [1] - 67:21
**demonstrated** [1] -
56:17
**denied** [2] - 100:3,
103:15
**deny** [1] - 103:21
**denying** [2] - 69:13,
100:18
**deployed** [2] - 7:6,
7:24
**deprive** [1] - 28:4
**DEPUTY** [9] - 2:9, 5:3,
5:8, 5:15, 66:4, 66:6,
99:21, 99:23, 104:2
**describe** [2] - 16:12,
20:17
**described** [3] - 7:21,
21:15, 50:15
**designed** [1] - 6:22
**designing** [1] - 22:19

**designs** [1] - 6:8
**detailed** [1] - 62:15
**detection** [2] - 8:14,
9:4
**determine** [1] - 22:23
**determined** [1] - 76:15
**determining** [1] - 52:9
**developed** [1] - 27:24
**developing** [3] -
27:21, 27:23, 100:23
**develops** [1] - 84:5
**device** [32] - 10:5,
14:7, 15:16, 15:18,
15:24, 16:12, 16:17,
17:9, 17:12, 17:17,
17:20, 17:25, 20:22,
21:16, 41:8, 42:5,
42:11, 44:25, 45:6,
45:7, 45:8, 45:10,
45:11, 45:13, 66:24,
68:14, 68:20, 70:6,
82:6, 84:16
**device's** [2] - 18:16,
18:20
**devices** [1] - 36:6
**devote** [1] - 95:2
**DI-9-7** [1] - 49:11
**DI-9-8** [2] - 46:17,
47:17
**difference** [1] - 89:2,
89:4, 89:7
**different** [18] - 7:5,
13:10, 16:20, 17:4,
17:23, 19:11, 34:18,
36:3, 50:5, 59:12,
68:25, 76:15, 77:10,
79:20, 80:11, 84:14,
89:20, 97:5
**differently** [1] - 89:6
**difficult** [1] - 72:10
**digital** [1] - 10:17
**diminished** [2] -
66:11, 70:8
**DIRECT** [1] - 5:18
**direct** [3] - 4:16,
52:20, 91:25
**directed** [1] - 43:3
**directly** [6] - 46:11,
64:3, 64:11, 86:7,
89:23, 91:1
**dis** [1] - 89:25
**disagree** [2] - 57:7,
89:9
**disagreement** [1] -
88:15
**disassembly** [1] - 58:5
**disclose** [1] - 90:1
**disclosing** [1] - 67:17
**disclosure** [1] - 67:18
**discovery** [1] - 103:2

**discussed** [1] - 23:22
**discusses** [1] - 76:23
**discussing** [3] -
44:13, 44:19, 90:10
**discussion** [2] -
55:10, 60:18
**discussions** [4] -
86:7, 87:5, 87:8,
87:10
**disfavored** [1] - 74:15
**dismiss** [13] - 3:16,
3:20, 4:3, 4:12,
60:18, 61:7, 95:9,
102:13, 102:19,
103:15, 103:18,
103:24
**dismissed** [2] - 37:20,
37:22
**dispute** [8] - 57:9,
67:13, 81:23, 82:9,
82:12, 83:9, 88:12
**disputed** [1] - 60:7
**disputes** [2] - 69:3,
88:10
**distinct** [2] - 10:3,
91:19
**distinguished** [1] -
47:25
**distinguishing** [2] -
47:1, 59:2
**distribute** [1] - 55:15
**distributing** [1] - 76:4
**distribution** [6] -
48:15, 75:25, 78:12,
92:19, 94:9
**DISTRICT** [2] - 1:1, 1:2
**District** [6] - 42:21,
42:23, 50:21, 78:18,
92:25, 104:8
**doctrine** [15] - 45:18,
45:19, 45:20, 46:2,
52:7, 53:18, 56:1,
56:3, 56:6, 75:23,
76:2, 76:5, 76:17,
76:25, 84:7
**document** [4] - 11:19,
11:25, 12:9, 24:10
**documents** [1] - 83:3
**dollar** [1] - 22:2
**dollars** [3] - 22:5,
72:23, 73:5
**done** [7] - 23:12,
23:16, 30:4, 40:10,
40:11, 45:4, 71:5
**door** [1] - 55:13
**doors** [1] - 9:14
**doubt** [1] - 100:23
**down** [14] - 13:4,
19:10, 25:10, 37:21,
66:13, 69:10, 70:10,

70:12, 71:23, 72:25,
74:5, 86:3, 88:25,
91:11
**downstream** [2] -
27:8, 65:11
**drive** [6] - 18:6, 18:13,
21:2, 21:4, 70:6,
84:11
**drives** [1] - 102:1
**dropped** [2] - 93:21,
93:22
**due** [1] - 38:12
**duly** [1] - 5:13
**duration** [3] - 45:1,
75:4, 75:8
**during** [6] - 44:23,
44:24, 58:5, 66:10,
85:1, 101:24

**E**

**E-stop** [2] - 22:24,
23:8
**earliest** [1] - 83:5
**Eastern** [1] - 42:21
**eBay** [1] - 69:16
**editing** [1] - 84:16
**educational** [1] -
58:25
**effect** [2] - 59:16,
84:19
**efficient** [2] - 17:14,
28:25
**eight** [2] - 73:11,
73:12
**either** [5] - 42:4,
43:10, 60:6, 71:1,
87:18
**elaborate** [2] - 26:21,
30:5
**election** [1] - 91:7
**electrical** [4] - 6:2,
6:6, 23:25, 33:22
**electrician** [2] - 18:3,
18:21
**electronic** [1] - 14:7
**element** [2] - 100:11,
100:13
**elements** [4] - 58:9,
81:17, 100:4, 100:10
**ellipses** [1] - 53:25
**elsewhere** [2] - 44:12,
101:15
**embedded** [2] - 7:2,
26:5
**emergency** [4] - 9:15,
22:25, 23:10, 41:25
**employed** [1] - 92:2
**encourage** [1] - 103:7
**end** [7] - 6:10, 28:25,

6

53:19, 73:19, 86:23, 87:2, 103:5
**endeavored** [1] - 63:20
**ends** [1] - 87:17
**energy** [1] - 9:17
**engineer** [1] - 33:22
**engineering** [2] - 6:2, 6:6
**engineers** [3] - 22:21, 23:25, 27:22
**enhancing** [1] - 102:7
**ensure** [2] - 22:17, 39:3
**ensures** [1] - 24:22
**ensuring** [1] - 97:1
**entered** [1] - 52:21
**entering** [1] - 100:14
**entire** [2] - 8:24, 72:24
**entirely** [3] - 42:16, 70:11, 85:2
**entitled** [1] - 39:2
**entitlement** [1] - 95:24
**enumerated** [2] - 96:21, 98:10
**equals** [1] - 75:7
**equipment** [43] - 7:2, 19:20, 20:19, 24:23, 26:8, 29:16, 30:12, 30:17, 30:20, 30:22, 31:3, 31:14, 31:16, 31:18, 31:22, 32:14, 33:6, 34:3, 36:12, 38:11, 38:12, 49:13, 51:17, 51:18, 54:8, 65:15, 65:18, 69:2, 70:1, 70:2, 70:7, 70:9, 73:3, 73:4, 81:20, 81:23, 82:8, 82:9, 82:10, 82:17, 91:4, 97:1
**equities** [5] - 67:25, 72:21, 73:18, 91:3, 100:8
**ESQUIRE** [7] - 1:17, 1:18, 1:20, 1:21, 1:24, 2:2, 2:5
**essential** [26] - 33:6, 41:1, 41:2, 41:4, 45:18, 45:19, 45:25, 46:1, 52:7, 53:17, 55:4, 56:6, 57:15, 60:10, 74:19, 75:12, 75:13, 76:21, 81:15, 81:17, 81:19, 84:7, 89:5, 89:10, 90:13
**essentially** [2] - 40:3, 64:22
**establish** [3] - 100:6, 100:11, 100:13

**estate** [2] - 46:21, 55:20
**estimate** [2] - 22:1, 34:23
**estoppel** [1] - 48:4
**et** [5] - 50:12, 69:11, 69:25, 83:5
**eve** [1] - 79:10
**event** [2] - 14:17, 97:4
**evidence** [8] - 12:4, 12:6, 12:10, 12:11, 24:14, 39:23, 52:4, 60:24
**evidenced** [1] - 62:3
**evolved** [1] - 64:21
**ex** [1] - 99:17
**exactly** [4] - 14:12, 21:18, 32:7, 56:5, 58:15, 75:10, 78:17, 103:5
**exam** [1] - 4:16
**EXAMINATION** [3] - 5:18, 28:15, 36:20
**examination** [1] - 41:10
**example** [9] - 18:14, 18:18, 41:9, 42:3, 44:2, 60:25, 67:6, 102:7, 102:24
**examples** [6] - 22:7, 44:9, 45:13, 69:8, 69:23, 69:24
**exceed** [1] - 39:22
**excellent** [1] - 99:1
**exception** [4] - 43:11, 45:14, 45:17, 60:11
**exchange** [1] - 83:12
**exchanging** [1] - 13:24
**excluded** [1] - 49:12
**exclusive** [8] - 38:6, 39:25, 55:15, 60:8, 92:14, 92:16, 93:24, 94:12
**exclusively** [1] - 76:19
**excuse** [4] - 2:22, 10:19, 27:15, 42:16
**excused** [1] - 99:19
**executed** [1] - 83:9
**executing** [1] - 84:13
**exercise** [1] - 96:2
**exhibit** [1] - 11:15
**Exhibit** [2] - 11:20, 77:19
**exist** [6] - 62:22, 88:18, 88:19, 97:11, 98:7, 102:8
**existed** [2] - 44:4, 91:5
**exists** [6] - 36:11, 43:25, 44:12, 44:15,

44:18, 45:10
**exit** [1] - 20:18
**expect** [3] - 4:1, 4:15, 70:4
**expected** [1] - 27:16
**expedient** [1] - 72:15
**expense** [2] - 72:15, 103:8
**expensive** [1] - 103:2
**experience** [6] - 6:19, 11:5, 12:23, 14:19, 19:19, 56:16
**experiencing** [2] - 67:9, 68:3
**expert** [3] - 34:22, 75:9, 102:24
**explain** [7] - 7:8, 8:2, 9:9, 12:16, 13:11, 15:16, 17:23
**exploitation** [1] - 92:12
**expressed** [1] - 3:19
**expression** [3] - 54:17, 59:25, 60:3
**expressive** [1] - 59:10
**extended** [1] - 13:22
**extension** [1] - 102:17
**extensively** [1] - 45:21
**extent** [4] - 12:5, 49:16, 52:2, 60:22
**external** [30] - 10:5, 15:16, 15:18, 15:23, 16:11, 16:17, 17:9, 17:11, 17:20, 17:24, 18:15, 18:20, 20:22, 21:16, 41:8, 42:5, 42:11, 44:25, 45:6, 45:7, 45:8, 45:10, 45:11, 66:24, 68:14, 68:20, 70:6, 82:6, 84:16
**eyes** [1] - 101:14

---

## F

**F.3d** [1] - 101:22
**face** [1] - 95:20
**Face** [1] - 42:9
**facie** [1] - 39:6
**facilities** [1] - 30:21
**facility** [20] - 6:21, 6:23, 6:24, 7:3, 7:6, 7:24, 8:4, 8:20, 19:21, 23:4, 23:12, 26:18, 30:14, 30:23, 31:8, 31:12, 32:13, 38:11, 65:18, 98:5
**fact** [20] - 7:25, 40:20, 40:25, 43:19, 47:16, 52:6, 62:4, 64:4,

82:2, 83:7, 83:25, 86:18, 90:15, 90:20, 91:10, 92:14, 94:21, 100:25, 102:25
**fact-bound** [1] - 82:2
**factor** [5] - 53:21, 59:5, 59:6, 59:9, 59:13
**factors** [6] - 39:5, 39:7, 52:8, 52:9, 55:2, 58:20
**factory** [1] - 29:15
**facts** [13] - 25:18, 39:10, 43:23, 44:20, 58:12, 61:11, 61:20, 61:22, 82:7, 87:24, 88:5, 90:13, 95:16
**factual** [6] - 40:4, 40:9, 43:7, 66:9, 86:17
**failed** [2] - 14:8, 100:13
**failure** [1] - 100:11
**fair** [14] - 57:8, 57:18, 57:20, 58:2, 58:16, 58:19, 58:21, 59:5, 59:25, 60:5, 60:10, 74:18, 77:4, 84:9
**fairly** [1] - 92:23
**fairness** [1] - 56:16
**faith** [4] - 87:8, 87:10, 87:11
**fall** [3] - 41:18, 43:11, 74:6
**falls** [1] - 45:17
**false** [1] - 9:3
**far** [5] - 39:22, 50:16, 70:25, 87:11, 87:21
**fare** [1] - 45:18
**FARNAN** [3] - 1:24, 3:2, 36:17
**Farnan** [1] - 3:3
**fast** [1] - 26:10
**fast-moving** [1] - 26:10
**favor** [3] - 39:9, 97:23, 100:9
**favoring** [1] - 91:11
**features** [1] - 29:2
**February** [2] - 67:3, 69:7
**fed** [1] - 8:17
**feed** [6] - 19:8, 19:14, 21:7, 21:8, 31:17, 31:25
**feedback** [1] - 30:19
**felt** [1] - 61:10
**few** [4] - 25:10, 28:22, 66:2, 89:14
**fight** [1] - 57:7

**file** [2] - 103:17, 103:22
**filed** [2] - 61:17, 102:16
**filing** [1] - 60:23
**final** [2] - 21:19, 30:10
**finalized** [1] - 69:7
**finally** [2] - 38:20, 102:20
**fine** [7] - 4:17, 4:25, 37:21, 50:22, 71:25, 99:18, 102:17
**finger** [1] - 50:3
**Finger** [1] - 3:3
**FINGER** [1] - 1:23
**finish** [1] - 72:14
**Finkelson** [4] - 2:20, 3:17, 4:20, 56:8
**FINKELSON** [60] - 1:20, 3:17, 4:20, 5:19, 11:14, 11:18, 12:3, 12:12, 12:14, 13:4, 13:6, 15:4, 15:6, 24:9, 24:13, 24:20, 25:3, 25:5, 28:11, 36:21, 37:17, 37:24, 38:3, 47:8, 47:25, 48:23, 48:25, 49:24, 50:7, 51:10, 55:8, 56:23, 57:5, 57:14, 61:4, 61:6, 62:7, 62:10, 62:12, 63:18, 85:10, 85:12, 86:5, 86:22, 87:3, 92:8, 92:17, 93:11, 93:15, 93:17, 93:22, 95:11, 96:6, 96:10, 96:20, 96:24, 98:14, 98:18, 99:13, 103:11
**fINKELSON** [1] - 5:17
**first** [40] - 3:22, 13:18, 14:20, 15:16, 18:1, 18:14, 18:25, 22:17, 25:3, 25:4, 29:15, 33:20, 38:4, 39:5, 40:9, 43:13, 43:14, 43:20, 45:6, 45:20, 46:8, 52:7, 53:17, 55:1, 56:1, 56:3, 57:17, 58:23, 59:5, 64:7, 75:23, 76:1, 76:5, 76:12, 76:17, 76:25, 81:21, 89:4, 89:11
**first-sale** [10] - 45:20, 53:17, 56:1, 56:3, 75:23, 76:1, 76:5, 76:17, 76:25, 89:11
**fit** [1] - 94:21
**five** [4] - 19:7, 19:13,

31:17, 31:24
**fix** [1] - 84:5
**fixation** [2] - 75:4
**fixed** [1] - 75:8
**flagged** [1] - 44:10
**flags** [1] - 44:3
**flash** [2] - 35:17, 84:11
**flat** [1] - 55:25
**fleshed** [1] - 61:22
**flights** [1] - 99:8
**flip** [2] - 44:6, 59:22
**flow** [1] - 27:7
**flows** [3] - 64:1, 64:10, 65:11
**fly** [1] - 43:8
**focused** [3] - 93:12, 101:11, 101:23
**folks** [2] - 71:23, 99:8
**follow** [2] - 3:25, 90:10
**follows** [1] - 5:14
**footing** [1] - 59:12
**Footnote** [2] - 77:15, 77:23
**footnote** [1] - 77:20
**FOR** [1] - 1:2
**forbid** [2] - 26:7, 65:10
**force** [3] - 69:14, 100:20, 100:21
**forced** [5] - 64:17, 64:19, 64:23, 69:15, 100:19
**forego** [1] - 97:24
**foregoing** [1] - 104:4
**foremost** [1] - 38:4
**forklift** [1] - 20:20
**form** [3] - 58:15, 59:25, 93:19
**formal** [1] - 86:6
**forth** [3] - 62:23, 83:22, 98:4
**forward** [4] - 4:25, 88:9, 88:10
**forward-looking** [2] - 88:9, 88:10
**four** [3] - 13:10, 40:3, 58:19
**Fourth** [1] - 42:8
**fourth** [2] - 14:15, 59:16
**frame** [1] - 94:23
**framed** [1] - 94:21
**framework** [2] - 53:21, 69:5
**frankly** [4] - 40:7, 48:5, 57:5, 80:13
**free** [1] - 49:18
**freely** [3] - 49:16, 49:18, 52:2
**frequency** [2] - 16:12,

21:4
**frequently** [3] - 14:18, 14:21, 16:14
**friendly** [1] - 85:25
**front** [4] - 29:1, 48:18, 52:4, 78:18
**full** [1] - 78:6
**fully** [2] - 40:2, 61:19
**fulsome** [1] - 77:14
**function** [3] - 9:7, 27:1, 35:11
**functional** [4] - 33:3, 36:23, 37:11, 84:19
**functions** [10] - 8:3, 8:21, 8:25, 32:25, 33:5, 33:6, 36:3, 37:2, 37:16, 97:7
**fundamentally** [1] - 68:25
**future** [1] - 62:16

## G

**Galardi** [4] - 46:13, 46:20, 47:15, 55:19
**GALLAGHER** [1] - 1:17
**Gallagher** [2] - 2:18, 2:19
**gears** [1] - 18:23
**generally** [2] - 7:14, 14:19
**genuinely** [1] - 86:15
**Gilbert** [9] - 14:24, 16:8, 17:7, 25:11, 25:15, 25:22, 29:5, 40:12, 70:1
**Gilbert's** [6] - 15:1, 15:7, 16:5, 16:18, 24:15, 24:21
**given** [7] - 43:2, 53:9, 82:22, 85:20, 86:2, 88:5
**glaring** [1] - 41:9
**Global** [1] - 44:11
**goal** [1] - 61:13
**God** [3] - 5:10, 26:7, 65:10
**goods** [1] - 83:13
**goodwill** [5] - 21:25, 22:10, 26:14, 62:18, 90:22
**goodwill-based** [1] - 90:22
**GOULD** [1] - 2:2
**Gould** [1] - 3:4
**grant** [1] - 95:12
**granted** [7] - 52:13, 69:15, 73:14, 89:17, 95:10, 102:15,

102:18
**granting** [1] - 94:18
**Gray** [1] - 46:13
**ground** [1] - 33:13
**guarantee** [1] - 26:16
**guarding** [1] - 22:23
**guards** [2] - 9:13, 22:24
**guess** [3] - 37:12, 62:1, 79:19

## H

**half** [3] - 33:16, 99:7, 99:19
**HALL** [1] - 1:14
**Hall** [1] - 2:10
**hand** [3] - 5:4, 48:6
**handed** [2] - 12:9, 77:17
**handle** [1] - 79:8
**hands** [1] - 59:18
**happy** [5] - 39:12, 67:23, 71:21, 93:11, 95:9
**hard** [5] - 18:6, 18:13, 50:3, 101:5, 102:1
**hardware** [3] - 6:9, 14:10, 32:18
**harm** [57] - 21:20, 21:24, 22:4, 22:9, 22:12, 26:20, 27:17, 28:3, 39:7, 59:21, 60:14, 62:10, 62:12, 62:16, 62:21, 63:5, 63:11, 63:12, 63:14, 63:20, 64:1, 64:2, 64:3, 64:10, 64:19, 65:3, 65:19, 66:24, 67:9, 67:25, 68:4, 68:9, 68:12, 68:15, 69:1, 69:9, 69:11, 73:18, 73:19, 82:22, 84:25, 90:14, 90:16, 90:18, 90:21, 90:24, 91:1, 91:13, 91:16, 96:12, 100:7, 100:14, 100:18, 101:20, 102:3, 102:6
**harmed** [2] - 26:14, 27:5, 63:1
**harms** [8] - 64:4, 64:14, 64:15, 64:16, 91:12, 91:13, 98:10, 102:9
**hatched** [1] - 38:9
**hear** [3] - 40:23, 51:3, 103:1
**heard** [19] - 30:18, 32:5, 32:6, 32:7,

35:4, 40:21, 41:5, 44:20, 57:18, 59:20, 62:24, 63:7, 73:6, 79:24, 82:12, 84:9, 84:12, 89:15
**Hearing** [1] - 1:13
**hearing** [11] - 2:12, 3:15, 3:16, 50:10, 55:9, 72:9, 79:11, 98:21, 98:24, 99:2, 101:24
**hearings** [1] - 55:9
**heart** [1] - 79:3
**Heather** [3] - 3:5, 28:21, 104:7
**HEATHER** [1] - 2:2
**heavy** [1] - 20:19
**height** [1] - 9:5
**help** [2] - 5:10, 86:20
**helpful** [1] - 7:25
**helping** [2] - 23:21, 33:21
**helps** [1] - 86:11
**hereby** [1] - 104:4
**high** [4] - 8:2, 8:15, 26:8, 33:21
**high-speed** [1] - 8:15
**highlight** [2] - 24:18, 25:3
**highlighted** [1] - 12:19
**Hill** [1] - 101:22
**history** [4] - 66:9, 83:19, 85:18, 86:3
**hmm** [2] - 31:5, 34:15
**hold** [3] - 32:3, 32:9, 41:11
**Holdings** [1] - 2:14
**HOLDINGS** [1] - 1:7
**Honor** [63] - 2:17, 2:25, 3:2, 3:17, 4:11, 4:23, 5:17, 11:14, 12:3, 12:8, 15:4, 24:9, 24:14, 28:12, 36:15, 36:18, 37:19, 37:24, 38:4, 39:8, 40:7, 40:22, 43:2, 43:23, 45:19, 47:9, 47:19, 48:18, 50:11, 51:13, 52:20, 57:15, 57:20, 60:5, 60:12, 60:14, 61:4, 61:18, 61:19, 62:8, 62:13, 63:18, 64:18, 65:19, 65:22, 65:23, 66:8, 66:16, 68:4, 71:7, 74:14, 76:7, 85:7, 85:10, 85:13, 87:3, 88:25, 93:12, 97:2, 97:17, 98:15, 99:13
**Honor's** [10] - 49:5,

61:24, 64:8, 75:14, 85:17, 86:10, 86:15, 91:18, 95:18, 98:12
**Honorable** [1] - 2:10
**HONORABLE** [1] - 1:14
**hook** [3] - 72:16, 82:5, 82:24
**hopes** [1] - 86:8
**hotly** [1] - 95:3
**hour** [2] - 99:7, 99:20
**hourly** [1] - 34:17
**hours** [4] - 27:22, 34:25, 35:5
**huge** [1] - 102:23
**human** [1] - 44:16
**hundred** [2] - 59:15
**hurt** [4] - 26:7, 26:13, 65:10, 65:16
**hurts** [1] - 27:20

## I

**idea** [1] - 37:10
**identical** [1] - 52:23
**identified** [3] - 15:15, 26:20, 62:25
**identify** [1] - 11:23
**II** [1] - 43:4
**III** [1] - 1:17
**immediate** [1] - 73:20
**immediately** [1] - 41:17
**imminence** [1] - 41:9
**imminent** [6] - 15:12, 17:13, 40:20, 40:25, 43:4, 43:6
**imminently** [2] - 60:9, 94:22
**impact** [1] - 70:7
**impacts** [1] - 90:4
**imperfectly** [1] - 65:9
**implicated** [1] - 40:2
**important** [5] - 29:8, 40:22, 67:15, 70:2, 77:2
**importantly** [1] - 48:5
**impose** [2] - 52:17, 88:22
**imprecise** [2] - 47:1, 80:23
**impression** [1] - 75:17
**improper** [1] - 67:18
**IMS** [4] - 7:13, 7:14, 7:15, 7:22
**IN** [1] - 1:1
**in-feed** [6] - 19:8, 19:14, 21:7, 21:8, 31:17, 31:25
**inadequate** [1] - 101:2

**inappropriate** [1] - 100:12
**INC** [1] - 1:4
**incidence** [1] - 89:8
**incident** [1] - 93:4
**incidents** [8] - 76:23, 77:9, 81:24, 82:3, 82:4, 84:2, 89:12, 90:11
**include** [5] - 6:13, 6:16, 16:25, 49:12, 77:24
**included** [1] - 49:13
**includes** [2] - 6:9, 25:6
**including** [5] - 6:20, 17:2, 26:6, 83:3, 89:25
**inconsistency** [1] - 93:24
**inconsistent** [4] - 77:13, 92:14, 92:18, 94:6
**incorporated** [1] - 83:3
**Incorporated** [1] - 2:13
**increasing** [1] - 85:1
**incredibly** [1] - 103:2
**independent** [1] - 68:1
**indicated** [1] - 102:14
**indication** [1] - 54:3
**industrial** [1] - 7:15
**industry** [9] - 22:1, 22:10, 26:14, 26:15, 26:16, 26:17, 27:4, 29:12, 101:14
**inevitable** [2] - 40:20, 40:25
**inevitably** [1] - 60:9
**infinitesimal** [1] - 44:1
**inflicted** [2] - 91:13, 91:16
**informal** [1] - 86:6
**informative** [1] - 103:4
**infrequent** [1] - 16:2
**infringement** [47] - 39:16, 39:24, 42:12, 42:19, 42:20, 42:25, 43:4, 43:6, 43:11, 45:15, 45:17, 48:14, 48:18, 49:19, 50:19, 51:4, 60:11, 61:25, 62:17, 63:6, 64:12, 65:3, 65:8, 66:20, 66:21, 67:21, 67:22, 68:6, 68:11, 70:14, 74:4, 76:3, 78:10, 79:18, 79:24, 79:25, 80:11, 80:17, 85:22,

91:9, 91:20, 91:22, 101:5, 101:21, 101:23, 102:2, 102:10
**infringer** [1] - 57:22
**infringing** [5] - 38:25, 43:22, 44:2, 63:25, 65:20
**initial** [2] - 33:20, 95:21
**injunction** [43] - 3:15, 3:22, 3:24, 4:14, 4:22, 11:22, 24:16, 38:1, 39:3, 39:5, 39:9, 40:8, 42:15, 43:2, 60:17, 65:21, 66:12, 66:14, 67:16, 69:14, 69:17, 71:22, 72:9, 72:22, 73:14, 73:16, 74:11, 85:2, 91:10, 94:18, 94:20, 95:7, 95:17, 99:6, 100:2, 100:3, 100:5, 100:9, 100:12, 100:15, 100:19, 102:12
**injunctions** [3] - 42:18, 42:24, 69:15
**injunctive** [1] - 98:11
**injure** [1] - 101:13
**injured** [1] - 69:25
**injuries** [1] - 69:23
**injury** [6] - 62:14, 68:3, 69:17, 90:22, 90:23
**ink** [1] - 38:3
**inquiry** [2] - 53:19, 82:2
**inserted** [1] - 19:14
**Insights** [3] - 92:25, 94:3, 94:11
**insisted** [1] - 50:9
**inspection** [2] - 8:18, 33:25
**install** [3] - 32:1, 32:2, 32:10
**installation** [5] - 23:13, 23:18, 33:20, 34:19, 34:20
**installed** [1] - 81:22
**installing** [3] - 30:11, 34:1, 34:25
**instance** [8] - 14:2, 18:3, 44:2, 49:24, 52:7, 55:1, 63:22, 64:7
**instances** [2] - 59:8, 63:22
**instrumental** [1] - 6:24

**integrated** [1] - 9:11
**integration** [1] - 33:23
**intellectual** [12] - 22:14, 27:19, 47:1, 48:1, 48:2, 50:12, 77:5, 77:25, 78:4, 78:7, 79:8, 80:21
**intelligent** [1] - 7:12
**intend** [1] - 3:23
**intended** [1] - 37:16
**inter** [1] - 50:17
**interest** [2] - 3:19, 100:10
**interesting** [3] - 72:7, 82:22, 83:2
**intermediate** [9] - 19:7, 19:14, 21:6, 21:7, 31:17, 31:25, 58:4, 59:2, 60:3
**internally** [1] - 81:25
**interpretation** [1] - 51:15
**introduce** [1] - 5:20
**invariably** [1] - 94:22
**investigation** [1] - 89:9
**investment** [2] - 100:24, 102:23
**investments** [1] - 27:25
**invoked** [1] - 45:23
**involve** [1] - 94:23
**involved** [3] - 34:21, 87:6, 87:7
**IP** [8] - 48:1, 48:9, 49:7, 50:5, 53:15, 64:17, 89:18, 89:19
**irreparable** [38] - 21:20, 21:24, 22:9, 22:12, 39:7, 59:21, 60:14, 62:10, 62:12, 62:14, 62:16, 62:21, 63:5, 64:10, 64:19, 65:19, 66:24, 67:25, 68:3, 68:4, 68:9, 68:11, 68:25, 69:9, 69:17, 82:22, 90:14, 90:16, 90:18, 90:20, 90:24, 91:1, 96:12, 98:11, 100:7, 100:14, 100:18, 101:20
**irreparably** [4] - 26:14, 27:5, 28:3, 63:1
**issue** [29] - 9:22, 21:20, 43:1, 46:16, 51:13, 52:2, 52:24, 53:17, 55:12, 56:5, 57:8, 61:14, 62:2, 63:19, 65:21, 68:19,

68:21, 68:25, 70:8, 70:14, 73:16, 75:9, 79:3, 79:9, 91:5, 91:25, 92:2, 92:23, 95:19
**issues** [20] - 9:19, 26:19, 27:7, 27:10, 43:15, 43:16, 56:18, 56:25, 60:19, 61:8, 66:10, 69:11, 79:9, 87:15, 88:8, 88:10, 88:24, 89:1, 94:25, 96:16
**itself** [12] - 41:1, 43:24, 45:4, 54:13, 57:24, 58:9, 64:1, 64:19, 65:14, 73:8, 79:23, 102:10

**J**

**January** [1] - 83:9
**JENNIFER** [1] - 1:14
**Jennifer** [1] - 2:10
**jeopardize** [1] - 80:5
**jeopardizes** [1] - 101:16
**Jerry** [1] - 14:24
**jettisoning** [1] - 95:2
**job** [2] - 73:15, 95:18
**John** [1] - 3:6
**Judge** [20] - 47:5, 47:23, 50:24, 51:2, 51:3, 51:6, 51:10, 51:12, 51:13, 51:15, 54:24, 55:12, 55:21, 56:6, 56:16, 75:22, 77:3, 77:14, 79:12, 88:22
**judgment** [2] - 39:17, 43:3
**judicial** [1] - 48:3

**K**

**keep** [1] - 68:10
**keeping** [1] - 98:18
**Kelly** [1] - 3:2
**KELLY** [1] - 1:24
**key** [1] - 52:25
**kicked** [1] - 79:13
**kid** [1] - 29:20
**kill** [1] - 82:11
**killed** [2] - 26:7, 69:25
**kind** [9] - 19:9, 22:23, 42:10, 47:10, 75:15, 88:4, 90:2, 93:13, 97:1
**King** [1] - 1:10
**KK** [1] - 78:2

**Kliebenstein** [2] - 3:5, 28:21
**KLIEBENSTEIN** [36] - 2:2, 4:7, 4:10, 4:18, 12:8, 28:16, 36:14, 66:8, 70:24, 71:6, 71:9, 71:12, 71:15, 72:1, 72:6, 72:20, 76:7, 76:9, 76:12, 77:2, 77:7, 77:21, 78:21, 78:25, 79:6, 79:15, 80:3, 81:4, 81:6, 81:10, 81:13, 81:15, 99:14, 103:14, 103:20, 103:25
**knit** [1] - 26:15
**knowing** [2] - 74:15, 91:5
**knowledge** [4] - 11:8, 19:19, 31:20, 98:25
**knowledgeable** [1] - 7:1
**known** [2] - 6:16, 38:8
**knows** [3] - 45:20, 64:18, 65:17
**Krauss** [4] - 53:1, 53:2, 53:4, 54:12
**KYLE** [1] - 1:21
**Kyle** [1] - 2:20

**L**

**lack** [1] - 98:9
**Lake** [3] - 6:21, 6:24, 41:16
**language** [11] - 47:1, 47:11, 49:15, 50:9, 50:11, 52:20, 53:7, 56:13, 75:18, 89:18, 90:18
**laptop** [10] - 10:6, 15:24, 17:17, 17:20, 18:2, 18:4, 18:10, 60:25, 93:8
**laptop's** [3] - 18:6, 18:12, 18:13
**laptops** [3] - 16:20, 25:24, 102:1
**last** [9] - 12:20, 15:25, 23:4, 33:12, 45:5, 45:7, 45:12, 57:14, 57:16
**lastly** [2] - 27:17, 92:9
**lasts** [2] - 44:25, 45:2
**late** [1] - 62:5
**latter** [1] - 40:7
**law** [16] - 37:9, 37:11, 43:22, 48:4, 53:18, 56:20, 62:23, 63:5,

64:18, 75:5, 75:7, 76:13, 76:22, 76:23, 91:12, 101:6
**lawfully** [3] - 78:19, 78:23, 84:4
**laws** [1] - 39:18
**lawsuit** [2] - 67:10, 69:10
**lawyer** [1] - 37:8
**layperson** [1] - 21:23
**LAYTON** [1] - 1:23
**Layton** [1] - 3:3
**leads** [1] - 58:21
**leaks** [1] - 27:9
**least** [14] - 14:18, 33:11, 33:12, 43:15, 44:9, 44:13, 46:25, 60:21, 73:23, 73:24, 83:14, 83:22, 88:21, 99:5
**leave** [9] - 61:20, 95:10, 95:12, 96:8, 102:14, 102:15, 103:15, 103:22
**ledger** [1] - 59:22
**left** [2] - 52:1, 65:23
**legal** [5] - 40:5, 43:9, 66:10, 73:22, 101:19
**less** [2] - 56:11, 59:9
**level** [2] - 8:2, 84:3
**leverage** [1] - 71:19
**liability** [3] - 63:21, 64:11
**liable** [1] - 80:11
**license** [40] - 16:21, 38:16, 38:18, 38:22, 48:2, 52:9, 52:13, 53:3, 53:5, 53:6, 53:12, 53:18, 53:23, 54:3, 54:6, 63:15, 64:17, 64:19, 64:24, 69:15, 70:21, 70:22, 70:23, 78:4, 80:22, 80:25, 82:18, 82:23, 83:25, 85:21, 90:13, 92:12, 92:20, 92:21, 94:3, 96:17, 97:15, 100:19, 102:8
**License** [3] - 53:4, 63:8, 102:5
**licensed** [2] - 53:9, 54:18
**licensee** [6] - 24:5, 54:10, 54:16, 96:17, 98:2, 98:8
**licensees** [3] - 24:3, 97:19, 97:21
**licenses** [2] - 100:25, 101:7
**light** [3] - 8:7, 97:2,

97:3
**likelihood** [6] - 39:6, 39:14, 50:18, 60:12, 68:2, 100:6
**likely** [8] - 39:15, 39:21, 62:13, 63:1, 68:6, 90:19, 90:24, 100:7
**limitations** [1] - 54:9
**limited** [3] - 3:20, 54:6, 98:3
**Line** [1] - 19:15
**line** [10] - 7:19, 31:25, 33:24, 42:7, 42:13, 57:25, 64:21, 82:20, 83:4, 88:25
**linkage** [1] - 68:21
**listed** [1] - 33:5
**literally** [2] - 56:11, 72:4
**litigating** [3] - 86:25, 87:20, 102:22
**litigation** [1] - 103:8
**live** [1] - 40:23
**Live** [1] - 42:8
**LLC** [2] - 1:7, 2:14
**LLP** [2] - 1:17, 2:5
**lo** [1] - 49:3
**load** [1] - 12:20
**loaded** [1] - 103:1
**local** [1] - 18:15
**lock** [1] - 20:12
**locks** [1] - 29:23
**logic** [5] - 7:10, 11:12, 14:6, 29:23, 69:20
**Logic** [1] - 12:2
**long-term** [1] - 18:7
**look** [15] - 25:1, 52:8, 52:11, 52:12, 52:14, 52:16, 53:21, 58:19, 59:25, 67:15, 72:11, 83:20, 89:5, 89:12, 93:25
**looked** [2] - 3:8, 29:5
**looking** [8] - 11:24, 12:15, 50:2, 60:1, 88:9, 88:10, 89:11, 98:21
**looks** [1] - 55:2
**lose** [3] - 59:19, 90:6, 90:8
**loses** [1] - 26:4
**losing** [1] - 27:18
**loss** [5] - 22:13, 62:17, 63:2, 64:16, 90:22
**Loss** [1] - 83:2
**loud** [1] - 86:10
**lubricating** [1] - 21:7
**lubrication** [3] - 8:10, 8:11, 33:7

**lucky** [1] - 76:14
**Lynchburg** [7] - 5:24, 23:4, 23:12, 30:23, 31:7, 32:13

## M

**ma'am** [3] - 29:4, 33:18, 35:19
**machine** [27] - 8:7, 8:11, 8:24, 8:25, 9:17, 20:8, 20:9, 20:11, 23:23, 26:10, 26:13, 26:25, 27:3, 33:21, 33:25, 34:24, 37:16, 47:3, 47:7, 47:24, 58:8, 58:10, 66:19, 66:22, 72:5, 77:9, 86:19
**Machinery** [3] - 2:13, 4:21, 5:24
**machinery** [6] - 6:9, 6:20, 15:9, 20:15, 39:1, 80:19
**MACHINERY** [1] - 1:4
**machines** [37] - 6:12, 6:13, 6:16, 9:13, 9:24, 26:5, 26:8, 27:15, 30:25, 34:12, 35:15, 47:6, 49:23, 50:25, 61:1, 65:5, 65:10, 66:23, 68:13, 70:5, 71:2, 72:22, 72:23, 73:6, 78:10, 78:12, 78:20, 78:24, 79:23, 82:5, 82:10, 84:4, 98:1, 100:23, 101:25, 102:2
**MAI** [4] - 42:7, 44:14, 44:19, 75:6
**maintain** [1] - 66:15
**maintaining** [1] - 50:12
**maintenance** [5] - 13:12, 13:13, 13:23, 23:22, 90:3
**man** [2] - 27:22, 34:25
**man-hours** [2] - 27:22, 34:25
**manager** [2] - 6:2, 6:7
**mandatory** [1] - 70:17
**manner** [3] - 27:12, 28:2, 81:18
**manual** [3] - 11:10, 12:1
**manufacturing** [1] - 7:12
**March** [1] - 24:18
**marked** [1] - 12:10
**Marker** [3] - 51:15,

55:21, 56:6
**market** [6] - 59:17, 69:1, 70:8, 70:9, 84:19, 84:21
**marketplace** [1] - 28:7
**material** [4] - 52:23, 57:23, 57:24, 58:9
**materials** [1] - 35:1
**matter** [9] - 28:22, 30:10, 45:25, 74:23, 75:7, 86:18, 89:16, 94:16, 101:19
**McGuireWoods** [3] - 1:20, 2:21, 4:20
**mean** [6] - 21:24, 49:21, 52:3, 71:1, 77:8, 86:21
**means** [3] - 37:10, 39:17, 53:6
**measures** [1] - 8:18
**mechanical** [1] - 22:21
**mediating** [1] - 71:4
**mediation** [2] - 86:6, 102:21
**meet** [1] - 44:25
**memory** [10] - 10:20, 12:2, 12:21, 18:16, 35:17, 45:8, 55:21, 84:11, 99:2
**mention** [2] - 30:9, 56:1
**mentioned** [4] - 16:10, 20:5, 20:23, 32:14
**mentioning** [1] - 69:9
**mentions** [1] - 83:21
**Merchant** [1] - 3:4
**MERCHANT** [1] - 2:2
**Merit** [1] - 104:7
**merits** [5] - 39:14, 60:13, 68:2, 73:22, 100:6
**messages** [2] - 8:10, 15:22
**method** [1] - 72:14
**middle** [3] - 12:19, 19:15, 83:9
**might** [6] - 14:16, 27:3, 62:5, 95:8, 101:13, 101:15
**million** [9] - 34:5, 35:3, 38:12, 67:11, 83:12, 85:1, 85:3, 85:24, 85:25
**millions** [3] - 72:23, 73:4
**mind** [2] - 68:10, 72:13
**mindful** [2] - 64:8, 86:14

**minute** [3] - 26:10, 35:13, 75:13
**minutes** [3] - 44:13, 66:2, 66:3
**missed** [1] - 65:16
**missing** [1] - 76:6
**misunderstands** [1] - 25:17
**misunderstood** [1] - 25:17
**modification** [3] - 21:11, 64:2, 101:16
**modifications** [12] - 14:11, 14:12, 63:25, 82:6, 82:20, 96:14, 96:15, 96:18, 96:22, 97:9, 97:13, 98:3
**modify** [10] - 19:25, 20:23, 25:8, 25:11, 25:25, 65:5, 69:19, 97:4, 97:6
**modular** [1] - 19:9
**module** [4] - 19:8, 19:14, 20:20, 31:25
**modules** [4] - 14:13, 19:7, 19:11, 19:13
**moment** [5] - 32:4, 36:22, 38:9, 50:4, 72:2
**monetarily** [1] - 70:11
**monetary** [1] - 100:24
**money** [7] - 27:23, 69:12, 81:3, 82:13, 86:25, 102:24, 103:6
**monitoring** [2] - 9:13, 26:24
**month** [2] - 6:5, 14:21
**months** [8] - 40:18, 45:5, 45:9, 67:1, 73:5, 73:12, 88:3
**moot** [3] - 102:19, 103:15, 103:24
**most** [7] - 17:14, 17:15, 26:16, 27:20, 61:15, 68:16, 92:6
**motion** [23] - 3:16, 3:20, 3:22, 4:1, 4:2, 4:12, 4:22, 4:24, 11:22, 12:4, 37:25, 57:10, 60:18, 61:7, 95:9, 100:1, 100:2, 102:11, 102:13, 102:19, 103:15, 103:17, 103:23
**Motion** [1] - 1:13
**motor** [3] - 8:8, 21:1, 21:2
**move** [9] - 12:5, 15:14, 20:21, 21:19, 24:13, 26:19, 62:10, 78:2,

78:5
moving [1] - 14:10, 26:10, 33:8, 51:17, 72:2, 72:4, 72:20, 73:22, 75:12, 81:15
MR [62] - 2:17, 2:25, 3:17, 4:20, 5:17, 5:19, 11:14, 11:18, 12:3, 12:12, 12:14, 13:4, 13:6, 15:4, 15:6, 24:9, 24:13, 24:20, 25:3, 25:5, 28:11, 36:21, 37:17, 37:24, 38:3, 47:8, 47:25, 48:23, 48:25, 49:24, 50:7, 51:10, 55:8, 56:23, 57:5, 57:14, 61:4, 61:6, 62:7, 62:10, 62:12, 63:18, 85:10, 85:12, 86:5, 86:22, 87:3, 92:8, 92:17, 93:11, 93:15, 93:17, 93:22, 95:11, 96:6, 96:10, 96:20, 96:24, 98:14, 98:18, 99:13, 103:11
MS [37] - 3:2, 4:7, 4:10, 4:18, 12:8, 28:16, 36:14, 36:17, 66:8, 70:24, 71:6, 71:9, 71:12, 71:15, 72:1, 72:6, 72:20, 76:7, 76:9, 76:12, 77:2, 77:7, 77:21, 78:21, 78:25, 79:6, 79:15, 80:3, 81:4, 81:6, 81:10, 81:13, 81:15, 99:14, 103:14, 103:20, 103:25
multiple [2] - 14:21, 52:21
MUNKITTRICK [1] - 2:5
Munkittrick [1] - 3:5
must [6] - 54:11, 54:13, 68:1, 90:15, 100:6, 101:19

N

name [5] - 5:5, 5:22, 22:12, 27:5, 28:21
namely [2] - 69:18, 81:18
nature [4] - 8:19, 59:6, 65:13, 84:18
Naughty's [1] - 42:21
necessarily [3] - 9:25, 39:21, 96:15

necessary [8] - 20:3, 20:24, 25:23, 28:13, 57:10, 61:8, 94:17, 95:5
necessitating [1] - 14:19
neck [3] - 19:10, 31:17, 88:16
necker [45] - 7:10, 7:16, 8:5, 8:24, 9:2, 9:10, 10:8, 10:10, 11:5, 13:8, 13:22, 13:25, 14:5, 14:13, 14:14, 15:17, 15:21, 17:19, 18:4, 18:23, 19:4, 19:6, 19:15, 19:16, 19:20, 20:3, 20:6, 20:24, 21:10, 21:11, 26:9, 26:23, 30:11, 30:20, 31:16, 31:25, 33:24, 37:3, 41:9, 41:17, 41:19, 41:20, 41:22, 42:2
neckers [17] - 6:14, 6:20, 7:21, 8:3, 9:6, 9:20, 11:13, 19:8, 22:18, 22:19, 23:3, 23:15, 26:18, 31:6, 32:21, 32:25, 35:10
necking [4] - 6:13, 19:7, 19:13, 31:24
need [29] - 3:12, 4:13, 12:5, 13:22, 14:6, 15:19, 15:23, 16:9, 17:16, 19:21, 19:23, 19:24, 19:25, 20:20, 24:13, 27:11, 41:4, 48:16, 55:12, 56:7, 67:9, 71:2, 72:25, 79:4, 86:19, 86:20, 87:14, 95:24, 102:24
needed [8] - 6:11, 14:8, 16:4, 16:7, 30:14, 32:12, 41:17, 85:15
needle [1] - 47:11
needs [2] - 16:2, 34:13
negatively [2] - 26:12, 27:3
negligible [1] - 39:20
negotiation [1] - 85:18
Netherlands [4] - 31:9, 31:10, 31:12, 31:15
Network [4] - 44:4, 44:11, 44:13, 44:19
never [5] - 41:22, 49:17, 57:20, 57:21, 62:21
new [21] - 21:1, 21:4,

29:14, 29:20, 30:11, 32:14, 59:25, 60:3, 73:2, 73:3, 73:4, 73:8, 73:11, 74:23, 80:9, 80:20, 81:19, 88:2, 94:12
New [1] - 93:1
newcomer [1] - 71:13
next [4] - 6:5, 40:15, 55:18, 70:8
nice [1] - 3:1
Ninth [4] - 42:7, 52:10, 58:1, 75:5
nobody [1] - 69:2
non [6] - 43:22, 53:23, 58:7, 58:8, 59:3, 59:24
non-copyrightable [2] - 58:7, 58:8
non-infringing [1] - 43:22
non-transferrable [1] - 53:23
non-transformative [2] - 59:3, 59:24
none [6] - 40:5, 58:11, 60:4, 68:21, 87:5
nonetheless [1] - 49:5
nonprofit [1] - 58:24
nontransitory [7] - 44:1, 44:8, 44:10, 44:12, 44:21, 45:13, 60:10
nonvolatile [6] - 10:19, 12:1, 18:16, 35:17, 45:7, 84:10
normal [1] - 13:12
North [1] - 1:10
Northern [1] - 42:23
notable [1] - 52:17
note [4] - 30:9, 74:8, 84:22
noted [2] - 68:4, 75:6
notes [2] - 25:10, 104:5
nothing [8] - 5:10, 8:6, 8:24, 21:6, 58:2, 66:25, 88:14, 103:11
notice [2] - 61:13, 61:15
noticeably [1] - 40:13
noticed [1] - 61:12
notwithstanding [1] - 51:8
nuance [1] - 64:20
nuanced [1] - 94:14
nudge [2] - 87:14, 87:16
Number [2] - 2:14, 93:6

number [3] - 67:17, 88:3, 100:17

O

objecting [1] - 79:22
objection [6] - 4:5, 4:10, 12:7, 50:10, 80:17, 88:17
obligations [1] - 99:18
obtain [1] - 100:5
obvious [2] - 15:21, 26:3
occur [6] - 8:25, 14:16, 14:19, 42:4, 42:10, 84:10
occurred [1] - 42:10
occurs [3] - 10:14, 12:20, 16:13
OF [1] - 1:2
offers [1] - 34:8
often [3] - 86:9, 87:13, 87:16
old [1] - 80:9
once [4] - 23:16, 50:24, 91:22, 102:18
one [49] - 9:19, 14:1, 14:15, 14:18, 14:20, 15:25, 19:12, 24:9, 24:14, 25:4, 27:20, 31:25, 33:24, 34:10, 34:20, 37:9, 40:4, 40:21, 41:6, 44:11, 54:7, 58:17, 60:19, 62:5, 63:21, 63:23, 63:24, 64:14, 67:17, 74:4, 78:1, 79:1, 86:23, 87:1, 87:6, 88:12, 91:16, 92:4, 92:16, 92:23, 93:24, 95:15, 96:9, 96:24, 98:24, 99:15, 101:17
ones [1] - 39:6
ongoing [1] - 42:19
online [1] - 15:23
open [3] - 18:11, 30:3, 45:12
opening [3] - 43:16, 45:22, 74:10
operate [1] - 36:8
operating [4] - 9:20, 9:24, 16:9, 39:1
operation [5] - 19:22, 20:4, 22:18, 26:12, 54:8
operational [1] - 24:23
operator [2] - 7:17, 8:10
opinion [2] - 66:16, 75:5

opponent's [1] - 78:9
opportunity [2] - 61:3, 61:21
opposed [3] - 47:2, 59:1, 97:23
opposing [1] - 75:21
option [2] - 73:15, 96:2
oral [1] - 101:12
oranges [1] - 85:5
order [7] - 20:3, 36:12, 46:9, 58:7, 67:16, 78:19, 78:22
Order [9] - 50:3, 55:7, 77:13, 77:15, 77:23, 78:3, 78:10, 79:4, 83:17
ordered [1] - 31:23
orders [1] - 65:16
organization [1] - 86:13
organized [1] - 28:18
original [5] - 73:9, 80:12, 80:13, 82:8, 96:17
OSHA [1] - 20:7
otherwise [7] - 28:5, 28:7, 40:16, 56:24, 57:21, 90:3, 102:21
ought [1] - 71:23
outage [1] - 14:16
outcome [1] - 52:8
outline [1] - 83:23
outlined [1] - 90:25
outside [2] - 26:11, 74:23
oversight [1] - 101:13
owed [3] - 67:12, 81:3, 85:4
own [29] - 16:5, 16:18, 44:6, 44:10, 44:22, 46:12, 46:22, 47:6, 47:20, 47:23, 48:1, 51:22, 51:24, 55:21, 55:24, 56:4, 56:8, 56:16, 60:7, 69:3, 76:19, 78:14, 82:1, 91:4, 97:25, 98:6
owned [5] - 51:18, 54:18, 77:25, 82:10
owner [10] - 46:2, 46:5, 72:12, 72:13, 72:14, 80:20, 81:22, 82:14, 83:4
ownership [39] - 15:9, 38:22, 48:8, 49:6, 49:7, 51:22, 52:9, 53:8, 53:12, 53:18, 54:4, 55:2, 55:3, 76:17, 76:18, 76:23,

76:24, 77:4, 77:5, 77:6, 77:10, 78:23, 81:25, 82:3, 82:4, 84:1, 84:2, 89:4, 89:5, 89:7, 89:8, 89:9, 89:12, 89:17, 89:20, 89:22, 90:11, 90:12
**ownership-based** [1] - 89:9
**owns** [3] - 45:23, 49:9

## P

**P-A-C-K-E-R** [1] - 5:7
**P.A** [1] - 1:23
**P.C** [1] - 2:2
**p.m** [2] - 1:12, 104:3
**PACKER** [1] - 5:13
**Packer** [32] - 2:23, 4:15, 4:23, 5:6, 5:22, 5:23, 6:4, 6:19, 9:18, 11:19, 12:17, 13:7, 21:23, 24:21, 26:2, 28:11, 28:19, 36:22, 37:8, 37:17, 40:21, 42:3, 44:20, 59:20, 62:25, 63:22, 65:12, 82:12, 84:9, 84:12, 84:18, 86:13
**packer** [1] - 3:24
**Packer's** [4] - 64:9, 69:21, 73:9, 97:17
**page** [2] - 56:12, 70:3
**Page** [6] - 12:13, 12:15, 12:17, 46:17, 47:17, 78:2
**paid** [5] - 34:2, 34:17, 35:2, 82:13, 83:11
**panel** [6] - 7:16, 13:14, 14:6, 14:8, 19:24, 20:13
**papers** [2] - 12:5, 100:16
**par** [1] - 53:2
**Par** [1] - 39:18
**Paragraph** [5] - 24:17, 25:1, 49:10, 78:2, 78:6
**paragraphs** [1] - 74:5
**parameters** [2] - 16:9, 65:5
**parcel** [1] - 92:20
**parked** [1] - 41:22
**part** [9] - 32:10, 34:22, 50:4, 50:14, 50:20, 57:16, 76:3, 79:25, 92:19
**parte** [1] - 99:17
**partes** [1] - 50:17

**participant** [1] - 71:15
**particular** [3] - 19:8, 34:13, 78:23
**parties** [24] - 29:7, 45:21, 66:9, 67:1, 67:13, 68:23, 70:3, 70:15, 70:20, 79:18, 81:21, 82:14, 85:17, 86:3, 86:5, 86:6, 86:10, 86:13, 87:4, 87:14, 88:10, 92:23, 102:17, 102:21
**parties'** [2] - 56:18, 83:14
**partner** [1] - 2:19
**parts** [25] - 17:2, 18:24, 19:1, 19:4, 19:6, 19:16, 19:20, 19:22, 20:3, 20:24, 21:1, 21:10, 25:21, 32:19, 41:9, 41:17, 41:19, 41:20, 41:22, 42:1, 42:2, 58:6, 72:2, 72:4, 72:7
**party** [12] - 8:17, 33:25, 45:23, 46:4, 61:15, 67:7, 73:10, 80:1, 87:17, 89:25, 90:1, 97:24
**pass** [3] - 28:12, 65:24, 83:4
**password** [2] - 17:4, 25:21
**passwords** [1] - 17:5
**past** [1] - 82:23
**pathway** [2] - 86:16, 87:19
**patience** [2] - 98:19, 99:25
**pause** [1] - 75:13
**pay** [3] - 38:11, 84:25, 85:24
**payment** [1] - 83:5
**PC** [1] - 7:15
**pending** [3] - 102:13, 102:19, 103:16
**people** [6] - 33:15, 65:16, 69:25, 70:12, 73:15, 76:18
**per** [2] - 26:9, 31:25
**perceive** [1] - 75:14
**percent** [4] - 47:8, 59:15, 72:25
**perform** [1] - 9:7
**performed** [3] - 8:3, 8:21, 58:5
**performing** [3] - 13:13, 27:15, 97:6
**performs** [2] - 32:25, 37:2

**perhaps** [1] - 95:20
**period** [1] - 75:8
**periods** [1] - 13:22
**permanent** [1] - 69:16
**permission** [3] - 74:14, 74:17, 95:18
**permitted** [3] - 22:3, 38:24, 82:19
**perpetuity** [2] - 54:13, 90:6
**person** [1] - 7:18
**personal** [3] - 11:4, 11:8, 12:23
**personally** [4] - 7:1, 33:14, 33:16, 33:17
**personnel** [6] - 16:16, 16:24, 23:16, 23:19, 25:7, 32:2, 69:20, 87:9
**personnel's** [2] - 25:19, 26:25
**perspective** [2] - 29:6, 84:24
**petition** [2] - 83:15, 85:4
**Pharma** [1] - 39:18
**phrased** [1] - 94:1
**physical** [1] - 8:19
**picked** [1] - 97:17
**pitch** [1] - 102:20
**pivot** [1] - 60:13
**place** [4] - 59:11, 67:13, 69:20, 86:24
**places** [2] - 31:2, 97:19
**plain** [1] - 95:24
**Plaintiff** [11] - 1:5, 1:22, 2:16, 4:21, 66:19, 81:2, 84:24, 100:5, 100:7, 102:14, 103:11
**Plaintiff's** [1] - 100:9
**plan** [6] - 3:21, 32:3, 38:9, 38:10, 38:13, 63:9
**plane** [1] - 99:8
**plans** [2] - 41:11, 41:13
**plant** [6] - 8:16, 14:17, 16:2, 17:15, 34:24, 71:1
**plants** [1] - 23:20
**play** [1] - 60:4
**played** [3] - 63:10, 64:20, 95:16
**players** [1] - 26:17
**PLC** [51] - 7:11, 7:21, 7:22, 8:3, 8:5, 8:21, 8:23, 9:6, 9:10, 9:11, 10:4, 10:6, 10:12,

10:18, 10:20, 10:21, 10:25, 11:3, 11:10, 12:24, 13:15, 14:7, 15:18, 15:19, 15:20, 15:23, 16:3, 16:7, 16:17, 16:25, 17:9, 17:16, 17:19, 17:24, 18:4, 18:6, 19:25, 20:23, 20:25, 21:11, 26:1, 33:24, 35:16, 36:10, 44:23, 44:24, 45:3, 65:5, 65:7
**PLCs** [6] - 10:11, 11:6, 13:9, 14:5, 15:2, 15:8
**pleading** [1] - 61:12
**pled** [1] - 61:10
**plug** [1] - 68:19
**plugged** [1] - 66:24
**plugging** [2] - 68:14, 70:6
**podium** [1] - 65:24
**point** [22] - 27:25, 29:19, 43:23, 44:6, 44:7, 47:23, 56:1, 57:18, 59:8, 71:2, 71:19, 76:4, 76:10, 78:1, 80:3, 86:9, 86:19, 88:21, 92:8, 96:24, 103:10, 103:23
**pointed** [6] - 46:14, 50:11, 64:5, 65:12, 65:13, 103:19
**points** [2] - 9:14, 97:23
**poll** [1] - 70:9
**popped** [1] - 40:7
**popping** [1] - 97:3
**portion** [2] - 46:14, 59:14
**portions** [1] - 46:24
**pose** [1] - 99:11
**position** [11] - 74:22, 85:13, 86:10, 92:11, 92:17, 92:24, 93:23, 94:2, 94:10, 95:19, 99:5
**positively** [1] - 41:17
**possessing** [1] - 67:22
**possession** [3] - 47:6, 78:19, 78:23
**possibly** [1] - 40:13
**post** [4] - 23:18, 64:6, 92:12, 94:3
**post-installation** [1] - 23:18
**post-license** [2] - 92:12, 94:3

**post-reproduction** [1] - 64:6
**posture** [1] - 75:19
**potential** [2] - 26:4, 59:16
**power** [25] - 9:17, 10:7, 10:18, 10:24, 11:2, 12:18, 13:14, 13:15, 13:22, 14:16, 14:17, 15:14, 17:7, 19:24, 20:2, 20:7, 20:12, 22:25, 41:7, 42:5, 42:10, 44:23, 45:2, 84:6
**powered** [8] - 10:4, 10:5, 10:11, 10:22, 15:2, 15:8, 20:8, 45:3
**powering** [1] - 21:10
**powers** [1] - 12:22
**practical** [3] - 97:10, 97:16, 97:18
**practice** [1] - 80:16
**pre** [1] - 85:4
**pre-petition** [1] - 85:4
**precise** [1] - 9:5
**precisely** [1] - 53:16
**precludes** [1] - 100:14
**preexisting** [1] - 38:14
**preliminary** [45] - 3:15, 3:22, 3:24, 4:14, 4:22, 11:21, 24:16, 37:25, 39:2, 39:5, 39:9, 40:8, 47:19, 51:21, 54:25, 55:6, 56:10, 56:12, 60:17, 65:21, 66:12, 66:14, 69:13, 71:22, 72:9, 74:10, 77:22, 78:13, 91:10, 94:18, 95:6, 95:17, 99:5, 99:6, 100:2, 100:5, 100:8, 100:12, 100:15, 100:18, 102:12
**premised** [1] - 77:3
**prepared** [1] - 9:22
**present** [5] - 3:23, 4:2, 51:13, 88:24, 99:16
**presentation** [1] - 86:18
**presented** [7] - 53:17, 56:5, 57:1, 74:10, 87:15, 92:24, 99:3
**presenting** [1] - 3:19
**preservation** [1] - 78:7
**preserve** [1] - 66:15
**preserved** [1] - 66:17
**preserving** [1] - 69:3

**presiding** [1] - 2:10
**presumed** [1] - 68:9
**presumption** [2] - 62:20, 62:21
**prevail** [2] - 39:16, 64:23
**prevent** [1] - 42:19
**prima** [1] - 39:6
**primarily** [3] - 67:10, 68:16, 84:19
**primary** [1] - 69:21
**privately** [2] - 69:2, 81:25
**problem** [5] - 55:22, 56:9, 75:20, 91:17, 99:11
**proceed** [8] - 3:14, 3:21, 4:19, 5:16, 37:24, 66:7, 85:10, 93:19
**proceeding** [8] - 4:5, 51:14, 80:25, 81:7, 91:19, 92:3, 99:17, 104:6
**proceedings** [6] - 48:7, 66:11, 67:2, 71:16, 75:15, 80:6
**PROCEEDINGS** [1] - 2:8
**proceeds** [2] - 56:19, 94:16
**process** [7] - 10:21, 21:16, 42:5, 42:6, 44:23, 44:24, 50:14
**processor** [2] - 10:17, 32:18
**production** [1] - 83:4
**PRODUCTION** [1] - 1:4
**Production** [3] - 2:13, 4:21, 5:24
**productive** [1] - 93:10
**productively** [1] - 93:4
**program** [17] - 7:12, 8:5, 8:6, 10:18, 15:19, 15:20, 16:1, 16:4, 17:16, 18:6, 18:11, 18:22, 20:25, 21:3, 26:1, 92:20, 92:21
**Programmable** [1] - 12:2
**programmable** [2] - 7:10, 11:12
**programming** [2] - 12:1, 21:3
**progress** [2] - 86:9, 87:12
**prohibit** [1] - 67:16
**prohibited** [1] - 54:2

**prohibiting** [2] - 42:15, 42:16
**prohibits** [1] - 90:5
**project** [1] - 32:3
**promise** [2] - 83:12, 99:9
**proper** [3] - 42:17, 55:14, 74:21
**property** [15] - 22:14, 27:19, 46:21, 47:2, 48:2, 48:3, 50:12, 55:20, 77:6, 77:25, 78:4, 78:7, 79:9, 80:21, 83:2
**proposal** [2] - 3:21, 87:22
**propose** [1] - 95:13
**proposed** [1] - 56:14
**proposition** [1] - 73:5
**Proskauer** [1] - 3:5
**PROSKAUER** [1] - 2:5
**protect** [1] - 25:21
**protection** [1] - 59:9
**protections** [2] - 98:7, 102:8
**prototypes** [1] - 27:24
**proud** [1] - 28:8
**prove** [1] - 68:1
**provide** [2] - 34:23, 95:23
**provided** [6] - 3:9, 18:14, 18:18, 38:15, 83:24
**provides** [1] - 69:23
**provision** [2] - 97:10, 97:12
**provisions** [2] - 90:2, 98:2
**public** [2] - 59:22, 100:10
**pulled** [1] - 87:25
**purchase** [4] - 17:9, 38:10, 78:3
**Purchase** [5] - 49:7, 49:9, 49:10, 49:21, 50:14
**purchased** [3] - 49:14, 77:16, 77:24
**Purchaser** [3] - 53:13, 53:14, 53:25
**purchaser** [4] - 49:16, 52:2, 77:23, 78:3
**Purchaser's** [1] - 53:10
**purely** [1] - 58:25
**purpose** [7] - 17:20, 58:6, 58:23, 66:12, 66:14, 85:5, 94:4
**purposes** [10] - 12:4, 37:11, 50:9, 58:25,

89:4, 89:5, 90:13, 94:18, 95:6
**pursuant** [1] - 31:18
**push** [2] - 22:24, 46:9
**put** [14] - 2:15, 3:11, 11:19, 19:21, 20:3, 22:1, 22:23, 27:21, 41:11, 44:21, 60:24, 74:22, 80:18, 85:2
**puts** [1] - 35:18
**putting** [2] - 50:3, 75:7

---

## Q

**quality** [13] - 7:18, 8:15, 22:13, 26:20, 27:1, 27:7, 64:3, 64:16, 65:4, 65:16, 68:21, 101:17
**quality-related** [3] - 26:20, 64:3, 64:16
**quantified** [1] - 101:9
**quantify** [2] - 22:5, 101:5
**quantity** [1] - 27:11
**Quantum** [1] - 42:8
**questioning** [1] - 23:24
**questions** [13] - 28:23, 36:14, 37:18, 39:11, 39:13, 57:15, 60:15, 65:24, 75:14, 77:8, 85:8, 91:18, 98:15
**quick** [1] - 99:9
**quicker** [1] - 28:17
**quickly** [1] - 55:8
**quintessentially** [1] - 45:13
**quite** [3] - 29:17, 40:13, 61:9
**quo** [2] - 66:15, 66:16, 69:4
**quoting** [1] - 53:25

---

## R

**raise** [2] - 5:3, 46:1
**raised** [3] - 43:14, 48:14, 83:10
**ram** [24] - 10:20, 10:25, 11:2, 18:13, 18:20, 35:18, 36:1, 36:9, 44:12, 45:3, 45:11, 45:12, 60:25, 63:13, 66:19, 75:7, 84:11, 84:13, 84:15, 93:7, 93:8, 101:25, 102:1, 103:1
**random** [1] - 10:20
**range** [1] - 88:4

**rarely** [1] - 51:10
**rate** [1] - 70:10
**rather** [2] - 81:21, 86:25
**reach** [1] - 95:5
**reacting** [1] - 75:16
**read** [7] - 15:10, 17:10, 25:9, 47:19, 74:4, 77:12
**reading** [2] - 56:17, 75:16
**ready** [2] - 78:5, 100:1
**Real** [1] - 104:7
**real** [1] - 67:9
**Real-Time** [1] - 104:7
**realities** [1] - 87:23
**reality** [3] - 97:11, 97:16, 97:18
**really** [12] - 3:10, 48:12, 51:5, 53:5, 57:7, 57:17, 60:21, 70:13, 76:5, 84:1, 92:4, 99:3
**reason** [7] - 15:20, 50:1, 50:20, 59:11, 70:4, 88:15, 101:4
**reasonable** [2] - 39:19, 88:1
**reasonably** [2] - 39:15, 60:20
**reasons** [11] - 13:3, 13:7, 13:10, 21:15, 23:21, 40:22, 48:24, 60:5, 63:23, 80:12, 81:4
**reboot** [15] - 10:8, 10:25, 12:18, 12:25, 13:8, 14:4, 14:19, 15:14, 21:16, 36:13, 41:7, 42:5, 42:11, 44:23, 45:2
**rebooted** [5] - 10:4, 10:11, 10:22, 15:2, 15:8
**rebooting** [1] - 20:2
**reboots** [1] - 17:7
**rebut** [1] - 4:3
**rebuttal** [1] - 65:23
**received** [2] - 30:16, 30:19
**receives** [1] - 7:16
**receiving** [1] - 31:18
**recent** [1] - 99:2
**recently** [1] - 18:25
**recess** [1] - 99:4
**Recess** [2] - 66:5, 99:22
**reciting** [1] - 99:4
**recognize** [4] - 20:25, 21:4, 21:5, 82:15

**recognized** [3] - 44:22, 83:16, 91:19
**recognizes** [1] - 70:2
**recognizing** [1] - 64:18
**record** [15] - 2:16, 5:5, 24:14, 39:23, 46:24, 46:25, 47:15, 50:21, 52:23, 56:15, 81:2, 93:18, 98:22, 100:13, 101:8
**record's** [1] - 17:18
**records** [1] - 92:8
**red** [2] - 97:2, 97:3
**redirect** [2] - 28:13, 36:17
**REDIRECT** [1] - 36:20
**reengineering** [1] - 58:6
**refer** [2] - 19:3, 23:9
**reference** [2] - 49:21, 88:21
**referenced** [1] - 89:15
**referred** [2] - 6:13, 24:2
**refers** [2] - 54:5, 76:23
**refile** [2] - 103:15, 103:22
**reflects** [1] - 49:8, 101:8
**regard** [3] - 22:13, 34:7, 82:8
**regarding** [2] - 7:1, 12:18
**regards** [1] - 22:10
**registering** [1] - 7:25
**registrations** [1] - 7:23
**regularly** [1] - 101:7
**reject** [1] - 101:4
**rejected** [4] - 7:17, 38:14, 80:23, 97:15
**related** [7] - 26:19, 26:20, 42:24, 64:2, 64:3, 64:15, 64:16
**relating** [1] - 32:7
**relation** [1] - 59:14
**relationship** [4] - 33:8, 68:24, 83:14, 87:24
**relevant** [4] - 19:23, 55:2, 65:17, 68:8
**relief** [5] - 42:1, 62:14, 95:24, 98:11, 100:8
**remain** [6] - 5:2, 5:3, 10:25, 11:2, 18:15, 18:19
**remains** [5] - 29:19, 45:12, 92:11, 92:17, 100:25
**remedied** [2] - 69:12,

103:18
**remedy** [1] - 101:6
**remember** [2] - 66:12, 99:1
**remind** [2] - 30:21, 53:3
**remotely** [1] - 58:12
**remove** [2] - 9:16, 22:25
**removed** [1] - 35:10
**renders** [1] - 100:11
**repaid** [1] - 67:11
**repair** [1] - 20:10
**repaired** [2] - 71:3, 86:19
**repairs** [1] - 13:13
**repeat** [2] - 28:24, 61:22
**replaced** [1] - 14:8
**replacement** [1] - 73:10
**replacing** [1] - 13:23
**reply** [10] - 43:15, 43:21, 57:16, 57:19, 74:8, 74:12, 74:15, 74:16, 74:21, 74:22
**reporter** [1] - 66:2
**Reporter** [1] - 104:7
**reports** [2] - 88:17, 102:24
**represent** [1] - 28:21
**representation** [3] - 47:18, 48:3, 48:8
**representations** [3] - 46:18, 48:9, 48:10
**representative** [1] - 86:14
**representatives** [1] - 86:12
**represented** [3] - 41:25, 46:11, 46:13
**representing** [1] - 80:10
**reproduce** [7] - 22:3, 38:19, 40:14, 41:4, 60:9, 63:24, 93:6
**reproducing** [5] - 57:23, 58:14, 63:23, 64:24, 93:8
**reproduction** [33] - 12:18, 38:6, 39:25, 40:19, 40:20, 41:1, 42:12, 43:10, 43:21, 45:1, 57:6, 57:11, 63:2, 64:4, 64:6, 64:7, 64:13, 65:1, 65:8, 91:2, 92:10, 92:19, 94:6, 94:8, 94:19, 94:23, 94:24, 95:5, 95:15, 95:16,

96:4, 96:13
**reproductive** [1] - 92:18
**reputation** [10] - 21:25, 22:10, 22:13, 26:13, 27:13, 27:16, 62:17, 69:10, 90:22, 101:13
**reputation-based** [1] - 90:22
**reputational** [3] - 64:15, 64:16, 101:18
**request** [1] - 69:17
**require** [6] - 13:14, 14:14, 20:7, 65:10, 95:23
**required** [9] - 17:4, 23:17, 24:1, 62:15, 70:16, 70:18, 76:25, 100:4, 100:24
**requirement** [2] - 63:5, 84:23
**requires** [1] - 17:15
**reselling** [1] - 67:4
**resides** [4] - 7:15, 47:3, 47:24, 49:22
**resolve** [3] - 15:22, 86:16, 87:20
**resolved** [3] - 86:25, 102:21, 103:8
**resolving** [1] - 86:8
**respect** [7] - 7:20, 15:15, 17:11, 25:19, 85:12, 85:18, 97:5
**respectfully** [1] - 63:19
**respects** [2] - 52:23, 57:9
**respond** [5] - 4:1, 4:3, 17:14, 71:25, 74:24
**responded** [1] - 74:12
**responding** [1] - 74:9
**response** [4] - 55:25, 74:21, 77:21, 91:25
**rest** [1] - 7:19
**restrain** [1] - 42:19
**restrict** [1] - 52:15
**restrictions** [4] - 52:17, 54:5, 54:18, 54:20
**result** [5] - 21:12, 27:18, 58:21, 59:4, 69:14
**resulted** [1] - 63:12
**results** [1] - 65:9
**retraining** [1] - 35:5
**return** [2] - 67:17, 67:21
**returning** [1] - 99:11
**revenue** [1] - 73:1

**review** [1] - 15:19
**reviewed** [1] - 14:23
**Richards** [1] - 3:3
**RICHARDS** [1] - 1:23
**rights** [26] - 16:21, 38:7, 38:23, 47:2, 48:17, 49:2, 49:3, 49:12, 50:4, 50:12, 53:14, 54:16, 60:8, 76:20, 77:6, 77:25, 78:4, 78:7, 79:21, 80:5, 80:21, 92:14, 93:5, 93:24, 98:5, 102:8
**ripe** [1] - 75:9
**rise** [6] - 2:9, 66:4, 66:6, 99:21, 99:23, 104:2
**Risk** [1] - 83:1
**risk** [4] - 22:22, 23:7, 69:21
**risks** [1] - 65:1
**Rockwell** [7] - 11:11, 12:2, 16:19, 16:23, 18:5, 25:23
**Rockwell's** [1] - 18:12
**role** [2] - 6:6, 71:21
**rooftops** [1] - 91:17
**room** [1] - 95:4
**roost** [1] - 38:21
**Ropes** [1] - 46:13
**ROSE** [1] - 2:5
**rotating** [1] - 23:19
**routine** [1] - 65:4
**routinely** [1] - 100:25
**rudimentary** [2] - 8:9, 9:2
**rule** [4] - 75:6, 94:12, 95:8, 100:1
**ruling** [10] - 47:20, 51:21, 54:25, 55:6, 56:11, 56:12, 77:23, 95:6, 99:17, 102:11
**run** [12] - 8:8, 18:4, 33:6, 36:6, 36:9, 36:12, 75:10, 82:9, 84:14, 84:15, 98:1
**running** [6] - 18:4, 29:15, 34:12, 66:20, 73:6, 93:5
**runs** [5] - 32:21, 36:1, 36:9, 100:22
**rushed** [1] - 41:15

**S**

**S-T-E-P-H-E-N** [1] - 5:6
**SaaS** [1] - 70:17
**Sacksteder** [1] - 3:6

**safe** [2] - 22:18, 26:12
**safely** [2] - 9:16, 22:25
**safety** [46] - 9:7, 9:12, 9:16, 17:1, 17:2, 22:11, 22:16, 23:6, 23:11, 23:17, 24:22, 24:23, 25:6, 25:12, 25:19, 26:1, 26:4, 26:6, 26:19, 26:22, 29:2, 29:7, 29:23, 29:24, 30:4, 64:2, 64:15, 65:4, 68:19, 69:11, 69:18, 69:19, 69:20, 70:2, 70:7, 82:21, 96:16, 96:25, 97:2, 97:4, 97:5, 97:6, 101:16, 102:7
**safety-related** [3] - 26:19, 64:2, 64:15
**Sale** [5] - 50:2, 55:7, 78:3, 78:10, 79:4
**sale** [21] - 45:20, 46:9, 48:13, 49:12, 50:9, 50:25, 51:17, 53:14, 53:17, 56:1, 56:3, 56:13, 75:23, 76:1, 76:5, 76:17, 76:25, 79:21, 79:22, 89:4, 89:11
**Salt** [3] - 6:21, 6:24, 41:16
**sat** [1] - 86:3
**scenario** [9] - 10:8, 17:25, 18:8, 41:8, 64:17, 64:24, 98:8, 102:9
**scenarios** [2] - 9:25, 10:3
**scope** [3] - 20:15, 74:23, 94:20
**scratch** [1] - 88:2
**screamed** [1] - 91:16
**screaming** [1] - 97:3
**screen** [4] - 11:15, 11:19, 15:22, 97:3
**screens** [1] - 82:21
**scrutiny** [1] - 40:5
**SD** [8] - 10:17, 35:16, 35:17, 35:23, 36:9, 84:11, 84:12, 84:14
**seat** [1] - 20:18
**seated** [4] - 2:11, 5:15, 66:7, 99:24
**second** [10] - 14:2, 15:15, 18:8, 18:9, 18:18, 33:23, 45:16, 53:21, 59:6, 81:17
**seconds** [1] - 44:5
**section** [4] - 12:19, 50:13, 52:25, 75:21

**Section** [12] - 42:17, 52:25, 53:7, 58:20, 72:12, 74:7, 75:2, 82:18, 82:25, 83:1, 94:8, 96:21
**sections** [1] - 89:14
**secure** [2] - 10:17, 46:10
**see** [14] - 3:1, 3:7, 23:23, 24:21, 25:6, 25:13, 41:21, 52:12, 55:10, 71:18, 86:21, 89:25, 90:7, 99:19
**seeking** [1] - 41:25
**seeks** [1] - 38:24
**seem** [2] - 63:12, 71:23
**sees** [1] - 94:21
**Sega** [2] - 58:1, 59:2
**selective** [1] - 8:15
**selectively** [1] - 8:16
**self** [2] - 91:13, 91:16
**self-inflicted** [2] - 91:13, 91:16
**selling** [1] - 84:20
**sells** [1] - 49:9
**send** [1] - 33:25
**senior** [1] - 86:13
**sense** [7] - 20:14, 76:25, 80:6, 81:13, 84:3, 84:7, 97:7
**sensors** [3] - 21:5, 22:23, 97:1
**sentence** [4] - 12:20, 24:19, 25:4, 74:3
**sentences** [1] - 25:10
**separate** [2] - 70:20, 80:21
**September** [1] - 33:13
**sequences** [1] - 8:13
**service** [9] - 23:16, 23:19, 26:25, 34:23, 63:9, 70:14, 70:16, 70:19, 70:23
**services** [6] - 34:7, 34:8, 34:17, 35:3, 83:13, 83:24
**servicing** [1] - 97:22
**servicings** [1] - 70:18
**session** [1] - 2:10
**set** [5] - 52:9, 62:23, 83:22, 85:5, 98:4
**setting** [1] - 29:14
**settings** [3] - 68:20, 70:7, 82:6
**several** [3] - 29:12, 29:15, 44:13
**shall** [3] - 53:25, 77:24, 83:4
**shape** [1] - 13:25

share [3] - 11:14, 24:10, 70:8
ship [2] - 23:5, 30:14
shipped [3] - 31:2, 31:3, 32:12
shipping [1] - 32:18
ships [1] - 30:22
shoes [2] - 75:15, 83:18
short [8] - 7:11, 9:4, 15:2, 15:8, 40:18, 74:16, 87:20, 95:23
show [8] - 39:15, 39:18, 39:19, 50:21, 82:7, 90:15, 90:19, 101:19
showing [3] - 50:18, 62:15, 68:9
shown [1] - 62:16
shows [1] - 39:23
shut [4] - 66:13, 70:12, 72:25, 91:11
shutdown [1] - 65:10
side [4] - 44:6, 51:2, 59:22, 99:16
sides [6] - 57:3, 86:24, 99:1, 99:3, 100:4, 103:7
sign [1] - 20:18
signature [1] - 29:24
signed [2] - 29:22, 55:7
significant [2] - 73:21, 100:24
significantly [2] - 39:20, 52:15
SILVERSTEIN [1] - 1:18
Silverstein [1] - 2:19
Silvertop [3] - 62:15, 62:18, 90:18
similar [6] - 8:23, 9:2, 13:21, 26:22, 40:24, 88:3
similarly [1] - 17:6
simple [1] - 20:10
simply [2] - 43:19, 67:22
sit [1] - 71:23
situated [1] - 28:17
situation [5] - 16:11, 55:3, 85:15, 93:23, 97:24
six [1] - 67:1
size [2] - 19:12, 20:14
skill [1] - 98:25
sky [1] - 41:18
SMITH [1] - 1:21
Smith [6] - 2:20, 12:12, 13:5, 24:17,

25:4, 61:7
Software [1] - 53:9
software [174] - 6:9, 7:2, 7:5, 7:14, 7:15, 7:20, 7:21, 7:22, 7:23, 8:3, 8:21, 8:23, 9:1, 9:6, 9:10, 9:11, 9:21, 10:1, 10:12, 10:16, 12:24, 12:25, 15:18, 16:17, 16:23, 16:25, 17:1, 17:9, 17:19, 17:21, 17:24, 18:2, 18:10, 18:12, 18:15, 18:19, 19:17, 19:25, 20:23, 21:12, 21:13, 22:4, 24:3, 24:6, 24:22, 25:6, 25:20, 25:22, 25:23, 26:5, 26:6, 26:23, 27:21, 27:24, 28:1, 28:2, 28:10, 32:15, 32:20, 32:21, 32:25, 33:3, 33:24, 34:1, 34:9, 35:9, 35:18, 35:24, 36:8, 36:12, 36:23, 37:2, 37:15, 38:6, 38:17, 38:19, 38:22, 38:23, 38:25, 41:4, 41:7, 44:24, 45:24, 45:25, 46:3, 46:5, 46:12, 46:21, 47:2, 47:3, 47:7, 47:20, 47:24, 48:8, 48:11, 49:7, 49:13, 49:18, 49:21, 49:22, 51:1, 51:9, 51:20, 51:22, 51:23, 51:24, 52:16, 53:8, 53:13, 53:14, 53:16, 54:1, 54:11, 54:16, 55:3, 55:13, 55:20, 58:5, 58:7, 58:14, 59:9, 59:12, 59:20, 60:7, 60:9, 63:3, 63:9, 63:25, 64:25, 67:4, 67:17, 69:2, 70:17, 73:10, 77:9, 78:11, 78:12, 78:14, 78:20, 78:24, 80:8, 81:20, 81:22, 81:25, 82:11, 82:13, 82:25, 83:23, 84:4, 84:14, 84:20, 89:18, 89:21, 89:23, 90:1, 92:13, 92:20, 93:5, 94:4, 96:16, 96:19, 98:9, 100:22, 100:23, 100:25, 101:7, 101:9, 101:12, 101:16, 101:24, 102:25
sold [2] - 51:19, 53:10

solely [1] - 54:7
someone [4] - 26:13, 70:23, 75:15, 86:9
sometimes [3] - 76:14, 86:11, 87:14
somewhat [1] - 59:9
somewhere [1] - 41:22
Sony [2] - 58:1, 59:2
sorry [5] - 8:9, 23:10, 24:7, 46:19, 55:19
sort [5] - 8:16, 63:8, 71:18, 71:19, 79:3
sorter [1] - 8:15
sorts [5] - 8:18, 23:21, 27:10, 27:23, 27:25
sound [1] - 50:5
sources [1] - 11:9
space [1] - 74:17
speaking [1] - 37:13
speaks [1] - 89:16
specific [5] - 22:7, 49:5, 58:2, 70:12, 72:8
specifically [6] - 6:19, 19:6, 43:4, 51:20, 54:7, 96:21
specification [1] - 34:13
specifics [1] - 34:24
specified [1] - 60:22
specify [3] - 52:13, 60:21, 60:24
speculative [1] - 70:11
speed [4] - 8:15, 16:10, 21:2, 26:9
speeds [1] - 26:9
spell [2] - 5:5, 95:15
spelled [1] - 94:7
spells [1] - 42:22
spend [1] - 86:24
spending [1] - 57:6
spent [3] - 6:3, 27:23, 98:21
spilled [1] - 38:3
splitting [2] - 20:5, 20:6
squarely [1] - 44:21
stages [1] - 40:8
stand [4] - 4:24, 5:1, 63:7, 77:17
standard [3] - 39:15, 62:13, 90:17
standing [2] - 5:2, 5:3
stands [1] - 60:19
start [9] - 4:23, 10:7, 22:16, 23:5, 67:23, 67:24, 84:1
started [1] - 32:22

starting [2] - 2:16, 56:19
startup [1] - 6:24
state [6] - 5:5, 61:23, 66:15, 96:4, 96:5, 99:16
statement [6] - 15:1, 15:7, 25:1, 62:2, 90:14, 95:24
statements [4] - 25:15, 47:14, 54:23, 68:7
STATES [1] - 1:1
station [1] - 87:1
status [4] - 9:3, 66:15, 66:16, 69:4
statutory [1] - 58:19
stealing [1] - 67:5
stemming [1] - 68:15
stems [1] - 66:25
stenographic [1] - 104:5
step [25] - 4:7, 23:4, 37:21, 45:18, 45:19, 46:2, 48:7, 52:7, 53:17, 55:4, 56:6, 57:15, 60:3, 60:10, 74:19, 75:12, 75:13, 76:21, 81:16, 81:17, 81:19, 84:7, 89:5, 89:10, 90:13
STEPHEN [1] - 5:13
Stephen [4] - 2:23, 4:23, 5:6, 5:22
stepping [1] - 80:10
steps [4] - 21:9, 22:17, 41:2, 83:17
sticks [1] - 76:20
still [3] - 38:12, 57:13, 73:12
stipulate [1] - 102:17
stop [7] - 9:15, 22:24, 22:25, 23:8, 23:10, 48:13, 65:21
stopped [2] - 15:21, 15:22
storage [2] - 18:7, 84:13
stored [1] - 10:16
stores [1] - 35:23
strategically [1] - 94:4
stream [1] - 73:1
Street [1] - 1:10
strike [1] - 10:9
structure [1] - 35:20
stuck [1] - 75:1
Studio [2] - 16:19, 18:5
stuff [2] - 51:16, 94:13
subclass [1] - 98:3

subject [6] - 28:12, 41:10, 74:23, 97:10, 97:15, 98:4
submit [10] - 39:2, 39:22, 43:2, 43:17, 52:19, 58:21, 59:1, 62:19, 65:20, 90:12
submitted [4] - 11:21, 14:23, 24:15, 40:23
subsection [1] - 49:11
substantiality [1] - 59:14
success [6] - 39:7, 39:14, 50:18, 60:13, 68:2, 100:6
suffer [8] - 22:4, 59:21, 62:13, 68:4, 68:6, 90:24, 91:1, 100:7
suffering [3] - 64:15, 90:16, 90:20
sufficiently [2] - 44:25, 61:10
suggest [2] - 73:17
suggesting [1] - 41:11
sum [3] - 75:18, 75:19
supply [1] - 83:13
support [9] - 3:23, 4:22, 4:24, 11:21, 37:25, 41:2, 59:7, 98:11, 100:17
supports [2] - 94:3, 94:11
Supreme [1] - 94:1
sur [6] - 43:15, 43:21, 57:16, 57:19, 74:15, 74:16
sur-reply [6] - 43:15, 43:21, 57:16, 57:19, 74:15, 74:16
surely [1] - 101:9
surprise [4] - 31:14, 34:5, 34:16, 35:2
suspicious [1] - 96:3
swear [1] - 5:8
switch [2] - 48:12, 82:11
switches [1] - 9:13
system [11] - 6:8, 7:12, 8:11, 8:12, 8:18, 9:12, 9:16, 17:1, 23:17, 44:18

T

table [1] - 87:5
table's [1] - 87:6
tailored [1] - 94:20
talks [2] - 50:4, 76:2
tangled [2] - 91:24,

92:1
tarnish [1] - 27:16
tarnished [1] - 27:6
tasks [2] - 13:13, 13:23
TD [1] - 101:21
team [5] - 6:8, 6:22, 8:16, 22:20, 23:25
tearing [2] - 20:11, 23:5
tease [1] - 94:15
technician [4] - 18:3, 18:17, 18:21, 44:16
technicians [1] - 16:8
Telebrands [1] - 62:18
Teleprompter [1] - 93:25
ten [2] - 66:3, 69:8
tens [2] - 72:23, 73:4
term [3] - 10:16, 18:7, 80:23
terminate [1] - 82:24
Termination [1] - 72:12
termination [1] - 82:23
terms [15] - 46:6, 47:2, 54:3, 71:20, 80:14, 83:21, 83:22, 88:11, 88:13, 88:18, 88:20, 88:23, 94:22, 94:24
test [9] - 81:16, 81:18, 81:24, 82:20, 90:15, 90:16, 90:24, 93:23, 93:25
tested [1] - 23:3
testified [6] - 5:14, 21:19, 33:9, 35:12, 35:14, 42:3
testify [3] - 40:15, 41:23
testimony [19] - 3:23, 4:24, 5:9, 12:18, 16:5, 24:21, 28:23, 29:1, 29:3, 30:9, 32:22, 36:24, 40:24, 64:9, 65:12, 69:22, 75:10, 97:18, 103:1
tethered [3] - 87:22, 87:23, 91:1
Texas [2] - 42:22, 42:23
THE [96] - 1:1, 1:2, 1:14, 2:11, 2:24, 3:1, 3:7, 4:5, 4:9, 4:17, 4:19, 4:25, 5:6, 5:12, 5:16, 11:17, 12:7, 12:9, 15:5, 24:12, 28:14, 36:16, 36:19, 37:21, 37:23, 38:2,

46:23, 47:22, 48:20, 48:24, 49:20, 50:1, 50:16, 55:5, 56:15, 57:4, 57:12, 60:16, 61:5, 62:1, 62:9, 62:11, 63:4, 65:25, 66:7, 70:21, 70:25, 71:8, 71:11, 71:14, 71:17, 72:4, 72:19, 75:24, 76:8, 76:11, 77:1, 77:5, 77:17, 77:19, 77:20, 78:8, 78:22, 79:2, 79:14, 79:16, 80:18, 81:5, 81:9, 81:12, 81:14, 85:9, 85:11, 86:2, 86:17, 86:23, 92:7, 92:16, 93:2, 93:14, 93:16, 93:21, 95:8, 95:22, 96:7, 96:11, 96:23, 98:13, 98:16, 98:20, 99:15, 99:24, 103:13, 103:17, 103:21, 104:1
themselves [4] - 19:16, 54:20, 54:21, 56:8
theories [1] - 61:25
therefore [5] - 18:7, 19:25, 25:24, 43:22, 74:3
they've [7] - 29:11, 29:15, 67:2, 87:8, 87:10, 91:7, 97:15
thinking [2] - 69:10, 90:10
third [11] - 8:17, 14:10, 14:12, 24:19, 33:25, 59:13, 67:7, 73:10, 81:17, 89:25, 90:1
Third [4] - 39:17, 62:14, 90:17, 101:21
third-party [3] - 8:17, 33:25, 67:7
thousands [1] - 35:5
thread [1] - 47:11
threat [2] - 62:16, 66:13
three [15] - 7:7, 7:9, 7:20, 22:9, 40:4, 43:9, 43:13, 44:9, 44:18, 52:11, 52:18, 62:25, 73:2, 73:15, 89:16
threshold [2] - 39:22, 45:1
throughout [1] - 66:18
throughput [1] - 27:2
thrust [1] - 69:21
tie [1] - 63:20

tied [6] - 64:3, 64:5, 70:14, 85:3, 96:13, 98:9
timely [1] - 27:11
tips [1] - 100:9
title [6] - 6:1, 51:8, 53:12, 82:1, 83:2, 89:8
Title [1] - 83:1
title-based [1] - 89:8
titled [1] - 72:13
today [29] - 2:12, 2:18, 2:22, 3:15, 28:1, 35:10, 37:18, 39:4, 40:15, 40:21, 41:11, 50:20, 60:22, 60:25, 62:25, 66:25, 71:7, 85:16, 89:1, 89:14, 92:10, 95:3, 98:21, 99:6, 100:17, 101:12, 101:24, 102:5, 103:12
tomorrow [2] - 40:14, 71:10
tons [1] - 20:20
took [1] - 15:9
tooling [2] - 13:24, 19:12
top [3] - 13:25, 19:10, 26:9
topic [2] - 21:19, 32:8
tore [1] - 13:19
tossup [2] - 73:24, 73:25
totality [1] - 57:23
totally [1] - 53:2
toto [2] - 58:14, 59:23
touch [1] - 40:6
toward [1] - 56:20
track [2] - 8:17, 98:18
tracking [3] - 57:13, 80:2
trade [3] - 83:21, 88:13
trademark [2] - 42:24, 67:6
trades [1] - 83:22
traditional [2] - 35:20, 36:5
train [2] - 19:9, 87:1
training [3] - 23:21, 29:17, 35:5
transcript [8] - 46:15, 50:10, 55:11, 56:24, 75:22, 77:12, 77:13, 104:5
transcripts [1] - 75:17
transfer [10] - 52:15, 53:21, 54:1, 54:2, 54:18, 77:25, 78:11,

79:23, 89:24, 90:9
transferrable [4] - 49:16, 49:18, 52:2, 53:23
transferred [3] - 51:2, 51:7, 80:20
transferring [2] - 51:22, 51:24
transformation [1] - 84:10
transformative [4] - 59:3, 59:24, 60:1, 84:17
transitory [4] - 43:22, 44:2, 45:14, 75:11
traveled [1] - 33:11
treat [1] - 89:6
Triad [1] - 44:17
trial [3] - 69:16, 86:1, 101:10
tricking [1] - 67:7
tried [4] - 48:13, 51:12, 64:9, 86:4
trim [1] - 9:5
Triozzi [1] - 104:7
troubleshoot [1] - 15:20
true [2] - 40:17, 104:4
truth [3] - 5:9, 5:10
try [3] - 28:24, 80:6
trying [3] - 71:7, 78:16, 99:9
turn [8] - 8:7, 12:12, 14:6, 20:9, 20:12, 68:18, 82:5, 84:5
turned [5] - 11:2, 44:19, 55:21, 66:23, 101:25
turning [5] - 13:14, 14:7, 55:18, 68:13, 70:5
turns [1] - 14:17
twice [2] - 33:11, 33:12
two [20] - 10:2, 10:3, 16:18, 16:19, 18:1, 19:23, 25:23, 33:16, 33:19, 36:3, 39:5, 39:7, 40:18, 41:5, 44:15, 45:5, 74:4, 77:10, 79:18, 95:13
two-and-a-half [1] - 33:16
type [2] - 33:19, 64:1
types [1] - 7:5
typically [1] - 74:4

**U**

U.S [2] - 93:5, 104:8

U.S.D.C.J [1] - 1:14
ultimate [1] - 58:10
ultimately [3] - 55:7, 91:24, 92:1
unabashedly [1] - 38:24
unable [1] - 25:11
unavoidable [1] - 15:13
uncontested [2] - 65:6, 73:23
uncontrolled [1] - 65:1
under [15] - 38:7, 39:17, 48:4, 55:15, 56:2, 56:20, 58:20, 74:6, 76:12, 76:25, 82:18, 85:4, 92:14, 96:17, 101:1
underlying [5] - 46:7, 52:12, 52:14, 52:18, 81:8
understandable [1] - 51:4
understood [9] - 29:19, 47:23, 51:12, 51:23, 62:7, 71:14, 72:19, 80:18, 87:3
unequivocal [2] - 53:8, 54:17
unequivocally [1] - 46:11
unfair [2] - 51:11, 71:17
unique [2] - 9:3, 29:23
UNITED [1] - 1:1
unknowingly [1] - 69:20
unknown [1] - 73:11
unlawful [1] - 40:19
unlawfully [1] - 38:5
unless [5] - 57:14, 60:14, 65:23, 85:8, 98:14
unlicensed [3] - 28:2, 73:24, 74:3
unplug [2] - 13:19
unreasonably [1] - 62:6
unusual [2] - 80:8, 80:19
up [28] - 4:7, 6:10, 10:18, 11:19, 12:9, 12:22, 18:11, 22:21, 22:23, 23:5, 29:14, 32:20, 34:12, 40:7, 57:16, 73:5, 75:20, 76:6, 79:10, 79:11, 82:5, 83:6, 84:3, 86:23, 87:2, 87:17,

97:3, 97:17
**updates** [1] - 70:17
**upgrades** [1] - 23:22
**upload** [1] - 18:6
**user** [8] - 11:10, 12:1, 12:21, 45:8, 52:13, 80:9, 81:22
**user's** [1] - 52:15
**uses** [6] - 54:10, 82:1, 84:14, 84:17, 90:18, 94:12
**Utah** [2] - 6:21, 78:18

## V

**valid** [1] - 60:7
**validation** [1] - 23:6
**value** [2] - 59:17, 101:8
**varile** [2] - 21:1, 21:4
**various** [4] - 32:24, 47:12, 48:24, 54:9
**vendor** [2] - 68:24, 83:8
**Vendor** [8] - 31:19, 31:20, 83:6, 83:8, 83:11, 83:16, 83:18, 83:21
**vendor-customer** [1] - 68:24
**venture** [1] - 37:12
**verbal** [1] - 75:19
**verification** [1] - 23:6
**verify** [1] - 23:16
**Vernor** [1] - 52:10
**versus** [3] - 52:9, 53:18, 90:13
**VFD** [1] - 21:4
**view** [6] - 17:11, 57:11, 60:12, 64:10, 86:18, 91:21
**violate** [5] - 60:8, 70:21, 70:23, 73:25, 75:2
**violated** [1] - 79:21
**violating** [1] - 80:14
**violation** [3] - 38:6, 39:24, 55:14
**Violet** [1] - 42:22
**Virginia** [2] - 5:25, 30:23
**virtue** [4] - 12:4, 63:23, 97:20, 97:21
**visibility** [1] - 33:21
**visits** [1] - 33:19
**Vobev** [45] - 29:11, 29:19, 33:9, 33:10, 34:2, 35:2, 38:10, 38:11, 38:13, 38:14, 38:15, 46:7, 46:12,

46:18, 46:21, 47:12, 48:6, 48:15, 49:9, 51:18, 51:25, 52:19, 52:22, 53:9, 54:10, 54:24, 55:16, 55:20, 56:7, 56:14, 65:14, 67:1, 69:24, 72:13, 82:14, 82:19, 83:18, 83:19, 85:20, 88:14, 88:18, 96:18
**Vobev's** [3] - 46:10, 46:19, 46:20
**Vobev-Belvac** [1] - 88:14
**volatile** [1] - 10:20
**volts** [1] - 20:8
**vs** [2] - 2:13, 101:21

## W

**wait** [1] - 77:16
**waived** [2] - 43:18, 74:23
**waiver** [2] - 74:9, 74:20
**walk** [1] - 10:14
**wants** [3] - 54:22, 67:11, 97:2
**washer** [4] - 13:17, 13:18, 13:19, 20:9
**ways** [6] - 17:23, 18:1, 62:25, 63:24, 71:19, 90:25
**weather** [1] - 14:16
**wednesday** [1] - 1:12
**weeks** [5] - 45:5, 45:9, 69:8, 73:12, 88:3
**weigh** [1] - 91:12
**weighing** [3] - 73:18, 91:3, 91:11
**weight** [2] - 54:22, 91:14
**Western** [1] - 92:25
**whole** [2] - 5:9, 13:14
**wholeheartedly** [1] - 24:24
**wholly** [3] - 54:19, 54:20, 59:3
**Wilmington** [1] - 1:11
**winning** [2] - 39:19, 96:7
**witness** [11] - 2:22, 3:22, 5:1, 11:15, 24:10, 28:12, 37:19, 41:12, 41:13, 63:7, 63:11
**WITNESS** [3] - 5:6, 5:12, 37:23
**witnessing** [1] - 26:25
**word** [3] - 23:8, 61:24,

76:15
**words** [2] - 55:23, 75:18
**works** [2] - 8:10, 9:16
**world** [1] - 65:14
**worry** [1] - 48:16
**worthless** [2] - 72:22, 72:24
**wreckage** [1] - 8:14
**write** [2] - 73:3, 73:10
**writing** [2] - 73:8, 73:10
**written** [1] - 53:3

## Y

**year** [1] - 86:1
**years** [9] - 6:3, 6:5, 27:21, 29:12, 29:16, 33:9, 33:16, 34:3, 35:3
**York** [1] - 93:1
**you-all** [3] - 71:4, 71:19, 78:17
**yourself** [1] - 5:21

## Z

**zero** [3] - 59:22, 69:23, 84:19
**Zoom** [2] - 55:9