

Kelly E. Farnan
302-651-7705
farnan@rlf.com

July 18, 2025

**BY CM/ECF & HAND DELIVERY**
The Honorable Sherry R. Fallon
J. Caleb Boggs Federal Building
844 N. King Street
Wilmington, DE 19801-3555

   RE: *Belvac Production Machinery, Inc. v. Adonis Acquisition Holdings LLC*,
      C.A. No. 25-166-JLH-SRF

Dear Magistrate Judge Fallon:

  Defendant Adonis Acquisition Holdings LLC ("Adonis") submits the following letter brief regarding ESI preservation in advance of the Hearing to Resolve a Discovery Dispute, set for July 29, 2025. (D.I. 66.)

  As an initial matter, Belvac offers no explanation about why the ESI categories it seeks to add to the ESI Protocol are "critical" to its case such that it could not bear its burden of proof through more efficient, less costly means. For example, Belvac fails to explain why it would not be easier, more efficient, and less costly to the parties to have experts analyze the Belvac Software Source Code and testify regarding how the Software works, whether it creates copies in RAM, and whether those copies exist for a more than transitory period. Similarly, Belvac fails to explain its basis for implying that Adonis will not comply with its discovery obligations to truthfully answer discovery requests seeking information relating to whether and when the equipment at issue is rebooted and/or powered off/on. Unsupported accusations that a party will commit discovery violations should not be considered "good cause" to deviate from the District of Delaware's Default Standard for Discovery ("Default Standard") to include the expansive language Belvac proposes.

  Even were the Court to accept Belvac's characterization of some of the ESI it seeks to force Adonis to preserve, Belvac still has not shown good cause to include the expansive language it proposes here. And the expense and effort required of Adonis to comply with even a narrower ESI preservation requirement would be unduly burdensome. The Court should, therefore, decline to enter any additional ESI preservation language. In the alternative, to the extent the Court feels some additional preservation is justified, it should enter language specifically and narrowly identifying the ESI to be preserved, the locations from which it should be captured, and the events that trigger the preservation requirement. In that instance, Adonis also requests that the Court order Belvac to pay for the preservation software Adonis will have to acquire and the data storage fees to maintain the files throughout the pendency of the litigation.

  The Default Standard is clear. "Absent a showing by the requesting party" (1) "[d]eleted, slack, fragmented, or other data only accessible by forensics"; (2) "Random access memory

The Honorable Sherry R. Fallon
July 18, 2025
Page 2

(RAM), temporary files, or other ephemeral data that are difficult to preserve without disabling the operating system"; and "[s]erver, system or network logs" "need not be preserved." (Default Standard ¶ (c)(ii); Default Standard, Schedule A ¶¶ 1, 2, and 11.) Belvac's letter makes no effort to establish good cause exists to force Adonis to attempt to preserve "[d]eleted, slack, fragmented, or other data only accessible by forensics," "other ephemeral data that are difficult to preserve without disabling the operating system," "server logs," or "network logs." The only place these terms appear in the Belvac's letter is in the block quotation of the language it proposes be included in the ESI Protocol. (*See generally* D.I. 68.) These are undisputedly broad categories, and yet Belvac offers no examples of data it contends actually exist—or would be created as a result of Adonis's use of the equipment at issue—that would fall into these categories or evidence copyright infringement.[1] (*Id.*)

Instead, Belvac readily admits that of the broad categories it "pulled directly from Schedule A of the Default Order, RAM data, other temporary files, and system logs are likely the most critical[2] to this case." (D.I. 68 at n.2.) It also expressly premises its showing of good cause on requiring only preservation of this narrower subset of data under specifically defined circumstances:

> Belvac's proposal requires the preservation of **RAM, temporary file, and log information** only if it evidences an infringing act by Adonis **under one of the known-to-Adonis scenarios** in which reproduction occurs, thus carefully balancing the probative value of the evidence against any possible, though yet to be articulated, burden on Adonis. This is precisely the type of "good cause" for preservation that the Default Standard contemplates as an exception to the nonpreservation default.

---

[1] Nor do Belvac's cases support indiscriminately adopting such broad language. The parties and courts in those cases specifically defined the data to be preserved, unlike Belvac. In *Columbia Pictures*, the court ordered preservation of the following log data residing in RAM of Defendant's web servers: "(a) the IP addresses of users of defendants' website who request 'dot-torrent' files; (b) the requests for 'dot-torrent files'; and (c) the dates and times of such requests (collectively 'Server Log Data')." *Columbia Pictures Indus. v. Bunnell*, 2007 WL 2080419, at **1, 7, 14 (C.D. Cal. May 29, 2007). In *Arista Records*, the "Usage Data" at issue was defined as "'pre-existing records from Defendants' computer servers reflecting actual requests by Defendants' paid subscribers to download and upload digital music files using Defendants' service." *Arista Records LLC v. Usenet.com, Inc.*, 608 F. Supp 2d 409, 416, 433 (S.D.N.Y. 2009). Unlike Belvac's vague proposed language, the delineated data in these cases illustrate example exceptions to the non-preservation default.

[2] Adonis does not agree that any of the ESI Belvac seeks to force Adonis to preserve is "critical" to this case. It is Adonis's position that Belvac's request would only force Adonis to undertake expensive and resource-consuming preservation efforts to maintain "evidence" that would be more efficiently and easily addressed by expert analysis and testimony regarding how the Software works and whether its operation will result in copies being made in RAM for a more than transitory period of time.

The Honorable Sherry R. Fallon
July 18, 2025
Page 3

(*Id.* at 2 (emphasis added; original emphasis removed); *see also id.* at 3 ("[B]ecause Belvac has detailed for Adonis the scenarios in which reproduction occurs, Adonis need ***only*** perform real-time retention when it is conducting one of the enumerated reproductive acts." (emphasis added)).) Belvac goes on to define the "known-to-Adonis scenarios" as being "each time Adonis powers on or reboots the Belvac Equipment," "whenever [Adonis's] personnel access the PLC Software through an external device for any purpose," and "each time the industrial PC [on which the IMS Software resides] is powered on or rebooted." (*Id.* at 3.)

Based on Belvac's own arguments regarding "good cause," the language it proposes is not justified. The starting point for any preservation provision should, therefore, be no broader than requiring preservation of: RAM data, temporary files, and system logs located in, as applicable, the Belvac Equipment PLCs, external devices used to access the PLC Software, and/or the industrial PC on which the IMS Software resides when, and only when, Adonis powers on or reboots the Belvac Equipment, Adonis personnel access the PLC Software through an external device, or Adonis powers on or reboots the industrial PC on which the IMS Software resides.

As Belvac acknowledges, however, determining whether Belvac has shown "good cause" to deviate from the Default Standard should include a consideration of the burden on Adonis of having to preserve ESI that is not customarily preserved under the Default Standard. Contrary to Belvac's speculation, Adonis has consulted with both its internal IT personnel and the external document collection vendor it has engaged for this litigation on whether what Belvac seeks is possible and, if so, what kind of burden compliance would place on Adonis.

As an initial matter, Belvac's reference to "real-time" capture of RAM is somewhat misleading. After investigation, the only programs Adonis has been able to identify, including those listed in Belvac's letter (except The Volatility Framework, which is used to analyze RAM rather than to preserve it), create a snapshot at the time the capture is initiated. This snapshot would not be a continuous capture of RAM over time.

With respect to the PLCs, the tools suggested by Belvac, as well as those known to Adonis, work on machines using common operating systems like Windows or Linux. The PLCs in the equipment utilize an operating system that is proprietary to Rockwell. (*See* Ex. 1 (Declaration of Danny Walker) ¶ 5.) Adonis is not aware of any tool that would allow it to capture a snapshot of RAM in the Rockwell PLCs.[3] (*Id.*) Similarly, while the PLCs create basic logs, to Adonis's knowledge those logs do not contain the information Belvac purports to seek. (*Id.* ¶ 7.) The program discussed below could be used to capture this data. (*Id.*) Finally, the PLCs do not create temporary files like normal computers do, therefore, to Adonis's knowledge there would be no ESI in this category to be preserved on the PLCs. (*Id.* ¶ 6.)

---

[3] Belvac implicitly acknowledges this fact in its letter as it only suggests The Volatility Framework, Magnet RAM Capture, and Forensic Toolkit for use with "the RAM on the external devices (e.g., laptops) that Adonis uses to access the PLC Software and the RAM on the industrial PC that houses the IMS Software." (D.I. 68 at 3.)

The Honorable Sherry R. Fallon
July 18, 2025
Page 4

With respect to external devices connected to the PLCs and the industrial PC on which the IMS software is housed, given the events Belvac has identified to trigger a preservation requirement, Adonis does not believe that it is feasible to involve the external document collection vendor to create the captures Belvac seeks, because it would cause significant delays to Adonis's production activities to need to contact an external vendor any time the equipment needs to be rebooted, serviced, or otherwise accessed via an external device. Nor does Adonis currently have the software necessary to create captures of RAM in those computers. Thus, in order to comply with a preservation requirement, Adonis will need to acquire and implement software, which Adonis IT personnel estimate would cost from $40,000 to over $200,000, depending on whether Adonis is required only to make best efforts to preserve the information or is required to create a system in which no one can connect an external device to the PLCs without going through the preservation software first. (*Id.* ¶¶ 8-9.) Based on prior experience, fully implementing such a system—including staff training—will take between 8 and 20 weeks, again depending on how stringent a preservation requirement is implemented. (*Id.*)

Finally, every time a triggering event occurs and Adonis is required to create a capture of an external device's RAM, it will be creating a 16GB file. (*Id.* ¶ 10.) Adonis will have to maintain such a capture in its own files throughout the pendency of this litigation. Depending on the frequency of triggering events, Adonis may have to purchase secure cloud storage or additional onsite digital storage to maintain this data through the litigation. (*Id.* ¶ 11.)

For the above reasons, the burden on Adonis of complying with any additional preservation requirement would vastly outweigh any benefit to Belvac from obtaining this information, and the Court should decline to add any additional preservation provision to the ESI Protocol that is otherwise agreed between the parties.

To the extent the Court finds some additional preservation provision is justified, Adonis respectfully requests that any such provision be limited to requiring Adonis to take reasonable steps to preserve RAM data, temporary files, and system logs to the extent such data exists in and can be captured from the Belvac Equipment PLCs, external devices used to access the PLC Software, and/or the industrial PC on which the IMS Software resides when, and only when, Adonis personnel access the PLC Software through an external device and Adonis powers on or reboots the industrial PC on which the IMS Software resides. Adonis also asks that the Court order Belvac to pay for the software and storage costs needed to comply with its preservation request.

Respectfully,

*/s/ Kelly E. Farnan*

Attachment

Kelly E. Farnan (#4395)

cc: All Counsel of Record (w/e) (By E-mail)

RLF1 32572319v.1